# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARSH USA LLC,

                Plaintiff,

      v.

MICHAEL PARRISH, GISELLE LUGONES, ROBERT LYNN, and JULIE LAYTON,

              Defendants.

**Civil Action No**. 25-cv-6208

**JURY TRIAL DEMANDED**

## COMPLAINT

1.     Plaintiff Marsh USA LLC ("Marsh"), by and through its undersigned counsel, files this Complaint against Defendants Michael Parrish, Giselle Lugones, Robert Lynn, and Julie Layton, and alleges as follows:

### INTRODUCTION

2.     This action arises from a coordinated and concealed scheme by the Defendants to lift out nearly an entire region of employees from Marsh for the benefit of a direct competitor in violation of their clear and enforceable contractual commitments. The Defendants executed this methodical raid, resulting in the near simultaneous departure of over 100 employees of Marsh and its affiliates as well as a growing number of Marsh's clients. The Defendants are the masterminds of this scheme. Each of them was a top leader of Marsh's Florida region (known as the "Florida Zone"). Yet even as they were employed and highly compensated by Marsh and owed their employer a duty of loyalty, the Defendants surreptitiously and under cover of darkness laid the groundwork to create overnight a U.S. business for a Marsh competitor—Howden US Services,

LLC—that until that moment had essentially no U.S. operations.

3.    The scheme hatched originally in the Spring of 2025.  Howden had been in talks to lawfully acquire Risk Strategies, another large U.S. insurance broker.  But as those talks broke down and Howden turned to plan B: enter the U.S. market by poaching employees and clients from the top of the market—Marsh and its affiliates.

4.    In Spring 2025, on information and belief, Howden and the head of Marsh's Florida Zone Michael Parrish devised a plan to open new U.S. offices for Howden where Parrish would serve as the CEO of this new U.S. business.  Rather than invest their own time and resources to develop this new office, on information and belief, Parrish and Howden decided to simply lift out Marsh's employees, including a majority of the employees in Marsh's Florida Zone, along with Marsh's clients and goodwill, without any of the requisite acquisition costs.  To receive the in-coming employees and clients, in March 2025, Howden incorporated at least two new LLCs under Delaware law: Howden US Services, LLC and Howden US Specialty, LLC.

5.    On information and belief, to pull off this lift out, Parrish brought into the scheme his direct reports and key Florida Zone leaders, Defendants Lugones, Lynn and Layton.  On infor-mation and belief, Parrish and his lieutenants then worked covertly over many months, all while being handsomely compensated by Marsh, to aggressively solicit Marsh's employees to join them at Howden, using Marsh's confidential information.  The Defendants' scheme culminated on July 21, 2025 when they all gave notice of their resignation to Marsh.  A flood of coordinated resigna-tions followed from Marsh employees (the "Departing Employees")—totaling approximately 90 resignations by the end of the day in Marsh alone.  This included the vast majority of the employees in Marsh's Florida Zone, who resigned *en masse*.  In some groups, every single employee resigned.

On information and belief, none of these employees applied for, submitted a resume to, or interviewed with Howden. Their job offers arrived without them even lifting a finger. That could not have happened if the Defendants—the Florida Zone leaders—had not provided the Departing Employees' information to Howden and directly or indirectly solicited them to join Howden's new, upstart U.S. business.

6.    And the raid did not stop with Marsh's employees. On information and belief, the Defendants simultaneously laid the seeds to unlawfully solicit Marsh's clients to move to Howden, too. Within hours of the mass resignations, Marsh clients began notifying Marsh that they would be moving their business from Marsh to a competitor, even though, on information and belief, no employees would begin with Howden until August 1, 2025. Each of those clients had previously been serviced by one of the Defendants. To date, at least eight major Marsh clients have moved to Howden—resulting in millions of dollars in lost revenue.

7.    Through this unlawful raid, the Defendants have sought to unfairly benefit themselves and Howden. In doing so, the Defendants have violated numerous obligations to Marsh, including, but not limited to, their agreements not to directly or indirectly solicit certain employees or clients of Marsh, to not disclose or unlawfully use Marsh's confidential information, and to comply with their duties of loyalty.

8.    The Defendants' unlawful actions have forced Marsh to commence this action to stop their ongoing misconduct and to remedy the harm they have already inflicted and are continuing to inflict on Marsh. The facts are egregious and clear cut: Marsh invested years and millions of dollars to build its specialized retail brokerage business in Florida. By contrast, Howden had, until this year, invested nothing. As of the morning of July 21, 2025, Howden did not have any significant presence in the U.S. retail broking market—no office, no employees and no clients.

That changed in a matter of hours when Defendants executed their scheme to help Howden create out of thin air a full-service U.S. retail brokerage business, with over 90 employees and numerous clients from Marsh.

9.    The Defendants aren't done yet: Howden and the Defendants did not intend to hire over 90 Marsh employees to work for a new Howden entity that had no clients, resources, or imprint of its own.  Instead, the expectation was that the Departing Employees would bring Marsh clients with them to Howden.  That is exactly what has happened.

10.    Starting the day of the resignations (July 21, 2025), at least eight major Marsh clients previously serviced by the Defendants have so far moved from Marsh to Howden.  The departure of such a significant volume of major clients in tandem is not coincidental—let alone from the established Marsh to an entirely new U.S. brokerage business at Howden.  Before July 21, Howden's U.S. business didn't exist—and Howden had no team to service any of these clients.  None of those clients could have moved to Howden without unlawful assurances by the Defendants that there would be a team of Marsh employees at Howden ready, willing, and able to service their accounts there.  Simply put, the rapid movement of clients immediately following the resignation of over 90 Marsh employees could not have happened but for the Defendants' active and unlawful solicitation.

11.    For over 150 years, Marsh has created a gold-standard insurance business that is the envy of upstart competitors like Howden.  Working in concert with Howden, the Defendants have run roughshod over their contractual and legal obligations—flagrantly disregarding contractual provisions they knowingly and freely agreed to and that should have protected Marsh from just this type of scheme.  The Defendants have inflicted, and continue to inflict, substantial damages and irreparable harm on Marsh, as they continue to poach growing numbers of employees

and clients to leave Marsh for Howden.  And they flatly refuse to provide assurances that they will honor their commitments to Marsh. Marsh therefore seeks injunctive and declaratory relief to stop the Defendants' ongoing unfair competition and contractual and common law breaches, and money damages for the harm inflicted on Marsh.

## PARTIES

12.    **Marsh**.  Marsh USA LLC is a single-member limited liability company whose sole member is incorporated in Delaware with its principal place of business in New York.  Marsh USA LLC and its sole member are both, therefore, citizens of Delaware and New York.  Marsh's headquarters is located at 1166 Avenue of the Americas, New York, New York 10036.

13.    **Parrish**.  Defendant Michael Parrish is employed by Marsh as the Florida Zone Leader based out of Marsh's Miami, Florida office.  On information and belief, Parrish is domiciled in and a citizen of Florida.

14.    Parrish was highly compensated through his: (1) base salary, (2) incentive compensation; (3) equity awards and other incentives.

15.    As Florida Zone Leader, Parrish has access to Marsh's highly confidential and proprietary information, including: financial and business information related to Marsh and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed over time and at considerable expense, including valuable non-public and historic information; information regarding the cost and revenue structure of client accounts and placements; information regarding client account renewal schedules and non-public client needs and preferences; proprietary analytical tools and models; and personnel information regarding Florida Zone employees' salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

16.     In exchange for certain of his significant compensation, Parrish had access to Marsh's highly confidential and proprietary information, and as a condition of his employment and in exchange for his continued employment with Marsh, Parrish executed binding contracts. They include, among other things, non-competition covenants, client and employee non-solicitation covenants and confidentiality covenants.  Specifically, on June 13, 2021 Parrish, represented by counsel, knowingly and willingly negotiated and executed a total of five agreements containing binding covenants related to his employment: (1) an offer letter (Parrish Offer); (2) the "Marsh USA Inc. Non-Competition and Non-Solicitation Agreement" (Parrish NCA/NSA); (3) the "Marsh USA Inc. Confidentiality Agreement" (Parrish CA); (4) the "Supplemental Terms and Conditions of Employment Agreement" (Parrish STE); and (5) the "Sign-On Bonus Agreement" (Parrish SBA).

17.     **Lugones**.  Defendant Giselle Lugones is employed by Marsh as a Sales Leader in its Florida Zone based out of Marsh's Miami, Florida office.  Lugones is head of the Florida Zone's specialty healthcare group.  On information and belief, Lugones is domiciled in and a citizen of Florida.

18.     Lugones was highly compensated through her: (1) base salary, (2) incentive compensation; (3) equity awards and other incentives.

19.     As Sales Leader and healthcare group head, Lugones has access to Marsh's highly confidential and proprietary information, including: financial and business information related to Marsh and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed over time and at considerable expense, including valuable non-public and historic information; information regarding the cost and revenue structure of client accounts and placements; information regarding client account

renewal schedules and non-public client needs and preferences; proprietary analytical tools and models; and personnel information regarding her team's employees' salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

20.     Lugones executed binding agreements in connection with and in exchange for her continued Marsh employment and in return for handsome compensation and other benefits.  Lugones was represented by counsel and negotiated these agreements.  The contracts include non-competition covenants, client and employee non-solicitation covenants, and confidentiality covenants.  Specifically, on June 9, 2021 Lugones executed a total of six agreements containing binding covenants: (1) an offer letter ("Lugones Offer"); (2) the "Marsh USA Inc. Non-Competition and Non-Solicitation Agreement" ("Lugones NCA/NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Lugones CA"); (4) the "Supplemental Terms and Conditions of Employment Agreement" ("Lugones STE"); (5) the "Joining Bonus Agreement" ("Lugones JBA"); and (6) the "Sign-On Bonus Agreement" ("Lugones SBA").

