**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARSH USA LLC,

Plaintiff,

v.

MICHAEL PARRISH, GISELLE LUGONES, ROBERT LYNN, and JULIE LAYTON,

Defendants.

**Civil Action No**. 25-cv-6208 (GBD)

**PLAINTIFF MARSH'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER,**
**PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 4

I. Marsh trained Defendants and granted them access to Marsh's confidential information. ..... 4

II. Defendants freely and voluntarily entered into reasonable restrictive covenants to protect Marsh's interests. ..... 6

III. Parrish and the other Defendants spearhead an unlawful scheme to induce *all* of Marsh's Florida Zone to move to Marsh's direct competitor, Howden. ..... 6

IV. Defendants lift out more than 90 Marsh employees in a single day, including most of Marsh's Florida Zone. ..... 7

V. Defendants solicit Marsh's clients to move their business to Howden, again breaching their contractual duties. ..... 10

ARGUMENT ..... 11

VI. The Court should grant a temporary restraining order or preliminary injunction to stop Defendants from further violating their agreements. ..... 12

A. Marsh is likely to prevail on its claims that Defendants breached their agreements. ..... 12

1. Marsh will likely succeed in proving that Defendants breached their agreements. ..... 13

2. Defendants' agreements are valid and enforceable. ..... 17

3. Marsh is likely to succeed on its common law claims. ..... 20

B. Absent injunctive relief, Marsh will suffer irreparable harm from damage to its client relationships and use and/or disclosure of its confidential information. ..... 21

C. The balance of hardships and public interest strongly favor Marsh because Defendants will suffer no harm from being held to their contractual bargains. ..... 25

VII. This Court should order expedited discovery in advance of an evidentiary hearing. ..... 26

CONCLUSION ..... 27

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*3M Co. v. Performance Supply, LLC*,
458 F. Supp. 3d 181 (S.D.N.Y.)........12

*Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.*,
No. 94 Civ. 5620 (JFK), 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994) ........25, 26

*Barbagallo v. Marcum LLP*,
820 F. Supp. 2d 429 (E.D.N.Y. 2011) ........20

*BDO Seidman v. Hirshberg*,
93 N.Y.2d 382 (1999) ........16

*Benham Jewelry Corp. v. Aron Basha Corp.*,
1997 WL 639037 (S.D.N.Y Oct. 14 1997) ........25

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
784 F.3d 887 (2d Cir. 2015)........12

*Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co.*,
610 F. App'x 69 (2d Cir. 2015) ........20

*Capstone Logistics Holdings, Inc. v. Navarrete*,
2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020) ........20

*Cortland Line Holdings LLC v. Lieverst*,
2018 WL 8278554 (N.D.N.Y. Apr. 6, 2018) ........24

*Estee Lauder Cos. Inc. v. Batra*,
430 F. Supp. 2d 158 (S.D.N.Y. 2006)........23, 24

*HRB Res. LLC v. Schon*,
2019 WL 4015256 (N.D.N.Y. Apr. 25, 2019) ........25

*Iannucci v. Segal Co., Inc.*,
2006 WL 8407380 (S.D.N.Y. June 27, 2006) ........24

*Re Inc.*,
550 F. Supp. 3d at105–06 ........22

*Int'l Bus. Machs. Corp. v. Papermaster*,
2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ........23

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
323 F. Supp. 2d 525 (S.D.N.Y. 2004)....22

*King v. Marsh & McLennan Agency, LLC*,
2020 WL 1498537 (N.Y. Sup. Ct. N.Y. Cnty., Mar. 27 2020)....17

*Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*,
2025 WL 304500 (S.D.N.Y. Jan. 27, 2025) ....11, 14, 16, 17, 18, 22, 23

*Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*,
26 N.Y.S.3d 72 (N.Y. Sup. Ct. Oct. 19, 2015) ....17

*Marsh USA Inc. v. Karasaki*,
2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008)....11, 14, 17, 22

*Marsh USA Inc. v. Schuhriemen*,
183 F.Supp.3d 529 (S.D.N.Y. 2016)....17

*Mastercard Int'l Inc. v. Nike, Inc.*,
164 F. Supp. 3d 592 (S.D.N.Y. 2016)....17, 19

*McRoberts Protective Agency, Inc. v. Lansdell Protective Agency, Inc.*,
61 A.D.2d 652 (1978) ....20, 21

*Mercer Health & Benefits LLC v. DiGregorio*,
307 F. Supp. 3d at 351 ....18

*Mohawk Maint. Co. v. Kessler*,
52 N.Y.2d 276 (1981) ....16

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*,
392 F.3d 520 (2d Cir. 2004)....12

*Natsource LLC v. Paribello*,
151 F. Supp. 2d 465 (S.D.N.Y. 2001)....18, 24

*Notaro v. Koch*,
95 F.R.D. 403 (S.D.N.Y. 1982) ....26

*Payment All. Int'l, Inc. v. Ferreira*,
530 F. Supp. 2d 477 (S.D.N.Y. Dec. 13, 2007) ....19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*QBE Americas, Inc. v. Allen*,
2022 WL 889838 (S.D.N.Y. Mar. 25, 2022) ....20

*R.R. Donnelley & Sons Co. v. Marino*,
505 F. Supp. 3d 194 (W.D.N.Y. Dec. 8, 2020)....26

*Singas Famous Pizza Brands Corp. . v. N.Y. Advert. LLC*,
468 Fed. App'x 43 (2d Cir. 2012)....24

*Ticor Title Ins. Co. v. Cohen*,
173 F.3d 63 (1999)....19, 22, 24, 25

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.*,
749 F. Supp. 473 (S.D.N.Y. 1990) ....26

*Willis Re Inc. v. Herriott*,
550 F. Supp. 3d 68 (S.D.N.Y. 2021)....22, 25

**RULES**

Fed. R. Civ. P. 30(b) ....25

Fed. R. Civ. P. 34(b) 25

## PRELIMINARY STATEMENT

Emergency relief is necessary to stop the continuation of Defendants' coordinated and concealed scheme to lift out nearly an entire region of employees from Plaintiff Marsh USA LLC for the benefit of a direct competitor in violation of their clear and enforceable contractual non-solicitation commitments. Defendants are top leaders of Marsh's Florida region (known as the "Florida Zone"). Defendants (while employed by Marsh) have been executing this methodical raid, resulting in the near simultaneous departure of over 90 employees of Marsh and its affiliates as well as a growing number of Marsh's clients. While on Marsh's dime, and in flagrant disregard of their duties of loyalty and contractual obligations to Marsh, Defendants worked in tandem with Marsh's competitor—Howden US Services LLC—to launch Howden's previously non-existent U.S. insurance brokerage business.