21.     **Lynn**.  Defendant Robert Lynn is employed by Marsh as a Regional Sales Leader in the Florida Zone and based out of Marsh's Miami, Florida office.  On information and belief, Lynn is domiciled in and a citizen of Florida.

22.     Lynn was highly compensated through his: (1) base salary, (2) incentive compensation; (3) equity awards and other incentives.

23.     As a Regional Sales Leader, Lynn has access to Marsh's highly confidential and proprietary information, including: financial and business information related to Marsh and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed over time and at considerable expense, including valuable non-public and historic information; information regarding the cost and revenue

structure of client accounts and placements; information regarding client account renewal schedules and non-public client needs and preferences; proprietary analytical tools and models; and personnel information for his team, including their salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

24.    Lynn executed binding agreements in connection with and in exchange for his continued employment, which included, inter alia, non-competition covenants, client and employee non-solicitation covenants, and confidentiality covenants. On information and belief, Lynn was represented by counsel and negotiated these contracts. Specifically, on June 10, 2021, Lynn executed a total of five agreements containing binding covenants: (1) an offer letter ("Lynn Offer"); (2) the "Marsh USA Inc. Non-Competition and Non-Solicitation Agreement" ("Lynn NCA/NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Lynn CA"); (4) the "Supplemental Terms and Conditions of Employment Agreement" ("Lynn STE"); and (5) the "Florida Leadership Bonus Terms" ("Lynn FLBTA").

25.    **Layton**. Defendant Julie Layton was employed by Marsh as a Risk Management Segment Leader in its Florida Zone and was based out of Marsh's Miami, Florida office. On information and belief, Layton is domiciled in and a citizen of Florida.

26.    Layton was highly compensated through her: (1) base salary, (2) incentive award payments, and (3) equity awards and other incentives.

27.    As a Risk Management Segment Leader, Layton has access to Marsh's highly confidential and proprietary information, including: financial and business information related to Marsh and the Florida Zone; strategic plans; non-public and commercially valuable client information; databases compiling client and prospect information developed over time and at considerable expense, including valuable non-public and historic information; information regarding the

cost and revenue structure of client accounts and placements; information regarding client account renewal schedules and non-public client needs and preferences; proprietary analytical tools and models; and personnel information for her team, including their salaries, bonuses, benefits, skills, qualifications, abilities, key relationships, and team structures.

28.    Layton executed binding agreements in connection with and in exchange for her continued Marsh employment.  On information and belief, Layton was represented by counsel and negotiated these contracts.  These agreements include client and employee non-solicitation covenants and non-disclosure provisions.  Specifically, on June 11, 2021 Layton executed a total of five agreements containing binding covenants: (1) an offer letter ("Layton Offer"); (2) the "Non-Solicitation Agreement" ("Layton NSA"); (3) the "Marsh USA Inc. Confidentiality Agreement" ("Layton CA"); (4) the "Supplemental Terms and Conditions of Employment Agreement" ("Layton STE"); and (5) the "Sign-On Bonus Agreement" ("Layton SBA").

## JURISDICTION AND VENUE

29.    The Court has jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.  Marsh is a citizen of Delaware and New York.  Each of the Defendants is, on information and belief, domiciled in Florida and therefore a citizen of Florida.

30.    By signing and accepting the terms of various binding agreements, along with accepting the significant benefits those agreements conferred, each Defendant expressly agreed to this Court's exercise of jurisdiction over this action and of personal jurisdiction over them.  Those agreements include the NCA/NSAs (Parrish, Lugones, and Lynn) or NSA (Layton) which provide at § 12: "[A]ny action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District

Court for the Southern District of New York, or in any other court of competent jurisdiction in or for the State and County of New York, and the parties agree to the personal jurisdiction thereof."

31.     There is a reasonable basis for the parties' choice of this forum in the Marsh USA Inc. Non-Competition and Non-Solicitation Agreement and other agreements each Defendant made with Marsh because each respective Defendant's specific agreements were negotiated in Marsh's headquarters, located at 1166 Avenue of the Americas, New York, New York 10036. The choice of forum is also reasonable based on Marsh's substantial contacts with New York. Many of Marsh's employees in the Florida Zone, including the Defendants, work closely with employees in Marsh's New York office and serve New York clients. At least two Marsh employees the Defendants unlawfully solicited are based in New York.

32.     This Court also has specific personal jurisdiction over each of the Defendants because they regularly conduct business in the State of New York, including with Marsh, which maintains its primary place of business in New York. On information and belief, each Defendant regularly transacts business with clients in New York and has traveled to New York for business, including to meet with clients, prospects, and Marsh's leadership. Lynn directly supervises at least one New York-based employee. Layton and Parrish work closely with New York-based employees. On information and belief, Parrish has traveled to New York to meet with his direct supervisor and to attend internal Marsh business meetings and client meetings.

33.     Venue is proper in this District because each Individual Defendant expressly agreed by signing their respective covenants that in "any action or proceeding with respect to" that covenant or their employment, they "waive[d] any objection . . . to the laying of venue of any such action in" the court(s) prescribed by that agreement.

34.     Venue is also proper in this District because Marsh maintains its principal place of

business in this District and a substantial part of the events or omissions giving rise to Marsh's claims occurred here: (1) the contracts that Defendants are breaching were negotiated in New York; (2) Defendants owed duties to their New York-based employer; (3) Marsh learned of the breaches in New York; (4) Marsh was harmed and continues to face the risk of additional immediate harm in New York as it deals with the operational and financial impact of the resignations; and (5) Marsh maintains some of the Confidential Information and Trade Secrets (as defined in Schedule 1 to the Marsh USA Confidentiality Agreement, hereinafter the "Confidential Information") relevant to its claims in this action in New York—including business records that form a basis for Marsh's claims.

## FACTUAL BACKGROUND

I.    **Marsh builds an industry-leading platform with decades of hard work and significant investments in its employees and confidential/proprietary insights and information.**

35.    Founded in 1871, Marsh is a leading insurance brokerage and risk management firm.  Marsh provides an array of services for its clients, including insurance broking, consulting, and claims advocacy services.  Marsh has built a comprehensive platform that allows it to service clients in every segment of the risk-management marketplace, including the largest, most complex accounts in specialized industries like healthcare, energy, construction, marine, and real estate.  Successfully serving these complex specialty accounts requires expertise and relationships that take years to develop.  Marsh has put in those years of work growing and investing in talented teams to serve these complex accounts, which are critical to Marsh's business and can be highly profitable.

36.    Marsh organizes its business by geographic regions or "Zones."  Defendants work in Marsh's Florida Zone.  Employees in the Florida Zone, as in other Marsh Zones, offer products and services including risk analysis, insurance program design and placement, insurance program

support and administration, claims support and advocacy, alternative risk strategies and a wide array of risk analysis and risk management consulting services.  The Florida Zone's clients benefit from Marsh's advanced analytics, deep technical expertise, specialty and industry knowledge, close collaboration across Marsh's global network and the ability to develop innovative solutions and products.  The Florida Zone, like other Marsh Zones, provides services to clients of all sizes, including large multinational companies ("Risk Management"), high growth middle-market businesses ("Corporate"), small commercial enterprises and high net-worth private clients, and affinity group members ("Commercial & Consumer").  Marsh's segments are designed to build stronger value propositions and operating models to optimize solutions and services for clients depending on their needs.

37.    Florida Zone employees produced and managed client accounts generating over significant revenue.

## II.    Marsh trained the Departing Employees, including the Defendants, and granted them access to Marsh's Confidential Information.

38.    Over the past several years, Marsh has invested significant time, millions of dollars, and goodwill to build the Florida Zone into a market leader and to develop and train Florida Zone employees.

39.    Prior to Howden's July 2025 raid, more than 100 Marsh employees worked in Marsh's Florida Zone, under Parrish's leadership.  Florida Zone employees were the majority of Marsh's Florida workforce.

40.    Parrish joined Marsh in 2021 and is Marsh's Florida Zone Leader.  As Zone Leader, Parrish is the head of all employees who work in Marsh's Florida Zone.  Parrish is also a member of the Marsh USA and Canada executive team.  Parrish directly supervises the Florida Zone's senior leaders, including all of the other Defendants: Lugones (Sales Leader for the healthcare

team), Lynn (Regional Sales Leader), and Layton (Risk Management Segment Leader). Parrish gave his notice of resignation to Marsh on July 21, 2025, and he is obligated to remain a Marsh employee until September 19, 2025, when his contractual notice period ends.

41.    As head of the Florida Zone, Parrish holds a position of influence and trust within Marsh with accompanying responsibilities. He leads the Zone's overall operations and direction, setting the direction for and impacting all of its more than 100 employees. He has extensive management responsibilities and is involved in some capacity in all of the Florida Zone's business initiatives and client relationships. He also supervises and works closely with many Marsh employees. Parrish has ultimate responsibility for virtually all the Florida Zone employees. Parrish also has significant, daily interactions with Marsh clients and potential clients.

42.    Lynn joined Marsh in 2021 and is currently a Regional Sales Leader in the Florida Zone, reporting to Parrish. Lynn gave his notice of resignation to Marsh on July 21, 2025, and he is obligated to remain a Marsh employee until September 19, 2025, when his contractual notice period ends.

43.    As Regional Sales Leader, Lynn supervises a team that—prior to the raid—employed 19 Sales and Account Executives. Sales Executives are responsible for negotiating, selling and managing relationships with new and existing clients. Their job is focused on developing prospects and building relationships to bring in and keep business. Account Executives are responsible for servicing existing client accounts.

44.    Layton joined Marsh in 2021 and was the Risk Management Segment Leader in the Florida Zone, reporting to Parrish. Layton gave her notice of resignation to Marsh on July 21, 2025, effective immediately.