Unbeknownst to Marsh, Defendants and Howden started hatching this scheme in the Spring of 2025. Howden had been in talks to lawfully acquire another large U.S. insurance broker earlier in the year. But as those talks broke down, Howden turned to plan B: enter the U.S. market by unlawfully poaching employees and clients from the top of the market—Marsh and its affiliates. Following the collapse of acquisition talks, Howden and Defendant Michael Parrish (the head of Marsh's Florida Zone) devised a plan to open new U.S. offices for Howden where Parrish would serve as the CEO. Rather than invest their own time and resources to develop this new office, Parrish and Howden decided simply to lift out an entire team of Marsh's employees, including a majority of the employees in Marsh's Florida Zone, and Marsh's clients.

To pull off this lift out, Parrish brought into the scheme his direct reports and key Florida Zone leaders, Defendants Lugones, Lynn, and Layton. Parrish and his lieutenants worked covertly over many months, all while still being handsomely compensated by Marsh, to aggressively solicit Marsh's employees to join them at Howden using Marsh's confidential information. Defendants'

scheme culminated on July 21, 2025, when they all gave notice of their resignations. A flood of coordinated resignations followed from Marsh employees—totaling approximately 90 resignations by the end of the day. This amounted to the vast majority of the employees in Marsh's Florida Zone. Discovery will show that most—if not all—of these employees did not apply for, submit a resume to, or interview with Howden before receiving a job offer. Their job offers arrived without them even lifting a finger. That could not have happened if Defendants—the Florida Zone leaders—had not provided the departing employees' information to Howden and directly or indirectly solicited them to join Howden's new U.S. business.

The raid did not stop with Marsh's employees. The Defendants simultaneously laid the seeds to unlawfully solicit Marsh's clients to move to Howden, too, and to irreparably harm Marsh's relationships with them and its goodwill. As Defendants planned, within hours of the mass resignations, Marsh clients began notifying Marsh that they would be moving their business from Marsh to a competitor, even though no employees would begin with Howden until August 1, 2025. Each of those clients had previously been serviced by one of Defendants. To date, at least eight Marsh clients, with significant associated revenue, have moved to Howden.

The facts are egregious and clear cut: For over 150 years, Marsh has invested millions to create a gold-standard insurance business that is the envy of upstart competitors like Howden. Working in concert with Howden, Defendants have run roughshod over their contractual and legal obligations—flagrantly disregarding contractual provisions they knowingly and freely agreed to and that are intended to protect Marsh from just this type of scheme. And they flatly refuse to provide assurances that they will honor their commitments to Marsh. As of the morning of July 21, 2025, Howden had no meaningful presence in the U.S. retail broking market—no office, no

employees and no clients. But by the end of the day, Defendants had helped Howden create out of thin air a full-service U.S. retail brokerage business, with Marsh's employees and clients.

Marsh now seeks injunctive relief to stop Defendants' ongoing misconduct. Marsh is likely to succeed on the merits of its contract claims. The employee and client non-solicitation obligations (which bind Defendants during their employment with Marsh and for 12 months thereafter) are narrowly tailored to protect Marsh's legitimate business interests and plainly enforceable as a matter of New York law. Defendants Parrish, Lugones, and Lynn also have enforceable 60-day notice periods during which they owe Marsh a continuing duty of loyalty, and, given their positions as highly compensated senior leaders within Marsh's business, reasonable 12-month non-competition obligations designed to protect Marsh's investment in their practices and its Florida Zone. The evidence of Defendants' breach of their contracts and faithless servitude is obvious. For literally months they lied to and deceived their employer by soliciting their coworkers to build a competing business behind Marsh's back. And the lies continue as they spread disinformation designed to pressure yet more Marsh employees and clients to leave. Absent emergency relief, Defendants will continue to execute their scheme and further irreparably harm Marsh's business—causing damage to client relationships and customer goodwill that courts throughout this Circuit have recognized qualifies as paradigmatic "irreparable harm." And the balance of equities and public interest clearly favor an injunction in this case. For those reasons, this Court should enter a temporary restraining order and preliminary injunction and grant expedited discovery in advance of an evidentiary hearing.

## STATEMENT OF FACTS

### I. Marsh trained Defendants and granted them access to Marsh's confidential information.

Founded in 1871, Marsh is a leading insurance brokerage and risk management firm that provides an array of services for its clients, including insurance broking, consulting, and claims advocacy services. McClellan Decl. ¶ 4.[1] Marsh organizes its business by geographic regions, or "Zones." *Id.* ¶ 5. Defendants are senior leaders in Marsh's Florida Zone. Schnabolk Decl. ¶ 4. Along with other Florida Zone employees, Defendants offer an array of services to Marsh's clients, including risk analysis, insurance program design and placement, insurance program support and administration, and claims support and advocacy. *Id.* ¶ 3. Marsh has invested significant time, millions of dollars, and goodwill to build the Florida Zone into a market leader, and to develop and train the Florida Zone employees. *See Id.* ¶ 18. Florida Zone employees produced and managed client accounts generating significant revenue. McClellan Decl. ¶ 8.

Parrish joined Marsh in 2021 as the Florida Zone Leader. Schnabolk Decl. ¶ 10. As Zone Leader, Parrish oversaw all Florida Zone employees and operations and managed 12 direct reports. *Id.* ¶¶ 8-9. Parrish supervised the Florida Zone's senior leaders, including Defendants and worked closely with many Marsh employees, including in other zones around the world. *Id.* As the Florida Zone Leader, Parrish was a member of the Marsh US & Canada executive team.

Lynn joined Marsh in 2021 as the Florida Zone Regional Sales Leader. Schnabolk Decl. ¶ 13. He supervised a team that—prior to the raid—employed 19 Sales and Account Executives. *Id.* ¶ 14. Layton joined Marsh in 2021 as the Florida Zone Risk Management Segment Leader. *Id.* ¶ 15. She supervised a team that—prior to the raid—employed 16 Client Service Executive

[1] Citations to declarations in this memorandum of law are to the declarant's last name and the relevant paragraph.

Associates, Client Service Representatives, and Account Representatives. *See id.* ¶ 16. Lugones joined Marsh in 2021 as the Florida Zone healthcare team Sales Leader. *Id.* ¶ 11. Prior to the raid, she supervised a team of 24 employees. *Id.* ¶ 12.

All Florida Zone employees received extensive training, client development resources, and cross-selling opportunities. Schnabolk Decl. ¶ 19. Florida Zone employees are provided with Marsh's confidential information to conduct their business on Marsh's behalf, including confidential information about clients, prospective clients, growth opportunities, pricing, and terms and conditions of contracts with clients, such as renewal timelines and policy terms. *See id.* ¶ 18; Mufson Decl. Exs. 2, 8, 16, 22. Florida Zone employees in senior leadership roles like Defendants have intimate knowledge of confidential personnel information concerning Marsh's workforce, including employees' relative strengths and areas of expertise, compensation, specific job tasks and account assignments, relationships with current or potential clients, and Marsh's recruitment and hiring efforts, plans, and strategies. Schnabolk Decl. ¶ 17.