45.    As Risk Management Segment Leader, Layton supervised a team that—prior to the

raid—employed 16 Client Service Executive Associates, Client Service Representatives, and Account Representatives. These positions are members of the Client Service Team with varying degrees of seniority. Client Service Executive Associates are responsible for retention of existing business and the development of business within those assigned accounts, work with the rest of the team to meet client needs, and may regularly meet with clients to ensure a high level of service. Client Service Representatives are associates who manage insurance programs, execute policy changes, update client information, facilitate collaboration, and work with the servicing team.

46.    Lugones joined Marsh in 2021 and is the Sales Leader for the healthcare team in the Florida Zone, reporting to Parrish. Lugones gave her notice of resignation to Marsh on July 21, 2025, and she is obligated to remain a Marsh employee until September 19, 2025, when her contractual notice period ends.

47.    As Sales Leader for the healthcare team, Lugones supervises a team that—prior to the raid—consisted of 24 employees. As in many of Marsh's specialty groups, the team is a largely self-contained unit within the Florida Zone, whose knowledgeable team members handle the full client account life-cycle for healthcare clients, from client development and account retention (sales), to account services including placement of policies, account management, and client service.

48.    Florida Zone employees leveraged Marsh's domestic and international talent to customize global solutions for their clients, including Marsh's unique market relationships with insurance carriers. They utilized Marsh's technology solutions to enhance client servicing capabilities and efficiencies. Marsh invested heavily in the Florida Zone. Marsh provided significant resources to enable to Florida Zone to attract top talent and clients, by growing production and client servicing capabilities, building out new office space and building the Florida Zone's brand

recognition in key markets.  Florida Zone employees also benefit from extensive training, client development resources, and cross-selling opportunities provided to them by Marsh.

49.     Florida Zone employees are provided with Marsh's Confidential Information (as defined in their agreements) to conduct their business on Marsh's behalf, including information about current clients, prospective clients, growth opportunities, pricing, and terms and conditions of contracts with clients, such as renewal timelines and policy terms.  Florida Zone employees in senior leadership roles like those held by the Defendants also have intimate knowledge of Confidential personnel information concerning Marsh's workforce, including employees' relative strengths and areas of expertise, salaries, specific job tasks and account assignments, relationships with current or potential clients, and Marsh's recruitment and hiring efforts, plans, and strategies.

50.     All of the Departing Employees had access to some or all of Marsh's Confidential Information.  As senior leaders, Defendants have access at the highest levels to the Florida Zone's most sensitive Confidential Information, including Confidential Information related to Marsh's strategic business initiatives outside of the Florida Zone.

51.     Marsh protects its Confidential Information, including by requiring employees in the Florida Zone to execute Confidentiality Agreements that define Marsh's Confidential Information (which also includes clients' confidential information) and describe employees' obligations to safeguard it.

52.     This commercially sensitive Confidential Information is vital to the Florida Zone's collective success and its employees' individual success, as information about prospective clients, competitive pricing, and growth opportunities are of paramount importance in this highly competitive industry.  Such detailed, proprietary information provides Marsh and its employees with significant competitive advantages.  Marsh went to great lengths at enormous expense to collect and

refine this information to benefit its business relative to its competitors, giving it a strong competitive advantage. And this information is not generally known to the public or readily ascertainable.

### III. Marsh protected its legitimate business interests with reasonable restrictive covenants that each Defendant freely and voluntarily entered.

53.    As key senior leaders in Marsh's Florida Zone each of the Defendants executed multiple binding agreements with Marsh.

54.    Each of the Defendants was a sophisticated party who had opportunity to negotiate the agreements and was encouraged to seek the advice of counsel before entering each of these binding agreements. On information and belief, each of the Defendants actually did negotiate their agreements with Marsh's New York leadership—and was represented by counsel during those arms'-length negotiations with Marsh. Each Defendant voluntarily signed and executed the agreements, and received handsome compensation and other benefits pursuant to them.

**Offer Letters.**

55.    Each of the Defendants executed an Offer Letter when they joined Marsh in 2021.

56.    Relevant to this action, Parrish, Lugones, and Lynn's Offer Letters each provide that:

> *You agree that you will provide 60 days' prior written notice (the "Notice Period") to your manager of your intention to terminate your employment with the Company (whether by retirement or other voluntary termination). Throughout the Notice Period, the Company will have the obligation to pay you your base salary and to provide benefits on the same basis as other employees. Upon receipt of such notice, the Company will have no obligation to pay you any unearned incentive compensation. You understand and agree that you will remain obligated to perform any or all of your regular job duties requested by the Company during this Notice Period. Moreover, throughout this Notice Period, you will remain an employee of the Company with all attendant fiduciary duties including, without limitation, your duties of loyalty and confidentiality to the Company.*

57.    Under the terms of their respective Offer Letters, after tendering their resignations, Parrish, Lugones, and Lynn are each subject to a contractual notice period to remain employees of

Marsh for up to 60 days following their resignations.

58.     Each of the Defendants tendered their individual resignation to Marsh on July 21, 2025.

59.     Based on each Defendants' individual tender of resignation on July 21, 2025, Parrish, Lugones, and Lynn's respective notice periods end on September 19, 2025. Their employment with Marsh will terminate as of that date.

60.     Marsh is continuing to pay each of the Defendants' compensation during this period.

61.     During this period, Defendants remain Marsh employees and continue to be bound by their fiduciary duties and duty of loyalty to Marsh.

62.     The Offer Letters show that each Defendant was highly compensated for their employment at Marsh, receiving significant salaries, bonuses and special awards, and other customized compensation.

**Supplemental Terms and Conditions of Employment.**

63.     Each of the Defendants executed a Supplemental Terms and Conditions of Employment ("STE") agreement when they joined Marsh in 2021.

64.     Relevant to this action, the Parrish, Lugones, and Lynn STEs provide that:

*The Offer Letter and these Terms & Conditions will be governed by and construed in accordance with the laws of the State of New York, without reference to principles of conflict of laws. Any disputes under the Offer Letter and these Terms & Conditions or any action for enforcement of the Offer Letter and these Terms & Conditions may be enforced in any federal or state court located in the County of New York. By my acceptance of the Offer Letter, I consent to the jurisdiction of such courts. The Offer Letter and these Terms & Conditions may not be amended or modified other than by a written agreement executed by an authorized employee of the Firm and me.*

65.     The Layton STE includes an almost-identical choice of law and venue provision:

*Governing Law; Amendments*

*The Offer Letter and these Terms & Conditions will be governed by and construed in accordance with the laws of the State of New York, without reference to principles of conflict of laws. Any disputes under the Offer Letter and these Terms & Conditions or any action for enforcement of the Offer Letter and these Terms & Conditions will be brought in any federal or state court located in the County of New York, New York, and such courts will have exclusive jurisdiction over any such dispute or action. By my acceptance of the Offer Letter, I agree to submit to the jurisdiction of such courts. The Offer Letter and these Terms & Conditions may not be amended or modified other than by a written agreement executed by an authorized employee of the Firm and me.*

66.    Under the terms of their respective STEs, each Defendant expressly agreed that New York law would govern these agreements without reference to principles of conflict of laws and that actions must be brought in New York.

67.    Under the terms of their respective STEs, each Defendant expressly consented to the personal jurisdiction of this Court and agreed not to challenge venue.

**Non-Competition/Non-Solicitation Agreement.**

68.    Parrish, Lugones, and Lynn each executed a Non-Competition and Non-Solicitation (NCA/NSA) Agreement when they joined Marsh in 2021.

69.    Layton executed a Non-Solicitation (NSA) Agreement when she joined Marsh in 2021.

70.    Each NCA/NSA states that it applies to employees of Marsh USA, Inc. and its subsidiaries.  Marsh USA, LLC is a subsidiary of Marsh USA, Inc. for purposes of this agreement.

71.    The NCA/NSA signed by Parrish, Lugones, and Lynn are substantially similar to each other in whole and identical in all provisions relevant to this action.

72.    Relevant to this action, each Defendant's NCA/NSA includes provisions (1) incorporating that Defendant's Confidentiality Agreement by reference; (2) prohibiting each Defendant from directly and indirectly soliciting certain of Marsh's employees or customers during their employment and for a 12-month restricted period following termination of that employment; and (3)

agreeing that lawsuits with respect to the Agreement or the Defendant's employment must be brought in New York Courts (applying New York law):

*1. Marsh USA Inc. Confidentiality Agreement*

*The Marsh USA Inc. Confidentiality Agreement . . . is incorporated herein by reference.*

*2.    Non-Solicitation Of Clients*

*(a)    Employee acknowledges and agrees that solely by reason of employment by the Company, Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto, including those regarding the Company's clients, prospective clients and related information, and will have access to and the benefit of good will developed by Company with its clients.*

*(b) Consequently, Employee covenants and agrees that in the event of separation from employment with the Company, . . . Employee will not, for a period of twelve (12) months following such separation, directly or through others: (i) solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company; (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; (iii) perform or supervise the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or (iv) assist others to do the acts specified in Sections 2(b) (i)-(iii). This restriction shall apply only to those clients or prospective clients of the Company with which Employee had contact or about which Employee obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with the Company or its predecessors. For the purposes of Section 2, the term "contact" means interaction between Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of the Company. For purposes of Section 2, the term "contact" with respect to a "prospective" client means interaction between Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this Section has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information and*

*Trade Secrets to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.*

*3. Non-Solicitation Of Employees*

*Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information and Trade Secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or through others, solicit, or endeavor to cause any employee of the Company with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets, to leave employment with the Company.*

73.    The NCA/NSAs executed by Parrish, Lugones, and Lynn also include the following non-competition, acknowledgment, and equitable relief provisions:

*4.    Non-Competition*

*(a)    Employee acknowledges and agrees that solely by reason of employment by the Company, Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto, including those regarding the Company's clients, prospective clients and related information, and will have access to and the benefit of good will developed by Company with its clients.*

*(b) Consequently, Employee covenants and agrees that in the event of separation from employment with the Company, whether such separation is voluntary or involuntary, Employee will not, for a period of twelve (12) months following such separation, directly or through others; (i) engage, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, contractor, agent, partner, director, officer, volunteer, intern, or any other similar capacity, in selling or providing products or services of the type sold or provided by Employee while employed by the Company; (ii) perform or supervise the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by the Company; or (iii) assist others to do the acts specified in Sections 4(b) (i)-(iii).*

*Employee acknowledges that the Company's business is global and is not limited to the United States and that the restrictions in this Section likewise are not limited geographically.*

. . .