This commercially sensitive confidential information is vital to the Florida Zone's collective success and its employees' individual success, as information about prospective clients, competitive pricing, and growth opportunities are critical in this highly competitive industry. *Id.* ¶ 19. Such detailed, proprietary information provides Marsh and its employees with significant competitive advantages by, for example, allowing Marsh employees to offer clients access to Marsh's advanced analytics and other attractive proprietary features. McClellan Decl. ¶¶ 4, 6. Marsh went to great lengths at enormous expense to collect and refine this information to benefit its business, giving it a strong competitive advantage. *See id.* ¶ 4; Schnabolk Decl. ¶ 18. And Marsh vigorously protected such information by, for example, requiring its employees to execute robust Confidentiality Agreements as a condition of employment. Mufson Decl. Exs. 3, 9, 17, 23.

## II. Defendants freely and voluntarily entered into reasonable restrictive covenants to protect Marsh's interests.

As senior Florida Zone leaders—and in connection with receiving significant compensation, including salary, bonuses, and equity grants—each Defendant executed multiple binding agreements with Marsh including Offer Letters, a Confidentiality Agreement and either a Non-Competition and Non-Solicitation Agreement (Parrish, Lugones, and Lynn) or a Non-Solicitation Agreement (Layton). Schnabolk Decl. ¶ 20; Mufson Decl. Exs. 2, 8, 16, 22. Parrish, Lugones, and Lynn negotiated their contracts individually and were represented by counsel. Schnabolk Decl. ¶ 20.

Each Defendant's Non-Compete and/or Non-Solicitation Agreement contains provisions that (1) incorporated by reference the Confidentiality Agreement they signed; and (2) prohibited each Defendant from directly and indirectly soliciting certain employes and/or servicing certain of Marsh's clients during their employment and for a 12-month restricted period following termination of that employment. Mufson Decl. Exs. 2, 8, 16, 22 §§ 1–3. All but Layton's also contained provisions that (1) required 60-day notice of termination; and (2) restricted them from working for a direct Marsh competitor for 12 months. *Id*. 1, 7, 15 at pp. 4; 2, 8, 16 § 4.

## III. Parrish and the other Defendants spearhead an unlawful scheme to induce *all* of Marsh's Florida Zone to move to Marsh's direct competitor, Howden.

In Spring 2025, Parrish was already considering leaving Marsh to start and run Howden's new U.S. operations, in direct competition with Marsh. Maffai Decl. ¶ 3; *see* Mufson Decl. Exs. 27, 31, 33, 34, 35; Martino Decl. ¶¶ 3–4. In a phone call around then, Parrish told a direct report that if Parrish went to start and run Howden's new operations, he would want the employee to leave Marsh and join him. Maffai Decl. ¶ 3. Parrish then recruited Lynn, Lugones, and Layton to assist with his solicitation scheme, along with other direct reports. *See* Dahan-Roxin Decl. ¶ 6;

Gonzalez Decl. ¶ 6; McClellan Decl. ¶ 10. They, in turn began recruiting on Parrish's—and Howden's—behalf. Dahan-Roxin Decl. ¶ 6; Gonzalez Decl. ¶¶ 6–7; Abboud Decl. ¶ 5.

Parrish's long-time executive assistant and his other direct reports began asking Marsh employees for their personal contact information. *See, e.g.,* Minton Decl. ¶ 3; Abboud Decl. ¶ 6. Subsequently, many employees received offer letters from Howden even though Howden had no U.S. business and none of these employees had ever applied to work there. *See, e.g.*, Abboud Decl. ¶ 7, Minton Decl. ¶ 5; Dahan-Roxin Decl. ¶¶ 8–9. Some of Parrish's direct reports recruited Marsh employees directly, telling them many in the office were leaving for Howden and inviting these Marsh employees to join the Howden team. *See, e.g.,* Dahan-Roxin Decl. ¶ 6; Gonzalez Decl. ¶ 6.

## IV. Defendants lift out more than 90 Marsh employees in a single day, including most of Marsh's Florida Zone.

On July 18, 2025, the press learned that a raid of Marsh by Howden was planned. Mufson Decl. Ex. 30. That same day, Parrish confirmed to Marsh employees in the Florida Zone that he was resigning to join Howden, asked Marsh employees to move with him, and connected Marsh employees with Howden so they could receive job offers. *See* Maffai Decl.¶¶ 5–8. Parrish told at least one Marsh employee that "everyone" in the Florida Zone would be leaving Marsh to join Howden. *Id*. ¶ 5. That direct report consented to Parrish connecting him with Howden's recruiters. *Id*. ¶¶ 5–6. After that phone call, Howden and its recruiters reached out to this employee via his personal cell phone number. *See id.* ¶¶ 6–7. Before this conversation with Parrish, no Howden recruiter had called this employee. *Id*. ¶ 8. But after the phone call with Parrish, this employee received multiple phone calls from Howden recruiters. *Id*. ¶¶ 6–7.

Lynn also solicited Marsh employees to move to Howden with Defendants. *See* Dahan-Roxin ¶ 6. On July 18, 2025, he called a Marsh colleague to convince her to move to Howden.

*Id.* To do so, Lynn told the colleague a rumor that Marsh was going to fire Parrish and that if Marsh fired Parrish, Lynn also expected to be fired. *Id.* Lynn also told his colleague that she should join them at Howden because planned changes at Marsh would increase her workload. *Id.* Each of these statements were false. Lynn also said he would get her a "title bump" and suggested should would make more money at Howden. *See id.* ¶¶ 3, 6.

Also on July 18, 2025, Lugones held an in-person meeting in Marsh's Miami office with multiple Marsh employees on her team, and then they left for lunch and never returned. Gonzalez Decl. ¶ 14. Every employee Lugones invited to that meeting resigned from Marsh the very next business day. *See id.*; Schnabolk Decl. ¶ 12.

On the next business day, Monday, July 21, 2025, resignations from Florida Zone employees began pouring in, including from each of the Defendants. *See* Schnabolk Decl. ¶ 9-16. Parrish, Lugones and Lynn's resignations triggered their 60-day contractual notice periods, requiring that they remain employees of Marsh through September 19, 2025. Mufson Decl. Exs 1, 7, 15 pp. 4. Layton resigned effective immediately. Schnabolk Decl. ¶ 15.

Dozens of the Marsh employees who worked under Defendants immediately followed their leaders and resigned from Marsh to accept employment offers at Howden. Schnabolk Decl. ¶ 8, 12, 14, 16. In fact, by the end of July 21, 2025, more than 90 Marsh employees had notified Marsh of their resignations. Schnabolk Decl. ¶ 6.