*6. Employee's Acknowledgement*

*Employee hereby expressly acknowledges and agrees that the restrictions and obligations imposed on Employee under Sections I, 2, 3, 4 and 5 are necessary to protect the legitimate business interests of the Company and are reasonable in view of the benefits and consideration Employee has received or will receive from the Company.*

*7. Equitable Relief*

*In recognition of the fact that irreparable injury will result to the Company in the event of a breach by Employee of his or her obligations under Section 1, 2, 3, 4 or 5 of this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, Employee acknowledges, consents and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (a) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by Employee and persons acting for or in connection with Employee and (b) recovery of all reasonable sums and costs, including attorneys' fees, expert witness fees, expenses and costs incurred by the Company in seeking to enforce the provisions of this Agreement.*

74.      The NSA executed by Layton also includes the following acknowledgment, equitable relief, and liquidated damages provisions:

*5. Employee's Acknowledgment*

*Employee hereby expressly acknowledges and agrees that (a) the restrictions and obligations set forth in and imposed by Sections 1, 2, 3 and 4 will not prevent Employee from obtaining gainful employment in Employee's field of expertise or cause Employee undue hardship; and (b) the restrictions and obligations imposed on Employee under Sections 1, 2, 3 and 4 are necessary to protect the legitimate business interests of the Company and are reasonable in view of the benefits and consideration Employee has received or will receive from the Company.*

*6. Equitable Relief*

*In recognition of the fact that irreparable injury will result to the Company in the event of a breach by Employee of his or her obligations under Section 1, 2, 3 or 4 of this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, Employee acknowledges, consents and agrees that in the event of such breach,*

*or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (a) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by Employee and persons acting for or in connection with Employee and (b) recovery of all reasonable sums and costs, including attorneys' fees, expert witness fees, expenses and costs incurred by the Company in seeking to enforce the provisions of this Agreement.*

*7. Liquidated Damages*

*(a) Employee agrees that in the event that Employee breaches the provisions of Section 2 the Company is entitled to recover damages, in addition to any equitable remedies to which it is entitled, even though such damages cannot be readily ascertained and will not make the Company whole or fully remedy the breach. Employee acknowledges that the Company's clients enjoy long term business relationships with the Company and expand their business relationship with the Company over time and that the loss of a client will therefore likely result in the loss of an increasing revenue stream to the Company from that client for a significant but indeterminate period of time into the future, extending beyond the period that Section 2 is in effect. Employee further acknowledges that the loss of a client erodes the goodwill enjoyed by the Company, and that the loss of a client reduces referral opportunities and business from existing clients, including opportunities for the Company to obtain or service business from that client in addition to business from that client that Employee personally obtained or serviced. Employee acknowledges that the Company's acquisition of clients is a result of the Company's investment of time and money in hiring personnel, including Employee, for the purpose of attracting and servicing clients, in developing a technological and business infrastructure, and in otherwise enabling Employee to form and maintain relationships with clients, and acknowledges that a breach of the obligations of Section 2 erodes or reduces the value of the Company's investment in a manner and to an extent which cannot be fully calculated. Employee further acknowledges that a breach of the obligations set forth in Section 2 will force the Company to incur out-of-pocket costs such as increased overhead, increased financial accommodations to clients, increased costs in deploying personnel to attempt to retain clients, and other costs, which cannot be readily allocated or calculated. Employee acknowledges that these and other uncertainties make it difficult to ascertain the amount of damage that the Company will sustain from a breach of Section 2.*

*(b) Recognizing the difficulty of calculating actual damages and acknowledging the factors set forth in Section 7(a), among other factors, in the event of a violation of Section 2 resulting in a client either reducing the amount of business or canceling business with the Company and directing or redirecting such business through Employee or through any entity or person with whom Employee becomes associated, in addition to all other remedies provided herein, Employee agrees to pay the Company an amount equal to the total fees and commissions received by the Company for such business during the two (2) years prior to the breach. Said amount shall*

*be payable to the Company no later than (30) days following Employee's receipt of the Company's written statement of the total fees and commissions for that client for the prior two years. Employee acknowledges and agrees that this amount is a reasonable approximation of the damages likely to occur following a breach of Section 2.*

*(c) The remedy set forth in Section 7(b) shall be in addition to and not in place of such additional remedies as a Court may order, including equitable relief to prevent further breaches or to provide further remedies.*

*(d) This provision shall not affect the damages or other remedies the Company may recover from any other provisions of this Agreement.*

75.     Under the terms of their respective NCA/NSAs or NSA, each Defendant expressly agreed to refrain from *directly or indirectly* soliciting Marsh employees and customers, as defined in the agreement, while employed and for twelve months after the termination of their employment.

76.     Under the terms of their respective NCA/NSAs, Parrish, Lugones, and Lynn agreed to refrain from competing with Marsh as defined in this agreement for 12 months after the termination of their employment.

77.     Under the terms of their respective NCA/NSAs or NSA, each Defendant agreed that New York law governs this agreement and any disputes arising from it, including the present action, and that lawsuits related to the agreement must be filed in New York.

78.     Under the terms of their respective NCA/NSAs or NSA, each Defendant agreed that Marsh would be entitled to equitable relief, including "specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond)."

79.     Under the terms of her NSAs, Layton agreed that Marsh would be entitled to liquidated damages for her breaches of the NSA's non-solicitation provisions.

**Confidentiality Agreement.**

80.     Each of the Defendants executed a Confidentiality Agreement ("CA") when they

joined Marsh in 2021.

81.    Each CA states that it applies to employees of Marsh USA, Inc. and its subsidiaries.

Marsh USA, LLC is a subsidiary of Marsh USA, Inc. for purposes of this agreement.

82.    Each of the Defendants' CAs includes an identical non-disclosure provision and

identically defines the Confidential Information:

> 3.    *Nondisclosure of Confidential Information and Trade Secrets*
>
> *a.    I acknowledge and agree that the Company is engaged in a highly compet-itive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled and acquired by the Company at its great effort and expense. I further acknowledge and agree that any disclosing, divulging, revealing, or using of any of the Confidential Information and Trade Secrets, other than in connection with the Company's business or as specifically authorized by the Company, will be highly detrimental to the Company and cause it to suffer serious loss of business and pecuniary damage. Accordingly, I agree that I will not, while associated with the Company and for so long thereafter as the pertinent information or documen-tation remains confidential, for any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity Confidential Information and Trade Secrets, except as required to carry out my duties as an employee of the Company, and except as expressly authorized by the President or highest executive officer of the Company.*
>
> . . .
>
> 6.    *Miscellaneous*
>
> . . .
>
> *c. Equitable Relief. In recognition of the fact that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Com-pany shall be entitled, in addition to any other legal remedies and damages avail-able, to (i) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threat-ened violation of such obligations by me and persons acting for or in connection with me, and (ii) recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agree-ment.*

. . .

*Schedule 1*

*Definitions*

*(a)      "Confidential Information and Trade Secrets" are items of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees that derive independent economic value, actual or potential, from not being generally known or available to the general public, but have been developed, compiled or acquired by the Company at its effort and expense, and which the Company has made reasonable efforts to protect its confidentiality. Confidential Information and Trade Secrets can be in any form, including but not limited to: verbal, written or machine readable, including electronic files. Trade secrets are items of Confidential Information that meet the requirements of applicable trade secret law.  The absence of any marking or statement that any particular information is Confidential Information or trade secret shall not affect its status as Confidential Information or trade secret.  Confidential Information and Trade Secrets include but are not limited to:*

*(i)      financial and business information relating to the Company, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas;*

*(ii)     product and technical information relating to the Company, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models, and research and development projects;*

*(iii)    client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients;*

*(iv)    personnel information, such as the identity and number of the Company's other employees, their salaries, bonuses, benefits, skills, qualifications, and abilities.*

*(v)     any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling and operating practices;*

*(vi)    any information not included in (i) or (ii) above which I know or should know is subject to a restriction on disclosure or which I know or should know is*

*considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public; . . . .*

83.    Under the terms of their respective CAs, each Defendant agreed that Marsh would be entitled to liquidated damages for their breaches of the CA's provisions, including disclosing Marsh's Confidential Information in violation of the non-disclosure provision.

84.    Under the terms of their respective CAs, each Defendant agreed that Marsh's Confidential Information subject to the CA included personnel information and client information as defined in Schedule 1(a)(iii)-(iv).

**IV.    Parrish, with the other Defendants as his lieutenants, spearheaded an unlawful scheme to lift out *all* of Marsh's Florida Zone employees in anticipation of assuming the role of CEO of the new U.S. operations for Marsh's direct competitor, Howden.**

85.    Howden is based in the United Kingdom and has historically had little presence in the United States—let alone a full-service insurance brokerage business.  Recently, Howden decided to enter the U.S. insurance brokerage market.  By at least January 2025, Howden was in talks to acquire Risk Strategies, a large privately held U.S. insurance broker, as a means to expand into the U.S. retail insurance market.  But by March 2025, the deal was not closed, and Howden abandoned its pursuit of Risk Strategies.