Defendants continue to solicit Marsh employees. For example, on July 21, 2025, one of Parrish's reports, Clifford Mawn, Senior Vice President, Florida Zone, who resigned from Marsh to move with Parrish to Howden, called another Marsh employee to convince him to move to Howden. Abboud Decl. ¶ 5. On this call, Mawn revealed the Howden team had instructed him to reach out to his Marsh colleague because they had a close relationship with each other because of

their employment at Marsh together. *Id.* Later that evening, Mawn called this Marsh employee for a second time that day to talk more about the potential move to Howden. *Id.* ¶ 6. Mawn said that his Marsh colleague would be expected to "handle [his] existing book of business and do exactly what [he] [is] doing now" at Marsh. *Id.* The Marsh employee understood this to mean that Mawn and Howden expected all the accounts that he worked on at Marsh to move to Howden. *Id*.

Also on that call, Mawn asked his Marsh colleague to send his personal email to Mawn so Mawn could provide it to Howden, and Howden could send an offer to the Marsh employee's personal email. *Id*. After the call ended, the Marsh employee sent his personal email address to Mawn. *Id*. The next morning, on July 22, 2025, Howden sent this Marsh employee two emails to his personal email address—one email with an offer letter for employment at Howden and a second email with a password to access the offer letter. *Id.* ¶ 7. These are the only two emails this Marsh employee ever received from Howden. This Marsh employee had never before received any phone calls from Howden or talked to anyone at Howden. *Id*. ¶ 7. He also had never given his resume or any other information to Howden. *Id*. This Marsh employee understands that he received an offer of employment with Howden based on the recommendation of Mawn and other Marsh Florida Zone senior team members working at the direction of Parrish. *Id.*

On the evening of that same day, July 22, 2025, Mawn sent text messages to this Marsh employee and instructed the Marsh employee to call him to discuss the Howden offer. *Id*. ¶ 9. On a phone call with this Marsh employee that evening, Mawn told his Marsh colleague that he had to accept the Howden offer by the next day because Howden is facing an injunction soon and would be enjoined from hiring him. *Id*. ¶ 10.

This carefully calculated raid of Marsh's workforce was only possible because of Defendants' solicitation efforts and use of confidential information about the departing employees' terms of employment with Marsh. Many Marsh employees were given job offers at Howden without applying, sending a resume, or interviewing. Gonzalez Decl. ¶¶ 7–8; Dahan-Roxin Decl. ¶¶ 8–9. In fact, for many of them, their first interaction with Howden was when they received their offer letter from Howden. Gonzalez Decl. ¶¶ 7–8; Dahan-Roxin Decl. ¶¶ 8–9; Abboud Decl. ¶ 7. The only way Howden could have executed a raid like this was with Defendants' active participation—sharing Marsh's confidential information to Howden and directly or indirectly soliciting Marsh employees.

## V. Defendants solicit Marsh's clients to move their business to Howden, again breaching their contractual duties.

Defendants' raid was not limited to Marsh's employees, but to Marsh clients as well. In the weeks leading up to her resignation, Layton—the leader of the risk management team in the Florida Zone group who resigned from Marsh along with most of her team—took direct steps in preparation to port over Marsh's clients. On June 26, 2025, approximately one month before the raid, Layton had every member of her team upload key client documents, full of Marsh's confidential information, to a SharePoint. Gonzalez Decl. ¶¶ 3–4. Despite working for Marsh for years, Layton had never made any similar request to her team in the past. *Id.* ¶ 5. Layton had no legitimate business reason to make this ask. Rather, her unprecedented request—sent after she was likely solicited by Parrish to join Howden—suggests she was preparing to solicit Marsh's clients to Howden.

So far, eight Marsh clients (and counting) have transferred their business to Howden, McClellan Decl. ¶ 10—a new insurance brokerage with no prior track record the United States, Mufson Decl. Ex. 31. Until the execution of Defendants' scheme, it would have been impossible

for longstanding Marsh clients to move their business to Howden—as it simply did not exist in the U.S. The departure of clients was only possible due to Defendants' solicitation.

* * *

Since Defendants' resignations, Marsh has written to them multiple times to confirm that they intend to abide by the covenants their agreements. Each time, Defendants' actions have only indicated an intention to continue breaching their lawful obligations, including by filing a lawsuit to declare their covenants invalid. Mufson Decl. Ex. 49.

## ARGUMENT

A temporary restraining order or preliminary injunction is vital to prevent Defendants' continuing violations of the non-solicitation provisions of their Non-Competition and Non-Solicitation Agreements and their Confidentiality Agreements. Courts in this district have repeatedly held—in cases involving the same or substantially similar Marsh agreements—that conduct like Defendants' establishes a likelihood of success on the merits for breach of contract and breaches of duty of loyalty/unfair competition. *See Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*, 2025 WL 304500 at *6 (S.D.N.Y. Jan. 27, 2025); *Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *20 (S.D.N.Y. Oct. 31, 2008); *McRoberts Protective Agency, Inc. v. Lansdell Protective Agency, Inc.*, 61 A.D.2d 652, 653 (1978). And courts have concluded that Defendants' agreements—and others materially indistinguishable from them—are valid and enforceable. Absent a temporary restraining order and injunctive relief, Marsh will suffer irreparable harm from damage to its client relationships and misappropriation of its confidential information. By contrast, holding Defendants to the benefit of their bargain will cause them no hardship and will further the public interest in the enforcement of contracts. This Court should grant Marsh's motion and bar Defendants from soliciting Marsh's employees and customers or

revealing Marsh's confidential information. The Court should also authorize expedited discovery in advance of a hearing on this motion.

## VI. The Court should grant a temporary restraining order or preliminary injunction to stop Defendants from further violating their agreements.

A temporary restraining order or preliminary injunction is warranted where a plaintiff shows: (1) a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of irreparable harm absent the requested relief; and (3) that the balance of hardships favors the plaintiff and the public interest would not be impaired by the requested relief. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y.) (same standard governs temporary restraining orders and preliminary injunctions).

Because Marsh is likely to succeed on its claims that Defendants breached their agreements with Marsh, Defendants' violations of those agreements have inflicted—and are continuing to inflict—irreparable harm on Marsh, and the balance of hardships and public interest decisively favor Marsh, this Court should grant a temporary restraining order and preliminary injunction.

### A. Marsh is likely to prevail on its claims that Defendants breached their agreements.

A breach of contract claim requires: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from that breach." *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).[2] Marsh is likely to succeed in establishing these elements.

Each Defendant signed binding restrictive covenant agreements with Marsh. Mufson Decl. Exs. 2, 8, 16, 22. Marsh will likely prove Defendants breached their agreements by soliciting

[2] Each of the relevant agreements have New York choice-of-law provisions. Mufson Decl. Exs. 2, 8, 16, 22 § 12.

restricted Marsh employees and/or clients and actively recruiting and therefore serving the interests of a direct Marsh competitor—including long before their notice periods and non-competition periods expire. Marsh will also prove Defendants breached their Confidentiality Agreements by using and/or disclosing Marsh's confidential information to aid their solicitation. And Marsh will succeed in establishing it has suffered—and continues to suffer—damages as a result. *See infra* Part I.B. In addition, Defendants cannot argue that the agreements they voluntarily signed and freely negotiated are somehow unenforceable; numerous courts have already held just the opposite with respect to those exact agreements and others materially indistinguishable from them.