86.    With its plan for a U.S. acquisition off the table, Howden turned to plan B.  This time, rather than investing the time and resources to build a U.S. presence, Howden hatched an unlawful scheme to poach Marsh's employees, clients, Confidential Information, and goodwill.

87.    In March 2025, Howden incorporated at least two new LLCs under Delaware law: Howden US Services, LLC and Howden US Specialty, LLC.  On information and belief, shortly thereafter, Howden enlisted Parrish to serve as the CEO of its newly minted U.S. operations.  On information and belief, Parrish, with Howden's full support, led the effort to move Marsh's entire Florida Zone, as many Marsh clients as possible, and Marsh's business information and goodwill,

unfairly taking from Marsh what Howden was apparently unwilling to buy through acquisition.

88.    On information and belief, Parrish also recruited the key leaders in Marsh's Florida Zone, Defendants Lugones, Lynn and Layton, to help him execute this raid.  Together, Defendants leveraged Confidential Information about Marsh's workforce and business to conduct a coordinated and systematic campaign to recruit employees and clients to join Howden in what they planned to become a raid of unprecedented scale.

89.    Beginning March 2025, Defendants quietly and surreptitiously laid the groundwork to lift out the entire Florida Zone in August 2025, a timeline which was ultimately accelerated to July when the press got wind of the plan.

90.    In a phone call in the Spring of 2025, Parrish told a Marsh employee who reported to him that Parrish would be going to start and run Howden's new United States operation, in direct competition with Marsh.  Parrish told the employee that when this happened, he wanted the employee to leave Marsh and go work for Howden under him as the leader of one of Howden's U.S. specialty groups.

91.    On information and belief, Parrish also directed Defendants and others to collect Marsh employees' personal non-Marsh contact information so that they could communicate with them discretely and so Howden could send offer letters and follow-up recruitment efforts.

92.    On information and belief, Parrish directed his longtime executive assistant, Wilda Godinez, to collect personal email addresses from the employees in the Florida Zone.  Godinez claimed she was collecting personal email addresses to stay in touch with them after her retirement, but on information and belief, she was in fact collecting personal email addresses to funnel to Parrish, who then funneled them to Howden, so that Parrish and Howden could discretely solicit Marsh employees without the risks associated with using Marsh email addresses.

93.    On information and belief, at Parrish's direction, Godinez obtained a Marsh Florida Zone employee's daughter's personal cell phone number at a run-walk event in June 2025 where Marsh employees and their families participated.  The daughter was not a Marsh employee.  After the raid became public, Godinez then called the daughter's personal cell phone and asked the daughter to deliver a message to her mother from "Mr. Parrish" about calling in a "poker chip," or favor.  The employee interpreted Parrish's message as encouraging her to follow him to Howden. Parrish's solicitation of this employee through Godinez violates his fiduciary and contractual agreements with Marsh, including Section 3 of the Marsh USA Inc. Non-Competition and Non-Solicitation Agreement.

94.    On information and belief Layton began laying the groundwork to move her team and the clients they supported from Marsh to Howden long before the resignations occurred.  On June 26, 2025, approximately one month before the raid, Layton created a SharePoint and directed her team to upload key client documents, including the "team chart" (showing the Marsh employees working on the account), the "account financial trackers" (showing the key financial information for the account) and the "schedules of insurance" (showing key events on the account, including renewals).  These documents contained and comprised Marsh's valuable Confidential Information.  Layton had never made any similar request to her team in the past.  On information and belief, Layton was collecting this Confidential Information to unfairly compete and to solicit Marsh's clients.

95.    On information and belief, Defendants funneled Marsh's Confidential Information about their Marsh team's employees and other Marsh colleagues to Howden so it could prepare employment offers for Florida Zone employees to incentivize them to leave Marsh for Howden.

**V.    Defendants lift out more than 90 Marsh employees in a single day, including almost all of Marsh's Florida Zone.**

96.     On July 18, 2025, news of the raid was leaked to the press.  One of Marsh's Miami Florida Zone employees saw an industry report online reporting that Howden planned to open a Miami office.  As a result, the Defendants had to move up their planned raid and immediately spring into action, actively recruiting and pressuring nearly all of the Florida Zone to resign *en masse* from Marsh and move to Howden.

97.     On July 18, 2025, Parrish confirmed to Marsh employees who worked under him in the Florida Zone that he was going to move to Howden, asked Marsh employees to move with him, and connected Marsh employees with Howden so they could receive job offers.  In his recruiting pitch, Parrish even went as far as to tell at least one Marsh employee that "everyone" in the Florida Zone would be leaving Marsh to join Howden.

98.     In a 12-minute phone call with one of his direct reports on that day, Parrish confirmed he was leaving for Howden and solicited his direct report to move to Howden.  The direct report consented to Parrish connecting him with Howden's recruiters.  After that phone call, Parrish instructed Howden and its recruiters to reach out to this employee via his personal cell phone number (which Parrish provided).  Before this conversation with Parrish, no Howden recruiter had called this employee.  But after the phone call with Parrish, this employee received multiple phone calls from Howden recruiters.

99.     Lynn also solicited Marsh employees to move to Howden with the Defendants, even going so far as to use false pretenses to do so.  On July 18, 2025, he called a Marsh colleague to convince her to move to Howden.  To do so, Lynn lied about the future of Marsh's business in Florida.  On that call, Lynn said that "Mike Parrish is probably going to get fired by Marsh."  Lynn told his colleague that if Marsh fires Parrish, Lynn expected to be fired also.  Lynn also told his colleague that she should join them at Howden because Marsh is going to lay off 30 people in

Florida and she will be at risk. Each of these statements was false. Lynn was lying to persuade his Marsh colleague to move to Howden.

100.    Also on July 18, 2025, Lugones held an in-person meeting in Marsh's Miami office with multiple Marsh employees on her team. Every single employee Lugones invited to that meeting resigned from Marsh the next business day. And they left as a group for lunch and never returned. On information and belief, during this meeting, Lugones solicited these employees to join Howden.

101.    On information and belief, the other Defendants likewise spent the day and following weekend soliciting the employees on their teams to resign from Marsh and join Howden.

102.    On the very next business day, Monday, July 21, 2025, resignations from Florida Zone employees began pouring in, including emails from each of the Defendants. Parrish, Lugones and Lynn's resignations triggered 60-day contractual notice periods, during which they must remain employees of Marsh through September 19, 2025, when their employments with Marsh will terminate. Layton resigned effective immediately and, on information and belief, begins employment with Howden on August 1.

103.    Dozens of the Marsh employees who worked under the Defendants (but who, like Layton, did not have contractual notice provisions) followed their leaders and resigned from Marsh effective immediately to accept an offer at Howden. In fact, by the end of the day on July 21, 2025, more than 90 Marsh employees had submitted their resignations or informed Marsh leaders or colleagues that they had offers of employment from Howden and were considering taking them. On information and belief, Howden intended to hire almost all Florida Zone employees.

104.    Defendants continued to solicit Marsh employees on the day of the raid and in the following days. For example, on July 21, 2025, one of Parrish's reports, Clifford Mawn, Senior

Vice President, Florida Zone, who resigned from Marsh to move with Parrish to Howden, called another Marsh employee to convince him to move to Howden.  On this call, Mawn revealed that the Howden team had instructed him to reach out to his Marsh colleague because they had a close relationship with each other as a result of their employment at Marsh together.  Later that evening, Mawn called his Marsh colleague for a second time that day in order to talk more about the potential move to Howden.  Mawn said that his Marsh colleague would be expected to "handle [his] existing book of business and do exactly what [he] [is] doing now" at Marsh.  The Marsh employee understood this to mean that Mawn and Howden expected all of the accounts that he worked on at Marsh to move to Howden.  Also on that call, Mawn asked his Marsh colleague to send his personal email to Mawn so that Mawn could provide it to Howden , and Howden could send an offer to the Marsh employee's personal email.  After the call ended, the Marsh employee sent his personal email address to Mawn.  The next morning, on July 22, 2025, Howden sent this Marsh employee two emails to his personal email address—one email with an offer letter for employment at Howden and a second email with a password to access the offer letter.  These are the only two emails this Marsh employee ever received from Howden.  This Marsh employee had never received any phone calls from Howden or talked to anyone at Howden.  He also had never submitted his resume or any other information to Howden.  This Marsh employee understands that he was given an offer of employment with Howden based on the recommendation of Mawn and other Marsh Florida Zone employees working under Parrish.  On the evening of that same day, July 22, 2025, Mawn sent a series of text messages to this Marsh employee and instructed the Marsh employee to call him to discuss the Howden offer.  On a phone call with this Marsh employee that evening, on July 22, 2025, Mawn told his Marsh colleague that he had to accept the Howden offer

by the next day, July 23, 2025, because Howden is facing an injunction soon and once that injunction goes through, Howden would not be able to hire him.

105.    This carefully calculated raid of nearly all of the Florida Zone was only possible as a result of the Defendants' solicitation efforts and use of Confidential Information about the Departing Employees' terms of employment with Marsh.  Many Marsh employees were given job offers at Howden without applying, submitting a resume or interviewing.  In fact, for many of them, their first interaction with Howden was when they received their offer letter from Howden. The only way Howden could have executed on a raid like this was with Defendants active participation—sharing Marsh's confidential information to Howden and directly or indirectly soliciting them.

106.    The Defendants' misdeeds constitute a clear violation of the contractual obligations the Defendants owe to Marsh.  And the raid is not over.  On information and belief, the Defendants are continuing to solicit current Marsh employees and work against Marsh's efforts to retain these employees, even while the Defendants remain high-ranking Marsh employees and on Marsh's payroll.