#### 1. Marsh will likely succeed in proving that Defendants breached their agreements.

Defendants breached their Non-Competition and/or Non-Solicitation Agreements by soliciting Marsh's employees and/or clients for Howden—a direct competitor.

*First*, Defendants wrongfully solicited Marsh's employees for a competitor. The agreements prohibit Defendants from directly or indirectly soliciting certain Marsh employees to leave Marsh during and for one year after their employment. Exs. 3, 9, 17, 23 § 3. This prohibition applies to employees that each Defendant had contact or about which the Defendant obtained confidential information, during the last two years of the Defendant's employment with Marsh. *Id.* The agreements also require certain Defendants (Parrish, Lugones, and Lynn, given their unique roles as senior leaders of Marsh) to provide Marsh 60-days notice of their intent to resign and to thereafter refrain from competing for twelve months. Mufson Decl. Exs. 1, 7, 15.

Defendants blatantly and repeatedly violated the agreements. While serving as leaders of Marsh's Florida Zone, Defendants induced Marsh employees to defect to Howden from Marsh. For example, Parrish told one direct report that "he was considering leaving Marsh and going to

start and run Howden's new United States operation" in the spring of 2025. Maffai Decl. ¶ 3. Parrish encouraged this direct report to resign from Marsh to work for Howden on July 18, 2025. *Id.* ¶ 5. Layton similarly reached out to a direct report on July 18, 2025 to tell him that the entire group was leaving to join Howden, and asked him to join Defendants. Gonzalez Decl. ¶ 6. Courts in this district have previously recognized that similar efforts by other former Marsh employees likely violated similar contractual provisions. *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*, 2025 WL 304500 at *6 (S.D.N.Y. Jan. 27, 2025); *Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *20 (S.D.N.Y. Oct. 31, 2008).

Defendants also used other Marsh employees to indirectly solicit employees. For example, one week before the mass resignation, Parrish's long-time executive assistant asked Marsh employees for their personal contact information. *See* Minton Decl. ¶ 3. On July 18, 2025, one of Parrish's direct reports told this employee that he would receive an offer letter to join Howden to his personal email; the offer letter arrived approximately one hour later from Howden's recruiters. *Id*. ¶ 5–6. Several employees—some of whom had never even heard about Howden's U.S. operations—received offers from Howden's recruiters to their personal emails and phone numbers despite never applying to work for Howden. *Id*. ¶ 6; Gonzalez Decl. ¶¶ 7–8; Dahan-Roxin Decl. ¶¶ 8–9; Martino Decl. ¶¶ 8–9. This could not have happened without Defendants' efforts and coordination with Howden, as expedited discovery will show. Again, a court in this district has previously recognized that identifying and approving potential recruits for others to approach violates the very same non-solicitation agreement applicable here. *Karasaki*, 2008 WL 4778239 at *20.

As a result of Defendants' actions, over 90 employees of Marsh and its affiliates resigned from Marsh with Defendants. Most of the departing employees did not have contractual notice

provisions and could start at Howden immediately. This sudden mass loss in expertise and relationships was timed to prevent Marsh from an orderly transfer of accounts.

*Second*, Lugones (and likely the other Defendants) also violated the non-solicitation provisions by soliciting Marsh's clients. The Non-Competition and/or Non-Solicitation Agreements prohibit Defendants from directly or indirectly soliciting and/or servicing certain Marsh clients and prospective clients in connection with specific tasks for one year after their employment at Marsh. Mufson Decl. Exs. 2, 8, 16, 22 § 2(b). This restriction only applies to Marsh clients or prospective clients that each Defendant had contact or about which the Defendant obtained confidential information during the last two years of employment with Marsh. *Id.*

But Defendants did—and are continuing to do—just that. Following Defendants' mass resignation, Marsh clients began notifying Marsh that they would be moving their business to Howden. At least eight Marsh clients have already transferred their business to Howden. Ex. McClellen ¶ 10. Since Howden had no U.S. presence, there would be no reason for a mass transfer of business from Marsh to Howden absent Defendants' solicitation. Mufson Decl. Ex. 31. Every day Marsh is gathering additional evidence of client solicitation. And when Marsh asked Defendants to confirm they would abide by their contractual restrictions, they refused to provide any assurances and instead have given Marsh every reason to believe that they do not intend to abide by their lawful restrictions, including by seeking to invalidate them. Mufson Decl. Exs. 43, 44, 45, 46, 47.

*Third*, Defendants also likely breached their Confidential Agreements by using confidential information to aid their wrongful efforts to solicit Marsh's employees and clients. Defendants' Confidentiality Agreements prohibit them from directly or indirectly using, disseminating, or disclosing Marsh's confidential information except as required to carry out their

duties as Marsh employees. Mufson Decl. Exs. 3, 9, 17, 23. Confidential information is defined to include both "personnel information" (such as employee salaries) and "client information" (such as amounts paid by clients to Marsh). *Id.*

Marsh is likely to establish Defendants breached this provision by using Marsh's confidential information to solicit Marsh's employees and clients to Howden. For example, Lynn discussed compensation with a direct report and suggested higher compensation if the direct report left Marsh to join Howden. Dahan-Roxin Decl. ¶ 6. Parrish similarly offered a direct report more money to join Howden, knowing what the direct report made at Marsh. Maffai Decl. ¶ 5; *see also* Minton Decl. ¶ 4. Those offers could only have been made using confidential information. Abboud Decl. ¶ 7.

Defendants also violated their Confidentiality Agreements by using their access to Marsh's confidential client information to solicit those clients to leave Marsh. For example, approximately one month before the raid, Layton asked her direct reports to place confidential client information—including account financial trackers, schedules of insurance, and team charts—in a newly created Sharepoint for her use. Gonzalez Decl. ¶ 4. Layton had never before asked for such client information all to be aggregated in a single location; nor had she ever required that level of granularity. *Id.* ¶ 5. This unprecedented behavior a month before Defendants executed their raid creates a strong inference that Defendants misappropriated Marsh's confidential information to solicit its clients. Indeed, a court in this district previously held that Marsh demonstrated a likelihood of success on claims that a former employee breached a confidentiality agreement when he created "personal" spreadsheets containing Marsh client information and clients left Marsh within days of his resignation after the employee targeted them. *MMA LLC*, 2025 WL 304500 at *6. Just so here.