107.    The Defendants' scheme to solicit their peers and teams to move *en masse* to Howden was effective.

108.    On information and belief, while employed in a senior role at Marsh, Parrish solicited the vast majority of his 12 direct reports to join him in the move to Howden.  Most of Parrish's direct reports resigned on or soon after July 21, 2025.  On information and belief, the vast majority of Parrish's direct reports are moving to Howden, depriving Marsh of valuable expertise and goodwill.  On information and belief, while still a Marsh employee who owed contractual and fiduciary duties to Marsh, Lugones solicited all her direct reports to move to Howden, including Alexander

Lloyd-Baker (a healthcare practice leader who had transferred from the UK to the Miami office), and Alfred Gronovius (Managing Director of Marsh's Healthcare Practice).  On information and belief, Lugones also solicited the vast majority of her 24-person team, most of whom resigned on or soon after July 21, 2025.  On information and belief, the employees Lugones successfully solicited are now moving to Howden, depriving Marsh of valuable expertise and goodwill.

109.    On information and belief, while still a Marsh employee who owed contractual duties to Marsh, Lynn solicited the vast majority of his 19 direct reports on the sales team to move to Howden. Most of Lynn's team resigned on or soon after July 21.  On information and belief, the employees Lynn successfully solicited are now moving to Howden, depriving Marsh of valuable expertise and goodwill.

110.    On information and belief, while still a Marsh employee who owed contractual and fiduciary duties to Marsh, Layton solicited the vast majority of her 16 direct reports on the Risk Management team to move to Howden.  Most resigned on or soon after July 21, 2025.  On information and belief, these employees are now moving to Howden, depriving Marsh of valuable expertise and goodwill.

111.    The raid on Marsh's Florida Zone has harmed Marsh and is harming it every day. Although individual departures are natural and to be expected, Marsh has succession plans in place for when individual employees leave.  Succession plans are particularly critical for Marsh's business because failed client coverage resulting from a departure can result in coverage lapses that can damage clients.  Marsh can recruit to fill one-off departures without disrupting its business. But to systematically solicit an entire business unit not only damages Marsh but threatens to leave clients at serious risk.  That is precisely why the Defendants' restrictive covenants are narrowly

tailored and critical to protect Marsh's legitimate business interests. And it is precisely why Defendants must be held accountable.

**VI.    The Defendants solicit Marsh's clients to move their business to Howden, again breaching their contractual duties.**

112.    The Defendants' raid was not limited only to Marsh's employees. It targeted established Marsh clients that, on information and belief, the Defendants solicited—while they were still working as Marsh employees—in violation of the Defendants' non-solicitation agreements and other legal duties.

113.    On information and belief, in the weeks leading up to her resignation, Layton—the leader of the risk management team in the Florida Zone group who resigned from Marsh along with most of her team—took direct steps in preparation to help Defendants port over Marsh's clients.

114.    On June 26, 2025, approximately one month before the raid, Layton had every member of her team upload key client documents, full of Marsh's Confidential Information, to a SharePoint. Despite working for Marsh for years, Layton had never made any similar request to her team in the past. Layton resigned within the month to move to Howden. On information and belief, Layton was collecting these documents, which contained and comprised Marsh's valuable Confidential Information, to use to solicit clients to Howden, directly or indirectly.

115.    On information and belief, the Defendants or others acting at their behest acted to hamper Marsh's ability to serve clients after they left. On July 25, 2025, Marsh employees working to transition coverage for a healthcare client whose policy was set to renew on August 1, 2025 discovered that the account folders with the previous policies and binder were empty, so that essential information was not available. The team had been reviewing the policy to support the client's renewal when the missing documents were discovered. That same day, Marsh received

the client's BOR. (A BOR is a document issued by a policyholder (i.e. a broking firm's client) to third parties (typically insurers) identifying the insurance broker that can act on its behalf and authorizing third parties that they may share information with the broker named in the BOR. The BOR is used to transfer the responsibility of managing the policy from one broker to another broker and reflects a client's decision to place or move its business. Receiving this BOR showed that the account was moving to Howden from Marsh or, in broking terminology, had "BOR'd.")

116. And, on information and belief, the Defendants have continued to solicit Marsh clients after the raid. On information and belief, Howden and the Defendants did not intend to hire over a hundred Marsh employees to work for a new Howden entity that had no clients of its own. Instead, on information and belief, the Defendants' and Howden's expectation was that the Departing Employees would bring Marsh clients with them to Howden.

117. That is exactly what has happened. Starting on the same day as the mass resignation and continuing to the present, Marsh clients began notifying Marsh and third parties that they would be moving their business from Marsh to a competitor. So far, Marsh has received nine post-raid BORs where Marsh clients have indicated that they are transferring their business from Marsh to Howden. Each of these BORs was for an account previously been serviced by one of the Defendants.

118. Departing Employees have used their personal email addresses to deliver BORs moving business to Howden. One client, in fact, signed a BOR *on the day of the raid*. A former Marsh account executive sent that BOR to Marsh from his personal email account. The account executive carbon copied the personal email address of Albert Gronovius—Lugones' direct report. On information and belief, Lugones indirectly or directly solicited this client's move to Howden, and the account executive and Gronovius executed on her solicitation.

119.    Also on July 25, 2025, Lynn was calling Marsh clients to solicit their business on behalf of himself and Howden.  In one call, for example, Lynn took the approach of telling a Marsh client false, negative information about Marsh—his current employer—in order to lay the ground-work to move this client away from Marsh and to his soon-to-be employer, Howden.

**COUNT I**
**BREACH OF CONTRACT - SOLICITATION OF EMPLOYEES**
*(all Defendants)*

120.    Marsh incorporates the previous paragraphs as if fully restated here.

121.    Marsh has valid and enforceable Employee Non-Solicitation Agreements with the Defendants, as detailed above.

122.    The Defendants expressly agreed that their Employee Non-Solicitation Agreements with Marsh were reasonable and agreed to refrain from soliciting Marsh's employees with whom they worked or about whom they had Marsh's confidential and proprietary information and trade secrets during their employment and for a 12-month restricted period.

123.    Marsh performed its obligations under the Employee Non-Solicitation Agreements.

124.    As detailed above, the Defendants each individually breached their Employee Non-Solicitation Agreements by directly and indirectly soliciting their Marsh Florida Zone teams, re-ports, and colleagues, inducing those teams, reports, and colleagues to terminate their employment and accept offers from Howden.

125.    On information and belief, Lugones directly and indirectly solicited Marsh employ-ees by soliciting at least three of her four direct reports to move to Howden, as well as all four of her second-level reports under Alexander Lloyd-Baker, a healthcare practice leader who had trans-ferred from the UK to the Miami office, and all four of her second-level reports under Alfred Gronovius, Managing Director of Marsh's Healthcare Practice.

126.    On information and belief, as a direct and proximate result of Lugones' direct and

indirect solicitation of employees in breach of her Employee Non-Solicitation Agreement, at least 11 employees she directly or indirectly supervised have resigned to begin employment with Howden.

127.    Parrish solicited employees by directly reaching out to then-current Marsh employees as early as Spring 2025 about moving to Howden.  Parrish also indirectly solicited employees by directing his longtime executive assistant to solicit Marsh employees on his behalf.

128.    As Zone Leader for the Florida Zone Parrish had access to Marsh's Confidential Information and trade secrets about Florida Zone Employees, including all of the employees in the Florida Zone that he oversaw.

129.    Parrish used that Confidential Information and his position of leadership to solicit his direct reports and other key employees, beginning months before he tendered his resignation on July 21, 2025.

130.    During his employment, Lynn solicited all or most of his 19 direct reports on the sales team to resign on or soon after July 21, 2025 to move to Howden.  As a direct result of Lynn's solicitation, on information and belief, these employees are now moving to Howden, depriving Marsh of valuable expertise and goodwill.

131.    During her employment, Layton solicited all or most of her 16 direct reports on the sales team to resign on or soon after July 21, 2025 to move to Howden.  As a direct result of Layton's solicitation, on information and belief, these employees are now moving to Howden, depriving Marsh of valuable expertise and goodwill.

132.    By these actions, each of the Defendants individually breached the provisions of their respective Non-Solicitation Agreements that prohibited them from directly or indirectly soliciting Marsh employees for restricted purposes during the course of their employment.

133.    By these actions, each of the Defendants individually directly and proximately have caused employees with whom they worked at Marsh for the purpose of selling insurance and/or risk management-related products and services, and about whom they as the teams' managers and formal or informal leaders had Confidential Information and trade secrets, to resign from Marsh to perform the same or substantially similar role on the Defendants' teams at Howden.

134.    On information and belief, each of the Defendants individually desires and intends for the Departing Employees on their teams, whom they directly or indirectly solicited, to provide the same or substantially similar insurance and risk management-related products and services to clients at Howden, as shown by their efforts to lift out and move wholesale their Marsh sales and client service teams, from supporting roles to leadership.

135.    Despite Marsh's multiple requests, since they resigned on July 21, the Defendants have refused to confirm that they intend to abide by their Employee Non-Solicitation Agreements.

136.    Marsh has no adequate remedy at law.

137.    The Defendants executed binding agreements with Marsh acknowledging that that irreparable injury will result to Marsh if they breach the employee and client non-solicitation provisions in their respective NCA/NSAs or NSA, that there is no adequate remedy at law for such breaches, and that Marsh is entitled to "specific performance," "temporary and permanent injunctive relief (without the necessity of posting a bond)," and reasonable costs and fees—including attorneys' fees—incurred by the Company in seeking to enforce the provisions of this Agreement.

138.    Injunctive relief enforcing the Defendants' contractual obligations to Marsh is necessary to preserve the status quo during the pendency of this action and enjoin the ongoing and further breaches of Defendants' Employee Non-Solicitation Agreements.