**2. Defendants' agreements are valid and enforceable.**

To the extent Defendants attempt to defend their violations of the contractual provisions by arguing that they are unenforceable, that argument fails. In New York, "agreements restricting the parties' right to compete" are "fully enforceable" if they are "reasonable." *Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276, 283-84 (1981). A restrictive covenant is reasonable if it is (1) reasonable in time and area, (2) necessary to protect the employer's legitimate interests, (3) not harmful to the general public, and (4) not unreasonably burdensome to the employee. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999). Defendants' contractual provisions satisfy each requirement.

***Non-Solicitation.*** For four reasons Marsh is likely to succeed in demonstrating the non-solicitation covenants are enforceable. *First*, Defendants agreed to wait one year after the end of their employment before soliciting Marsh employees and soliciting and/or servicing clients that they had contact with or confidential information about in the last two years of their employment with Marsh. Mufson Decl. Exs. 2, 8, 16, 22 §§ 2–3. Defendants further agreed that these restrictions were "necessary to protect the legitimate business interests of the Company" and "reasonable in view of the benefits and consideration [each Defendant] has received or will receive from the Company." Mufson Decl. Exs. 2, 8 , 16 ¶ 6; 22 ¶ 5 6.

The non-solicitation and non-servicing provisions are reasonable in both time and area. With regard to time, federal and state courts in New York have regularly "upheld as reasonable one-year and two-year non-solicitation provisions." *Mastercard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016) (collecting cases). And with regard to area, "New York state courts have upheld . . . client-based restrictions without geographic limitations as reasonable in scope." *Karasaki*, 2008 WL 4778239 at *16. Courts have repeatedly upheld identical or materially identical Marsh non-solicitation and non-servicing provisions in Marsh's contracts as "valid."

*MMA LLC*, 2025 WL 304500 at *7 (collecting cases); *Marsh USA Inc. v. Schuhriemen*, 183 F.Supp.3d 529, 535 (S.D.N.Y. 2016); *Karasaki*, 2008 WL 4778239 at *18; *but see Marsh USA, Inc. v. Alliant Ins. Servs., Inc.,* 26 N.Y.S.3d 72 (N.Y. Sup. Ct. Oct. 19, 2015).[3]

*Second*, this Court should also "join[ ] the great weight of authority" in concluding that Marsh "undeniably has a legitimate interest" in: "protecting its client relationships and good will" and "limiting the solicitation of its employees to depart for its direct competitors." *MMA LLC*, 2025 WL 304500 at *7 (quotation omitted). The contractual provisions are necessary to promote those vital interests.

Marsh has a "legitimate interest in limiting the solicitation of its employees to depart for its direct competitors." *Id.* In the highly competitive insurance brokerage and risk management industry, it takes years to develop the expertise and relationships necessary to service clients and gain their trust, and Marsh has invested heavily in the departing employees, including Defendants, to develop client relations. McClellan Decl. ¶ 4; Schnabolk Decl. ¶¶ 18–19. Marsh bargained for a one-year period after Defendants leave the company before they can solicit other employees to follow suit so that Marsh has an opportunity to re-staff and maintain its clients through other employees. *Supra* pp. 14–16. Marsh is entitled to what it bargained for, to stop "[t]he loss of training and interference with already established relationships" that would result if Defendants are permitted to solicit remaining colleagues to join Howden. *See Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001).

---

[3] Although Justice Ramos held Marsh's non-solicitation provisions unenforceable in *Alliant Insurance Services*, both federal and state courts in New York have recognized that decision was an anomaly. *See*, *e.g.*, *MMA LLC*, 2025 WL 304500 at *6–7 (noting that Justice Ramos "appears to have overlooked the distinction between a covenant not to compete and covenants respecting solicitation and confidential information"); *King v. Marsh & McLennan Agency, LLC*, 2020 WL 1498537, at *4 (N.Y. Sup. Ct. N.Y. Cnty., Mar. 27 2020) (agreeing with Marsh that Justice Ramos's decision is an "outlier").

*Third*, the public will not be harmed by the enforcement of the contract provisions. To the contrary, "the public interest would be advanced by" Marsh's requested relief "because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *MMA LLC*, 2025 WL 304500 at *9 (quoting *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d at 351) (S.D.N.Y. 2018) (cleaned up)).

*Fourth*, Defendants will not be unreasonably burdened by the enforcement of the contract provisions. Marsh has paid Defendants very substantial customized compensation. *See* Schnabolk Decl. ¶ 20. Defendants expressly agreed that the one-year non-solicitation provisions were "reasonable in view of the benefits and consideration Employee has received or will receive from the Company." Mufson Decl. Exs. 3, 9, 17, 23 § 6. Refraining from soliciting Marsh employees and clients imposes no unreasonable burden on Defendants' ability to "earn[] a livelihood" for a year. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 71 (1999).

***Non-Competition.*** For similar reasons, Marsh is likely to succeed in proving its non-competition covenant is enforceable. New York Courts have regularly upheld non-compete provisions of one year or more as reasonable, particularly for senior executives such as Defendants Parrish, Lugones, and Lynn. *See, e.g.*, *Mastercard Int'l Inc.*, 164 F. Supp. 3d at 601 ("New York courts have upheld as reasonable one year and two year non-solicitation provisions") (collecting cases); *Payment All. Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 485 (S.D.N.Y. Dec. 13, 2007) (holding former executive's two-year non-compete provision was reasonable). Given the global nature of Marsh's business relationships with customers and clients who partner with Marsh, the worldwide geographical scope of the restrictive covenant is similarly reasonable. *See Mastercard*, 164 F. Supp. 3d at 602 ("[W]here an employer's business is conducted worldwide to a global customer base, the lack of a geographic restriction [in a restrictive covenant] is necessary").

The Second Circuit's analysis in *Ticor Title* is analogous. 173 F.3d 63 (1999). There, the Court held that a Defendant's $1.1 million in total compensation and $600,000 annual salary, paid in exchange for signing a non-compete, meant that the defendant had "sufficient funds" to sustain him and to assuage the "public policy concern regarding impairment of earning a livelihood" that resulted from the agreement. *Id. at 71.* That reasoning is equally applicable here. Defendants Parrish, Lugones, and Lynn, who were senior leaders of Marsh and negotiated their agreements through counsel at arm-length, Schnabolk Decl. ¶ 20, cannot legitimately claim otherwise to escape their contractual obligations.

**3. Marsh is likely to succeed on its common law claims.**

Marsh is also likely to succeed on its two common law claims.

*First*, Marsh is likely to succeed in proving Defendants all violated their duties of loyalty. "It is a 'firmly established principle in the law of [New York] that [an employee] is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" *Capstone Logistics Holdings, Inc. v. Navarrete*, 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020). Here, Defendants—while employed at Marsh—used Marsh's resources to poach its employees and misappropriated its confidential information—all to build an entirely new competing business. That is definitionally disloyal. *See, e.g.*, *QBE Americas, Inc. v. Allen*, 2022 WL 889838, at *15 (S.D.N.Y. Mar. 25, 2022) (holding plaintiff likely to succeed on duty of loyalty for defendant breaching confidentiality and beginning to work for a competitor during his notice period).