139.    Based on the Defendants' breaches, Marsh is entitled to relief as provided for in § 7

of Parrish, Lugones, and Lynn's respective NCA/NSAs and § 6 of Layton's NSA, including reasonable attorneys' fees and costs incurred seeking to enforce the agreement.

140.    Based on Layton's breaches, Marsh is entitled to liquidated damages as provided for in § 7 her NSA, in an amount equal to the total fees and commissions received by the Company for such business during the two years prior to the breach.

141.    Marsh is also entitled to monetary damages for all the Defendants' breaches.

**COUNT II**
**BREACH OF CONTRACT - SOLICITATION OF CLIENTS**
*(Lugones)*

142.    Marsh incorporates the previous paragraphs as if fully restated here.

143.    Marsh has a valid and enforceable Client Non-Solicitation Agreement with Lugones, as detailed above.  This agreement prohibits both direct and indirect solicitation.

144.    Lugones expressly agreed that her Client Non-Solicitation Agreement with Marsh was reasonable and agreed to refrain from soliciting Marsh's clients during her employment and for a 12-month restricted period.

145.    Marsh performed its obligations under the Client Non-Solicitation Agreement with Lugones.

146.    As detailed above, Lugones breached her Client Non-Solicitation Agreement by directly and indirectly soliciting Marsh's clients and prospective clients, inducing Marsh's clients or prospective clients to terminate, cancel, not renew or not place business with Marsh, performing or supervising the provision or performance of services of the type provided while they were employed by Marsh on behalf of any Marsh clients or prospective clients, and assisting others in doing the same.

147.    Lugones directly and indirectly solicited clients by reaching out to them, either personally or by directing or encouraging other Departing Employees on the healthcare team she led

to reach out to them on her behalf, to inform them of the healthcare team's move to Howden, for the purpose of encouraging them to move their accounts to Howden from Marsh by executing BORs, for the purpose of providing the same type of products or services she and the healthcare team provided to them at Marsh.

148.    As a direct and proximate result of Lugones' direct or indirect solicitation of clients in breach of her Client Non-Solicitation Agreement, at least eight Marsh healthcare group clients have submitted BORs indicating that they are in the process of moving their business to Howden. Client accounts that BOR and move to a competitor represent significant revenue losses for the firm losing the business.

149.    On information and belief, the combined value of the client accounts that have sent BORs indicating that they are moving their business from Marsh to Howden as a direct result of Lugones' unlawful solicitation is, at minimum, millions of dollars in annual revenue, potentially recurring for additional years.

150.    On information and belief, Lugones has been and continues to actively solicit healthcare group client accounts to BOR and move to Howden. Many active accounts serviced by the healthcare group have not BOR'd but are at immediate risk of doing so each day Lugones and the Departing Employees who are acting at her direction continue in violation.

151.    The BOR and loss of these accounts will cause damage that cannot be monetarily quantified.

152.    By these actions, Lugones breached the provisions of her Non-Solicitation Agreement that prohibited her from directly or indirectly soliciting clients for these restricted purposes during the course of her employment.

153.    By these actions, Lugones directly and proximately caused clients with whom she

worked at Marsh for the purpose of selling insurance and/or risk management-related products and services, to either begin or complete the process of submitting BORs indicating that they are in the process of moving their business to Howden.

154.    On information and belief, Lugones desires and intends to provide the same or substantially similar insurance and risk management-related products and services to these clients at Howden, as shown by her efforts to lift out and move wholesale her Marsh sales and client service teams, from supporting roles to leadership.

155.    On information and belief, each of the Defendants individually desires and intends for the Departing Employees on their teams, whom they directly or indirectly solicited, to provide the same or substantially similar insurance and risk management-related products and services to clients at Howden, as shown by their efforts to lift out and move wholesale their Marsh sales and client service teams, from supporting roles to leadership.

156.    Despite Marsh's multiple requests, since they resigned on July 21, the Defendants have refused to confirm that they intend to abide by their Client Non-Solicitation Agreements.

157.    Marsh has no adequate remedy at law.

158.    The Defendants executed binding agreements with Marsh acknowledging that that irreparable injury will result to Marsh if they breach the employee and client non-solicitation provisions in their respective NCA/NSAs or NSA, that there is no adequate remedy at law for such breaches, and that Marsh is entitled to "specific performance," "temporary and permanent injunctive relief (without the necessity of posting a bond)," and reasonable costs and fees—including attorneys' fees—incurred by the Company in seeking to enforce the provisions of this Agreement.

159.    Injunctive relief enforcing the Defendants' contractual obligations to Marsh is necessary to preserve the status quo during the pendency of this action and enjoin the ongoing and

further breaches of Defendants' Client Non-Solicitation Agreements.

160.    Based on Lugones' breach, Marsh is entitled to relief as provided for in § 7 of her

NCA/NSAs, including reasonable attorneys' fees and costs incurred seeking to enforce the agree-

ment.

161.    Marsh is also entitled to monetary damages for Lugones' breach.

## COUNT III
## BREACH OF CONTRACT – NON-DISCLOSURE
### *(all Defendants)*

162.    Marsh incorporates the previous paragraphs as if fully restated here.

163.    Marsh has valid and enforceable Confidentiality Agreements with the Defendants,

as detailed above.

164.    The Confidentiality Agreements are also expressly incorporated by reference into

Marsh's valid and enforceable Non-Competition and Non-Solicitation Agreements with the De-

fendants.

165.    The Defendants expressly agreed that their Confidentiality Agreements with Marsh

were reasonable and agreed to refrain from using or disclosing Marsh's Confidential Information,

as defined in Schedule 1 of the Confidentiality Agreement, "except as required to carry out [their]

duties as an employee of the Company."

166.    Schedule 1 to each of the Defendant's valid and enforceable CA defines Marsh's

Confidential Information as including:

> (iii)    client information, such as the identity of the Company's clients, the names
> of representatives of the Company's clients responsible for entering into contracts
> with the Company, the amounts paid by such clients to the Company, specific client
> needs and requirements, specific client risk characteristics, policy expiration dates,
> policy terms and conditions, information regarding the markets or sources with
> which insurance is placed, and leads and referrals to prospective clients;

(iv)     personnel information, such as the identity and number of the Company's other employees, their salaries, bonuses, benefits, skills, qualifications, and abilities.

167.    Marsh performed its obligations under the Confidentiality Agreements.

168.    As detailed above, the Defendants each individually breached their Confidentiality Agreements by disclosing Marsh's Confidential Information, including personnel information, to Howden, to facilitate its recruitment and hiring of their Marsh Florida Zone teams, reports, and colleagues, and its solicitation of their Marsh clients.

169.    Parrish disclosed Marsh's confidential personnel information to Howden to facilitate Howden's recruitment of Marsh employees, including those in the Florida Zone as early as Spring 2025.  As Zone Leader for the Florida Zone, Parrish had access to Marsh's Confidential Information, including personnel information, for all Florida Zone Employees, including all of his direct reports as indicated on the organizational charts discussed and included above.

170.    As a direct and proximate result of Parrish's disclosure of this personnel information in breach of his Confidentiality Agreement, more than 90 employees in the Florida Zone have resigned to begin employment with Howden.

171.    Lugones disclosed Marsh's confidential personnel information to Howden to facilitate Howden's recruitment of her direct and second-level reports.  As a direct and proximate result of Lugones' disclosure of this personnel information in breach of her Confidentiality Agreement, more than 10 employees she directly or indirectly supervised have resigned to begin employment with Howden.

172.    Lynn disclosed Marsh's confidential personnel information to Howden to facilitate Howden's recruitment of his direct reports.  As a direct and proximate result of Lynn's disclosure of this personnel information in breach of his Confidentiality Agreement, more than 10 employees he directly or indirectly supervised have resigned to begin employment with Howden.

173.    Layton disclosed Marsh's confidential personnel information to Howden to facilitate Howden's recruitment of her direct reports.  As a direct and proximate result of Layton's disclosure of this personnel information in breach of her Confidentiality Agreement, several employees she directly or indirectly supervised have resigned to begin employment with Howden.

174.    By these actions, each of the Defendants individually breached the provisions of their respective Confidentiality Agreements that prohibited them from disclosing Marsh's confidential information "except as required to carry out [their] duties as an employee of the Company."

175.    By these actions, each of the Defendants individually directly and proximately have caused employees with whom they worked at Marsh for the purpose of selling insurance and/or risk management-related products and services, and about whom they as the teams' managers and formal or informal leaders had Confidential Information, including personnel information, to resign from Marsh to perform the same or substantially similar role on the Defendants' teams at Howden.

176.    On information and belief, each of the Defendants individually desires and intends for the Departing Employees on their teams, whose recruitment by Howden they facilitated by providing Confidential Information to Howden, to provide the same or substantially similar insurance and risk management-related products and services to clients at Howden, as shown by their efforts to lift out and move wholesale their Marsh sales and client service teams, from supporting roles to leadership.

177.    Lugones also disclosed Marsh's confidential client information, including details about "specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients," to Howden to facilitate Howden's

recruitment of at least eight healthcare group clients who have since BOR'd.

178.    As a direct and proximate result of Lugones' disclosure of this confidential client information in breach of her Confidentiality Agreement, at least eight clients she directly or indirectly worked with have BOR'd and are moving their business (worth millions of dollars) to Howden.

179.    On information and belief, each of the Defendants individually desires and intents to use Marsh's Confidential Information to recruit Marsh's employees and provide the same or substantially similar insurance and risk management-related products and services to clients at Howden.

180.    Despite Marsh's multiple requests, since they resigned on July 21, the Defendants have refused to confirm that they intend to abide by their Non-Disclosure Agreements.