*Second*, Marsh's unfair competition claim is likely to succeed, too. To prove unfair competition, a plaintiff must establish the defendant (1) "misappropriated the plaintiff[]'s labors, skills, expenditures, or good will," and (2) "displayed some element of bad faith in doing so."

*Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 446 (E.D.N.Y. 2011) (cleaned up). Unfair competition covers "any form of commercial immorality" or "endeavor[] to reap where one has not sown," including appropriating "the skill, expenditures and labors of a competitor, and misappropriating for commercial advantage of one person a benefit or property right belonging to another." *Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co*., 610 F. App'x 69, 70 (2d Cir. 2015) (summary order) (cleaned up).

The First Department's holding in *McRoberts Protective Agency, Inc*. is instructive. 61 A.D.2d at 653. There, a high-ranking executive officer resigned to form a new agency in direct competition with his former employer. He "actively set out to divert plaintiff's customers and accounts by soliciting employees to withdraw" and join his new agency. *Id*. Two other officers of the former employer "were still employed by plaintiff when they agreed upon and began such activity in concert with" the executive officer. *Id*. at 654. As a result of the three officers' "disloyal activity" and "plan to appropriate" the plaintiff's business, many employees and clients left plaintiff-corporation for the new agency—which was organized after much of the misconduct. *Id*. The First Department held the defendants were all liable for this unfair competition," *id.* at 655—conduct that differs from Defendants only because Defendants have solicited over 90 employees—not just a few.

**B. Absent injunctive relief, Marsh will suffer irreparable harm from damage to its client relationships and use and/or disclosure of its confidential information.**

Absent a temporary restraining order and preliminary injunction, Marsh will continue suffering two forms of immediate and irreparable harm because of Defendants' breaches, disloyalty and unfair competition: (1) harm to Marsh's relationships with its clients, with attendant losses to Marsh's reputation and goodwill, and (2) a substantial risk of Defendants' continued disclosure of Marsh's confidential information. As Defendants expressly acknowledged in signing

their agreements, only equitable relief is adequate to remedy the harms inflicted by violations of those agreements.

*First*, in soliciting clients and employees for Howden's benefit, Defendants have irreparably harmed Marsh's relationships with its clients, causing losses to Marsh's reputation and goodwill with them. *Supra* pp. 8–10. In one day, more than 90 Marsh employees followed Defendants to Howden's not-yet-operational U.S. business. S*ee* Schnabolk Decl. ¶ 6. So far, at least eight clients of Marsh have followed. McClellen Decl. ¶ 10. The morning of July 21, 2025, Howden had no presence in the United States—no employees, no clients and no office; however, by nightfall it had propped up a U.S. retail broking business, held upright by a mass of Marsh employees. Through this business, Defendants and Howden—Marsh's new direct competitor—purport to provide the *same* services to the *same* clients as Marsh did before the raid. *Supra* pp. 8–10. This unlawfully procured loss was meant to hamstring Marsh's ability to transition clients, expertise, and relationships.

This harm is immediate and ongoing. "It is well established in the Second Circuit that a loss of client relationships and customer goodwill that results from the breach of a restrictive covenant generally constitutes irreparable harm." *MMA, LLC*, 2025 WL 304500 at *10 (citing *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (collecting cases)). Defendants have also deprived Marsh "of the time and opportunity to transition clients from [Defendants] to other [Marsh] employees without interference, which some courts have recognized as a form of irreparable harm." *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 106 (S.D.N.Y. 2021) (internal citations and quotation marks omitted).

The harm to Marsh's business relationships is immeasurable and cannot be calculated or redressed solely through monetary damages. A plaintiff who stands to lose its business

relationships due to breach of restrictive covenants suffers irreparable harm because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title*, 173 F.3d at 69. "[I]nsurance company clients [like Marsh's] tend to develop long-term relationships with their reinsurance brokers, placing coverage through them year after year . . . [t]hus, [t]he total monetary value of [Marsh's] loss of client[s] would be very difficult, if not impossible, to calculate with any exactitude. Nor could the lost goodwill that [Marsh] has built with these clients be easily quantified and compensated." *Willis Re Inc.*, 550 F. Supp. 3d at105–06 (quoting *Karasaki*, 2008 WL 4778239 at *14).

*Second*, Marsh will continue suffering irreparable harm due to the substantial risk of Defendants' continued use and disclosure of its confidential information in the absence of injunctive relief. Irreparable harm may be established where, as here, there is a substantial risk that the Defendant will use and/or disclose the plaintiff's confidential information. *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 179 (S.D.N.Y. 2006). Defendants, as leading executives of Marsh's Florida Zone, possess knowledge of Marsh's confidential business strategies and information, including details about their Marsh colleagues and of Marsh's clients. Schnabolk Decl. ¶ .17

Howden recruited Defendants specifically to prey upon the confidential information they had access to in order to raid Marsh's employee and client bases. As planned, to facilitate the coordinated mass defection of Marsh's employees to Howden and the subsequent solicitation of Marsh's clients, Defendants have already used and disclosed this information in violation of their non-disclosure obligations. Absent equitable relief, Defendants will continue using and disclosing Marsh's protectable confidential information in their solicitation efforts against Marsh. As with

the loss of customer relationships and goodwill, courts regularly acknowledge that it is "very difficult to calculate the monetary damages that would successfully redress the loss associated" with confidential information misappropriation. *Int'l Bus. Machs. Corp. v. Papermaster*, 2008 WL 4974508 at *7 (S.D.N.Y. Nov. 21, 2008) (internal citation omitted); *see also MMA LLC*, 2025 WL 304500 (finding misappropriation of confidential information justifies preliminary injunction enforcing non-solicitation and confidentiality agreements).

*Finally*, each Defendant has already acknowledged "that monetary damages for [breach of their contractual obligations] would not be readily calculable, and that [Marsh] would not have an adequate remedy at law therefor," and accordingly that Marsh is entitled "to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations." Mufson Decl. Exs. 2, 8, 16 § 7; 22 § 67. Courts have recognized that, "[a] movant's demonstration of irreparable harm is strengthened significantly where the employee has previously acknowledged—most often in an employment agreement—that his or her own breach of a restrictive covenant entitles the employer to injunctive relief because of the irreparable injury the movant would incur." *Iannucci v. Segal Co., Inc.,* 2006 WL 8407380, at *3 (S.D.N.Y. June 27, 2006); *see also Estee Lauder Cos.,* 430 F. Supp. 2d at 174 (granting preliminary injunction where non-compete included language entitling former employer to injunctive relief in the event of a breach). The Second Circuit has repeatedly held that comparable language is "arguably . . . viewed as an admission . . . that plaintiff will suffer irreparable harm were [defendant] to breach the contract's non-compete provision." *Ticor Title*, 173 F.3d at 69; *Singas Famous Pizza Brands Corp. . v. N.Y. Advert. LLC*, 468 Fed. App'x 43, 46 (2d Cir. 2012). Accordingly, absent a temporary restraining order or preliminary injunction, Marsh will continue to suffer irreparable harm.