181.    Marsh has no adequate remedy at law.

182.    The Defendants executed binding agreements in their Confidentiality Agreements "that irreparable injury will result to the Company in the event of a breach of my obligations under this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefore, I acknowledge, consent and agree that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (i) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by me and persons acting for or in connection with me, and (ii) recovery of all reasonable sums and costs, including attorneys' fees, incurred by the Company in seeking to enforce the provisions of this Agreement."

183.    Injunctive relief enforcing the Defendants' contractual obligations to Marsh is necessary to preserve the status quo during the pendency of this action and enjoin the ongoing and further breaches of Defendants' Employee Non-Solicitation Agreements.

184.    Based on these breaches, Marsh is entitled to relief as provided for in § 6(c) of each Defendant's CA, including reasonable attorneys' fees and costs incurred seeking to enforce the agreement.

185.    Marsh is also entitled to monetary damages for the Defendants' breaches.

### COUNT IV
### DECLARATORY JUDGEMENT
*(all Defendants)*

186.    Marsh incorporates the previous paragraphs as if fully restated here.

187.    On information and belief, the Defendants have solicited and continue to solicit Marsh's employees and clients in order to unfairly compete with Marsh in flagrant disregard of their contractual and legal obligations owed to Marsh.  And the Defendants' actions make clear that they are not done yet.  The Defendants have inflicted, and continue to inflict, substantial and irreparable harm on Marsh.  Marsh therefore seeks declaratory relief to stop the Defendants' ongoing contractual breaches.

188.    The Defendants contractually agreed to client and employee non-solicitation provisions, non-compete clauses (as to Parrish, Lugones, and Lynn only), and non-disclosure clauses.

189.    Despite Marsh's multiple requests, since they resigned on July 21, the Defendants have refused to confirm that they intend to abide by their client and employee non-solicitation provisions, non-compete clauses (as to Parrish, Lugones, and Lynn only), and non-disclosure clauses.

190.    Absent declaratory relief, Marsh will continue to lose clients and employees as a direct result of the Defendants' unlawful actions, resulting in immediate and irreparable harm.

191.    And given the ongoing and irreparable harm Marsh is enduring every day, the Court should order a speedy hearing on Marsh's declaratory judgment claim.

192.    Marsh is therefore entitled to a declaration that the Employee and Client Non-Solicitation provisions of each Defendant's respective NCA/NSA or NSA, the Non-Competition provisions of the NCA/NSAs (as to Defendants Parrish, Lugones, and Lynn only) and the Non-Disclosure provisions of each Defendant's CA are valid and enforceable.

**COUNT V**
**BREACH OF FAITHLESS SERVANT DOCTRINE**
*(all Defendants)*

193.    Marsh incorporates the previous paragraphs as if fully restated here.

194.    As the Florida Zone's highest-ranking employees, Parrish, Lugones, and Lynn owe fiduciary duties and a duty of loyalty to their employer Marsh.  Layton also owed fiduciary duties and a duty of loyalty to her employer Marsh while employed as a high-ranking Florida Zone employee.

195.    Each Defendant is or was employed in a position of trust and confidence and in the course of their employment has acquired Confidential Information relating to Marsh's business.

196.    Marsh employed each Defendant to perform economically valuable and operationally essential services for and on behalf of Marsh and the Florida Zone.  Marsh did not employ any of the Defendants for the benefit of its direct competitors, including Howden.

197.    Marsh employed Parrish as Zone Leader to lead operations and develop business strategy for the benefit of the Florida Zone.  Parrish acted contrary to his contract of service with Marsh and engaged in misconduct that rises to the level of a breach of a duty of loyalty and good faith beginning in March 2025, by spearheading a scheme to lift out the entire Florida Zone operations, including its employees and clients and move them *en masse* to Marsh's direct competitor

Howden.  Parrish violated his duty of loyalty and good faith to Marsh when he intentionally abandoned the agreed-upon strategic plan to generate business during a July 15, 2025 client dinner.

198.    Marsh employed Lugones as Sales Leader over the specialty healthcare team to develop prospects for Marsh, win and retain clients for Marsh, and support the needs of those clients while at Marsh.  Marsh also employed Lugones to lead a specialized team to support all of those functions for and at Marsh.  Lugones acted contrary to her contract of service with Marsh and engaged in misconduct that rises to the level of a breach of a duty of loyalty and good faith by acting as a top lieutenant for Parrish's scheme to lift out the entire Florida Zone operations, including her healthcare team's employees and clients, and move them *en masse* to Marsh's direct competitor Howden.

199.    Marsh employed Layton as the Florida Group's Risk Management Segment Leader to lead and manage its risk management group, including by supporting, servicing, and retaining Risk Management clients and recruiting, retaining, and managing the employees who would service and support those clients.  Layton acted contrary to her contract of service with Marsh and engaged in misconduct that rises to the level of a breach of a duty of loyalty and good faith by acting as a top lieutenant for Parrish's scheme to lift out the entire Florida Zone operations, including the Risk Management Group, and move them en masse to Marsh's direct competitor Howden. Marsh employed Lynn as Regional Sales Leader to lead and manage its Sales and Account Executives, for the purpose of developing prospects for Marsh, winning and retaining clients for Marsh, and supporting the needs of those clients while at Marsh.  Lynn acted contrary to his contract of service with Marsh and engaged in misconduct that rises to the level of a breach of a duty of loyalty and good faith by acting as a top lieutenant for Parrish's scheme to lift out the entire Florida Zone operations, including the Florida Zone's sales group, and move them en masse to Marsh's direct

competitor Howden.  And Lynn breached his duty of loyalty and good faith to Marsh when he began ignoring or significantly delaying responses to clients in the days leading up to his resignation.

200.    On information and belief, each Defendant acted as a faithless servant under New York's common law doctrine after March 2025.

201.    Marsh is entitled to disgorge and recover the compensation it paid to each Defendant during the time they acted as faithless servants.

**COUNT VI**
**UNFAIR COMPETITION**
*(all Defendants)*

202.    Marsh incorporates the previous paragraphs as if fully restated here.

203.    As detailed above, the Defendants' misconduct was not isolated breaches.  The Defendants acted as part of an unlawful and unfair scheme, orchestrated by Parrish and carried out by Defendants, to lift out a fully formed retail insurance business and transfer that business to a direct competitor in the same market—indeed, the same city.  The Defendants used deception and untruths to destroy Marsh's entire Florida Zone operations and transfer those fruits of Marsh's labor to Howden.

204.    Beginning in March 2025, Florida Zone Leader Parrish falsely represented to Marsh that he was a faithful employee carrying out his duties to grow the Florida Zone's retail insurance business, while in fact he had promised to join Howden as its U.S. CEO and was secretly working in Howden's interest.

205.    Beginning in March 2025, Parrish used deception to lay groundwork for a wholesale lift out of the Florida Zone.

206.    On information and belief, Lugones, Layton, and Lynn each acted as Parrish's lieu-

tenants and participated in the deceptive scheme to destroy the Florida Zone and move its operations *en mass* to Howden.

207.    The Defendants' deceptive actions were intended to destroy Marsh's entire Florida Zone operations so that those operations could resume, fully formed, across town as the nucleus of Howden's U.S. expansion into the retail insurance market.  By destroying Marsh's operations and transferring the group fully formed to Howden, the Defendants sought to unfairly take Marsh's Confidential Information and employee teams, from leadership through support staff, so that they and Howden could profit from the fruits of Marsh's labor.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Marsh respectfully requests the Court grant the following relief:

a.    Entry of judgment in Marsh's favor as specified in this Complaint;

b.    Entry of temporary, preliminary, and permanent injunctive relief;

c.    Entry of a declaratory judgement providing a declaration that the Employee and Client Non-Solicitation provisions of each Defendant's respective NCA/NSA or NSA; the Non-Competition provisions of the NCA/NSAs (as to Defendants Parrish, Lugones, and Lynn only); and the Non-Disclosure provisions of each Defendant's CA are valid and enforceable;

d.    Equitable tolling of each Defendants' Non-Solicitation Agreements;

e.    Actual damages;

f.    Punitive damages;

g.    Exemplary damages;

h.    Disgorgement of the compensation Marsh paid to each Defendant during the time they acted as faithless servants;

i.    Prejudgment and post judgment interest and court costs;

j.    Attorneys' fees, as provided for by the Non-Solicitation and Non-Compete Agreement and other binding agreements;

k.    Liquidated damages for Layton's breach of the Employee Non-Solicitation provision of her Non-Solicitation Agreement, as provided for in her NSA at § 7;

l.    Liquidated damages for Layton's breach of her of the Client Non-Solicitation provision of her Non-Solicitation Agreement, as provided for in her NSA at § 7;

m.    Award of all damages and relief as agreed to by the parties in the Agreements; and

n.    All other relief at law or in equity to which Marsh is entitled.

### JURY TRIAL DEMANDED

208.    Marsh demands a jury trial on all claims triable by jury.

Dated: July 28, 2025                    Respectfully submitted,

By:  /s/ *Harris M. Mufson*

Harris M. Mufson
Lee R. Crain
200 Park Avenue
New York, NY 10166
Tel.:  212.351.3805
Fax:  212.817.9505
hmufson@gibsondunn.com
lcrain@gibsondunn.com

Jason C. Schwartz (*pro hoc vice forthcoming*)
Ryan C. Stewart (*pro hoc vice forthcoming*)
Amanda C. Machin (*pro hoc vice forthcoming*)
1050 Connecticut Avenue, NW
Washington, D.C. 20036
jschwartz@gibsondunn.com
rstewart@gibsondunn.com
amachin@gibsondunn.com

Karl G. Nelson (*pro hoc vice forthcoming*)
Rachel W. Robertson (*pro hoc vice forthcoming*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
knelson@gibsondunn.com
rrobertson@gibsondunn.com

*Attorneys for Plaintiff Marsh USA, LLC*