### C. The balance of hardships and public interest strongly favor Marsh because Defendants will suffer no harm from being held to their contractual bargains.

The balance of hardships and public interest both strongly favor Marsh's requested relief. When balancing hardships, "the Court 'must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood.'" *Natsource LLC*, 151 F. Supp. 2d at 472 (quoting *Ticor Title*, 173 F.3d at 69). Marsh will suffer further irreparable harm without injunctive relief—namely, the loss of its ongoing customer relationships and of its goodwill and reputation with its clients, and the disclosure of its protectable confidential information. *See supra* pp. 15–18. Marsh will also face hardship if it is denied the benefit of its bargain with Defendants, a factor that weighs in Marsh's favor. *See*, *e.g.*, *Cortland Line Holdings LLC v. Lieverst,* 2018 WL 8278554 at *9 (N.D.N.Y. Apr. 6, 2018).

By contrast, Defendants will suffer no harm if they are held to their agreed-upon non-solicitation provisions. "New York courts have routinely found that an individual does not suffer undue hardship where a restrictive covenant merely prohibits him from soliciting his former employer's clients for a reasonably defined period of time." *Willis Re Inc.*, 550 F. Supp. 3d at 104 (collecting cases) (quotation omitted). As highly compensated senior executives, Defendants certainly possess sufficient funds and skills to sustain themselves without having to violate their obligations to Marsh. *See Ticor Title*, 173 F.3d at 71. Moreover, Parrish, Lugones, and Lynn continue to be employed and highly compensated by Marsh under Defendants' contractual notice period. Mufson Decl. Exs 1, 7, 15 pp. 4.

The public interest also weighs in favor of the enforcement of valid and binding contracts. "There is undoubtedly a public interest in enforcing valid contracts including such restrictive covenants as they may contain." *HRB Res. LLC v. Schon*, 2019 WL 4015256, at *3 (N.D.N.Y. Apr. 25, 2019). Injunctions enforcing such contracts advance the public interest by "tend[ing] to

encourage parties to abide by their agreements." *Willis Re Inc.*, 550 F. Supp. 3d at 104 (quotation omitted).

**VII. This Court should order expedited discovery in advance of an evidentiary hearing.**

This Court should order expedited discovery in advance of the hearing on Marsh's motion for a preliminary injunction. Courts have wide discretion to permit expedited discovery. *See* Fed. R. Civ. P. 30(b), 34(b); *Benham Jewelry Corp. v. Aron Basha Corp.*, 1997 WL 639037, at *20 (S.D.N.Y Oct. 14 1997). And "[e]xpedited discovery is often made available in cases where preliminary relief is sought." *Advanced Portfolio Tech., Inc. v. Advanced Portfolio Tech., Ltd.*, 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994).

In the Second Circuit, most courts apply a flexible "reasonableness and good cause" standard when evaluating whether a party is entitled to expedited discovery. *R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp. 3d 194, 209 (W.D.N.Y. Dec. 8, 2020). Other courts apply a four-part standard set forth in *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982), which requires the party seeking expedited discovery to demonstrate: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that Defendant will suffer if expedited relief were granted. *See Advanced Portfolio Techs.*, 1994 WL 719696 at *3. Marsh is entitled to expedited discovery under either standard.

Marsh anticipates propounding requests for production and limited interrogatories relating to each Defendant's breach of their agreements with Marsh. Marsh further anticipates deposing each Defendant and a discrete number of third parties, including potentially certain of Defendants' departing colleagues. Marsh also anticipates seeking limited third-party discovery from Howden. To date, the record has been limited to what information Marsh can uncover in its investigation of

Defendants' clandestine raid, made more difficult by the success of Defendants' blatant solicitation. Pertinent information demonstrating the full extent of Defendants' breach remains within their exclusive possession.

Marsh has demonstrated that it will suffer irreparable harm absent injunctive relief and that it is likely to succeed on its claim for breach of Defendants' non-solicitation and non-disclosure covenants with Marsh. *Supra* pp. 9–18. Expedited discovery is warranted because it will likely lead to evidence of Defendants' breach and its production in advance of any preliminary injunction hearing will facilitate the avoidance of irreparable injury. *See Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990). Defendants will suffer no injury by being required to produce documents related to their breach that are currently within their possession. The Court should therefore authorize expedited discovery in advance of the preliminary injunction hearing.

## CONCLUSION

For the foregoing reasons, Marsh respectfully requests that this Court enter an order, substantially in the form of the as-filed proposed order to show cause: (1) temporarily and preliminarily restraining[4] Defendants from directly or indirectly violating their agreements with Marsh, violating their duties of loyalty, and engaging in unfair competition; and (2) authorizing expedited discovery in advance of an evidentiary hearing.

Dated: New York, New York

July 30, 2025

[4] No bond should issue because Defendants have contractually waived that requirement. Exs. 2, 8, 16 § 7; Ex. 22 § 6.

GIBSON, DUNN & CRUTCHER LLP

By: _/s/ *Harris M. Mufson*_____
Harris M. Mufson
Lee R. Crain
200 Park Avenue
New York, NY 10166
Tel.: 212.351.3805
Fax: 212.817.9505
hmufson@gibsondunn.com
lcrain@gibsondunn.com

Jason C. Schwartz (*pro hoc vice forthcoming*)
Ryan C. Stewart (*pro hoc vice forthcoming*)
Amanda C. Machin (*pro hoc vice forthcoming*)
1700 M Street, NW
Washington, D.C. 20036
jschwartz@gibsondunn.com
rstewart@gibsondunn.com
amachin@gibsondunn.com

Karl G. Nelson (*pro hoc vice forthcoming*)
Rachel W. Robertson (*pro hoc vice forthcoming*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
knelson@gibsondunn.com
rrobertson@gibsondunn.com

*Attorneys for Plaintiff Marsh USA LLC*

## WORD COUNT CERTIFICATION

I certify that this Memorandum of Law complies with the applicable word limits excluding the caption, signature lines, certificate of service, and any cover page or index in accordance with Local Civil Rule 7.1(c). This certification is made in accordance with Local Civil Rule 7.1(c). The undersigned relied on the word count feature provided by word processing software. This Memorandum contains 8,449 words.

Dated: July 30, 2025

By: _/s/ *Harris M. Mufson*_____
Harris M. Mufson
200 Park Avenue
New York, NY 10166
Tel.: 212.351.3805
Fax: 212.817.9505
hmufson@gibsondunn.com