UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARSH USA LLC,

                              Plaintiff,

        v.

MICHAEL PARRISH, GISELLE LUGONES,
ROBERT LYNN, and JULIE LAYTON

                              Defendants.

Case No. 1:25-cv-06208-GBD

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

**CARLTON FIELDS, P.A.**

*Attorneys for Defendants Michael Parrish,
Giselle Lugones, and Robert Lynn*

# CONTENTS

**Page**

AUTHORITIES .................................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

FACTS ................................................................................................................................ 4

    A.  Defendants' successful careers predate their employment at Marsh. ......................... 4

    B.  Marsh's failed promises and hardball negotiations caused Defendants to explore a better platform. ................................................................................................. 6

    C.  The Marsh restrictive covenants at issue. .................................................................. 7

    D.  Defendants sought to cooperate with Marsh to return information and develop a fair protocol for transition, but Marsh chose litigation. ............................................... 8

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT ..................................................................................................................... 10

  I.  Marsh Has Not Shown Imminent Irreparable Harm. .................................................... 10

    A.  Marsh's allegations are conclusory and based on supposition and speculation. ........ 11

    B.  Marsh's allegations of past harm are insufficient. ..................................................... 11

    C.  Marsh has not established continuing harm. ............................................................... 12

        1.  Marsh cannot prove future loss of reputation or customer goodwill. ........... 12

        2.  There is no risk of disclosure. ...................................................................... 12

    D.  Marsh has an adequate remedy at law. ....................................................................... 13

  II.  Marsh Failed to Establish a Likelihood of Success on the Merits. ............................... 15

    A.  Marsh is unlikely to prevail on its restrictive covenant claims. ................................. 15

        1.  Marsh has no protectable interest. ................................................................ 15

        2.  The client non-solicitation provision is overbroad and unenforceable. ........ 17

            a.  Marsh cannot bar Defendants from soliciting their personal clients. ....... 17

            b.  Marsh cannot prevent Defendants from soliciting Marsh's "prospective" clients. ............................................................................ 18

            c.  Marsh's definition of "solicitation" is incompatible with New York law. ............................................................................................................. 18

        3.  The Non-Competition Clause is inoperable and unenforceable. ................... 20

            a.  The 2021 RCAs have been novated and superseded. .............................. 20

        b.   The 2021 RCAs are unenforceable even if they remain in effect............. 21

     4.   The Court should reject the restrictive covenants and not blue-pencil
          the agreements to correct Marsh's overreach................................................. 22

   B.  Even if the restrictive covenants were enforceable, Marsh has failed to show
       its breach claims are likely to succeed. ........................................................ 23

       1.   Marsh has not shown a breach of the Employee Non-Solicitation
            Provision............................................................................................... 24

       2.   Marsh has not shown a breach of the Client Non-Solicitation Provision. .... 25

       3.   Marsh has not shown a breach of confidentiality obligations. ...................... 26

   C.  Marsh has not shown a likelihood of success on its common law claims. ................. 27

III. The Balance of the Equities Tips in Defendants' Favor. .................................................. 28

CONCLUSION........................................................................................................................ 30

# AUTHORITIES

**Page(s)**

## Cases

*Agudelo v. Recovo Mortg. Mgmt. LLC*,
No. 22-cv-4004 (JMA)(LGD), 2025 WL 1674486 (E.D.N.Y. June 13, 2025) .....................25

*Aitkin v. USI Insurance Services, LLC*,
No. 2:21-cv-00267, 2021 WL 2179254 (D. Or. May 28, 2021).............................................29

*Aon Risk Services, Inc. of Florida, et al. v. Marsh USA Inc., et al.*,
Case No. 2021-015086-CA-01 (44)...................................................................................3, 24

*Arthur J. Gallagher & Co. v. Marchese*,
36 Misc. 3d 1219(A), (N.Y. Sup. Ct. Feb. 25, 2011) ...........................................................16

*AVCO Fin. Corp. v. Commodity Futures Trading Comm'n*,
929 F. Supp. 714 (S.D.N.Y. 1996)........................................................................................11

*Bajan Grp., Inc. v. Consumers Interstate Corp.*,
28 Misc. 3d 1227(A), (N.Y. Sup. Ct. 2010) .........................................................................19

*Banner Indus. of N.E. Inc. v. Wicks*,
631 F. App'x 79 (2d Cir. 2016) ............................................................................................14

*Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*,
No. 08 Civ. 02152(PKL), 2008 WL 759353 (S.D.N.Y. Mar. 20, 2008) ...............................10

*BDO Seidman v. Hirshberg*,
93 N.Y.2d 382 (1999) ....................................................................................................*passim*

*Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co.*,
610 F. App'x 69 (2d Cir. 2015) ............................................................................................27

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*,
42 N.Y.2d 496 (N.Y. 1977) .................................................................................................22

*Corley v. Jahr*,
2013 WL 265450 (S.D.N.Y. Jan. 24, 2013) ...........................................................................3

*Crye Precision, LLC v. Duro Textiles, LLC*,
No. 15cv1681 (DLC), 2016 WL 1629343 (S.D.N.Y. Apr. 22, 2016) ....................................22

*Davis v. Bank of N.Y. Mellon*,
No. 1:24-cv-7303-GHW, ECF No. 3 (S.D.N.Y. Sept. 27, 2024) .....................................10, 11

*In re Document Techs. Litig.*,
  275 F. Supp. 3d 454 (S.D.N.Y. 2017) .......................................................................15, 16, 5

*Eastview Mall, LLC v. Grace Holmes, Inc.*,
  182 A.D.3d 1057 (4th Dep't 2020) ...........................................................................14

*Elexco Land Servs. v. Hennig*,
  No. 11-cv-00214, 2011 WL 9368970 (W.D.N.Y. Dec. 28, 2011) ...........................22

*Garfinkle v. Pfizer, Inc.*,
  162 A.D.2d 197 (1st Dep't 1990) ..............................................................................21

*Heartland Sec. Corp. v. Gerstenblatt*,
  No. 99 CIV 3694 WHP, 2000 WL 303274 (S.D.N.Y. Mar. 20, 2000) ....................21

*JLM Couture, Inc. v. Gutman*,
  91 F.4th 91 (2d Cir. 2024) ........................................................................................28

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*,
  472 F. Supp. 3d 88 (S.D.N.Y. 2020) .........................................................................12

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
  917 F.2d 75 (2d Cir. 1990) ........................................................................................10

*Kanan, Corbin, Schupak & Aronow, Inc. v. FD Intl., Ltd.*,
  8 Misc. 3d 412 (Sup. Ct. N.Y. Cnty. 2005) ..............................................................29

*Kane v. De Blasio*,
  19 F.4th 152 (2d Cir. 2021) .......................................................................................11

*Koffler v. Joint Bar Ass'n*,
  51 N.Y.2d 140 (1980) ................................................................................................18

*Long Island Conservatory, Ltd. v. Jaisook Jin*,
  14 Misc. 3d 1219(A), (N.Y. Sup. Ct. 2007) .............................................................14

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006)........................................................................................3

*Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*,
  49 Misc. 3d 1210(A), (N.Y. Sup. Ct. 2015) ................................................14, 23, 29

*Marsh USA Inc. v. Doerfler*,
  46 Misc. 3d 1208(A), (N.Y. Sup. Ct. 2015) ............................................................17

*Marsh USA Inc. v. Karasaki*,
  No. 08 Civ. 4195(JGK), 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) ..................18

*Marsh USA Inc. v. Schuhriemen*,
    183 F. Supp. 3d 529 (S.D.N.Y. 2016)...........................................................17, 23

*MasterCard Int'l Inc. v. Nike, Inc.*,
    164 F. Supp. 3d 592 (S.D.N.Y. 2016)....................................................................22

*McRoberts Prot. Agency Inc. v. Lansdell Prot. Agency Inc.*,
    61 A.D.2d 652 (1st Dept. 1978).......................................................................27, 28

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Serv.*,
    769 F.3d 105 (2d Cir. 2014).................................................................................28

*Prager Metis CPAS LLC v. Koenig*,
    No. 652000/2023, 2025 WL 1446802 (Sup. Ct., N.Y. Cnty. May 13, 2025).........18

*Prebon Fin. Prods., Inc. v. GFI Grp., Inc.*,
    Nos. 603085/2000, 115749/2000, 2000 WL 35790805 (N.Y. Sup. Ct. June 7,
    2007) ........................................................................................................................14

*QBE Ams., Inc. v. Allen*,
    No. 22-cv-756 (JSR), 2022 WL 889838 (S.D.N.Y. Mar. 25, 2022).......................16

*Reed, Roberts Assoc. v. Strauman*,
    40 N.Y.2d 303 (N.Y. 1976) .................................................................................15

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990).................................................................................10

*State of N.Y. ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015).................................................................................10

*Silipos, Inc. v. Bickel*,
    No. 1:06-cv-02205, 2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006) .........................21

*Smith v. City of New York*,
    754 F. Supp. 3d 581 (S.D.N.Y. 2024)...................................................................11

*Sterling v. Deutsche Bank Nat. Tr. Co.*,
    368 F. Supp. 3d 723 (S.D.N.Y. 2019)...................................................................23

*Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*,
    43 F. Supp. 3d 236 (S.D.N.Y. 2014)....................................................................27

## Other Authorities

BLACK'S LAW DICTIONARY (5th ed. 1979) ........................................................................9

FED. R. EVID. 201(b) ......................................................................................................3

James Thaler & David Bull, *Exclusive: Marsh McLennan CEO Doyle Accuses Howden of Encouraging His Employees to Violate Employment Covenants*, *The Insurer* (July 25, 2025), https://www.theinsurer. com/ti/news/marsh-mclennan-ceo-doyle-accuses-howden-of-encouraging-his-employees-to-violate-2025-07-25 ........................................................................................................26

*Solicit*, MERRIAM-WEBSTER DICTIONARY (2025), https://www.merriam-webster.com/dictionary/solicit ..................................................................................19

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY ...............................................19

## INTRODUCTION

Plaintiff Marsh USA LLC ("Marsh")'s proposed order (ECF No. 15) would effectively impose a worldwide ban on the provision of insurance services by Defendants Michael Parrish, Giselle Lugones, and Robert Lynn ("Defendants") to any client because Marsh claims the industry as its own. It would prevent Defendants from speaking with their own personal clients and colleagues they have worked with for years (even before they joined Marsh), and effectively bar Defendants from earning a living. The record Marsh presents for such extraordinary relief is long on innuendo and speculation and short of facts to support Marsh's extraordinary request. Put simply, Marsh has not met its burden as the movant seeking injunctive relief.

Despite Marsh's rhetoric about fair competition, Marsh loathes new competition in the U.S. brokerage market, where it has long been the biggest bully on the block. By this action, Marsh wants to keep what it has no right to claim: Defendants personal clients and at-will team members who've chosen to follow Defendants to Howden. Although Marsh claims Defendants' resignations for better jobs constitute anti-competitive conduct, it is Marsh that wants to stifle competition.

Defendants are leaders in the insurance brokerage industry. Marsh aggressively recruited them away from a competitor, Aon, in 2021. As Marsh expected, most of Defendants' teams and personal clients followed them to Marsh. That's the same conduct Marsh now decries as anti-competitive.

Marsh hired Defendants as at-will employees. They signed a series of restrictive covenant agreements, but the covenants' terms changed over time, culminating in 2025 with a superseding set without non-compete clauses—a point Marsh never addresses in its submissions to this Court.

While Defendants Lugones and Parrish were negotiating terms for contract extensions earlier this year, they learned Howden was looking to establish a U.S. presence offering retail

insurance brokerage services. They chose to join Howden and left it to the individual decisions of their team members and clients as to whether they wanted to move as well. Many did.

Now, having lost to the same type of market competition Marsh championed four years ago, and to tactics Marsh routinely uses against competitors to this day, Marsh asks this Court to act in equity and hand it the win it could not secure through negotiations.

Marsh seeks aid here even though it filed only after being sued in New York state court by Parrish, Lugones, a third former employee, and their future employer, Howden U.S. Services LLC ("Howden"), over the same issues and contracts. As noted in other briefing before this Court, Marsh should not be permitted to proceed with this action as Howden is a necessary party and, if joined, this Court would lose jurisdiction. Also, all the issues here can be addressed in the state court action. In fact, Marsh has already filed a motion to dismiss the state court action raising the enforceability of the restrictive covenants at issue here. *See* Declaration of Counsel in Support of Defendants' Opposition to Plaintiff's Application for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery ("McCoy Decl.") at Exh. C.

To the extent this Court moves past those initial procedural issues, the Court should deny Marsh's request because Marsh has not met its burden to satisfy any of the criteria for the extraordinary and drastic remedy it seeks:

**First**, **Marsh cannot carry its burden to show irreparable harm.** The operative restrictive covenant agreements (the "2025 RCAs") have liquidated damages provisions to address the harm from any loss of clients. Those clauses specifically account for any loss of goodwill or client relationships and impose a formula to calculate such loss. Harms that can be so precisely redressed with monetary relief are not irreparable. Nor can Marsh show any other harm that would be irreparable. While emphasizing that Defendants had access to Marsh's allegedly confidential information during their employment, Marsh does not offer any evidence such information was

shared with Howden (or any other third party) or misappropriated. And the Declarations of the Defendants categorically deny that any confidential information was taken or used.

**Second**, **Marsh cannot prove it is likely to succeed on the merits.** A restrictive covenant is valid only to protect trade secrets or confidential information, to prevent competition from "unique" or "extraordinary" talents, or to protect goodwill with clients that a plaintiff generated through its time and resources. None of those interests is present here, because (i) there is no evidence confidential information was misappropriated; (ii) insurance brokers are not "unique" or "extraordinary" under New York law; and (iii) the clients at issue are personal clients Defendants originated through independent efforts and, in many cases, before they began working for Marsh. Defendants have no intent to solicit Marsh's clients in the 12-months of the restrictive covenants.

**Third**, **the equities do not tip in Marsh's favor.** The public interest is better served by vibrant competition in the insurance brokerage industry, with employees free to seek better opportunities and clients free to do business with brokers they trust from decades of service. Marsh's statement when it was defending Defendants' choice to join Marsh four years ago rings just as true today: "This Court should not now aid [Plaintiff] in suppressing 'more choice in . . . [the] marketplace."[1]

---

[1]    *See* Marsh's Response and Memorandum of Law in Opposition to Plaintiffs Aon Risk Services, Inc. of Florida, Aon Risk Services Companies, Inc. and Aon Group Inc.'s Emergency Petition for Temporary Restraining Order and Preliminary Injunction, McCoy Decl., Exh. A at 2.  Marsh's position four years ago defending exactly the same conduct it now decries is laid bare in those filings with a Florida court.

Pursuant to Federal Rule of Evidence 201(b), Defendants request the Court take judicial notice of that memorandum in the prior Aon/Marsh litigation, *Aon Risk Services, Inc. of Florida, et al. v. Marsh USA Inc., et al.*, Case No. 2021-015086-CA-01 (44), filed in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, and of all documents filed in that Florida state court docket, as they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (docket sheets are public records of which the court could take judicial notice); *Corley v. Jahr*, 2013 WL 265450, at *6 (S.D.N.Y. Jan. 24, 2013), *report and recommendation adopted*, 2013 WL 1453367 (S.D.N.Y. Mar. 28, 2013) (taking judicial notice of state court filings).

# FACTS

### A.    Defendants' successful careers predate their employment at Marsh.

Defendants are highly experienced professionals in the Florida insurance brokerage industry who have worked together for many years. Declaration of Michael Parrish (the "Parrish Decl.") ¶ 2. Marsh has admitted that when it hired the Defendants in 2021, they were already "major players and highly respected" in the Florida insurance market. McCoy Decl. at Exh. A at 9. Indeed, Defendants were all long-time colleagues at Marsh's competitor, Aon. Parrish Decl. ¶ 3. And each of them was, as Marsh described, a "top producer[]" before joining Marsh. McCoy Decl. at 8. That is why Marsh hired Defendants. *See id.* at 9-10.

Parrish has been in the insurance brokerage business since 1988. Parrish Decl. ¶ 2. For most of his career, Parrish worked at Aon, eventually becoming Aon's Managing Director and then the head of East Coast operations. *See id.* at ¶ 4. While at Aon, Parrish developed close relationships with his team, including Lugones, Lynn, and Julie Layton. *See id.* at ¶ 3. He also built an impressive client list through personal relationships, hard work, skill, and attention to client needs. *See id.* at ¶ 2.

In 2021, Marsh recognized the value of Parrish, his team, and his portfolio of clients, and approached Parrish about leaving Aon to join Marsh. *See id.* at ¶ 5. In its recruitment efforts, Marsh—through Jeff Alpaugh, then the U.S. and Canada Growth and Industry Leader for Marsh, and Martin South, then the President of Marsh U.S. & Canada—told Parrish that Marsh wanted him because of the team he had. *See id.* Marsh knew recruiting Parrish would lead to it also hiring most of Parrish's team and taking on most of his clients. *See id.* at ¶ 6. Marsh also recognized brokers have personal relationships with clients, which is why clients follow brokers to new brokerages. *See id.* at ¶ 7. Marsh preferred to recruit Parrish's team rather than building its own

Florida team organically over time because Marsh had tried to do that before without success. *See id.* at ¶ 6.

After Marsh recruited Parrish, many members of his team, and many of his clients away from Aon in 2021, Parrish served as a Zone Leader at Marsh. *See id.* at ¶ 15. Today, Parrish is a "senior leader" in the insurance brokerage industry. McCoy Decl. at Exh. A at 3.

Lugones is a senior leader in the health care segment of the insurance brokerage market. Before joining Marsh, Lugones already managed an extensive portfolio of health care clients. Declaration of Giselle Lugones (the "Lugones Decl.") ¶ 5. Over her more than 35-year career, Lugones developed personal rapport and friendships with these clients. *See id.* They travel and share holidays together. *See id.* at ¶ 3. Lugones's clients have trusted her to understand their risk exposures, analyze their coverage needs, and develop strategies to procure coverage from insurers. *See id.* at ¶ 5. When Marsh was recruiting Lugones to join in 2021, Marsh recognized the valuable client relationships Lugones had developed and the loyalty those clients had to her, which is why Alpaugh and South told her that they expected her clients to follow her to Marsh if she left Aon. *See id.* at ¶ 6.

Lynn also has more than 35 years of experience in the industry. Declaration of Robert Lynn (the "Lynn Decl.") ¶ 5. He worked with Parrish for more than 20 years at Aon. *See id.* In that time, he came to view Parrish as a friend, colleague, and mentor, and worked with him to develop a team of successful professionals and clients. *See id.* at ¶ 6. Lynn's clients are also personal friends he socializes with outside of work who have followed him across brokerage firms. *See id.* at ¶ 17.

Many of Defendants' clients are long-standing personal clients who followed them to Marsh, and some of whom have now chosen to continue their relationship with them at their new employer, Howden. Parrish Decl. ¶ 32; Lugones Decl. ¶ 4; Lynn Decl. ¶ 16-17. These clients did

not originate from Marsh's internal development efforts, but rather from Defendants' own relationship- and client-based skill sets. Parrish Decl. ¶ 32; Lugones Decl. ¶ 4; Lynn Decl. ¶ 17.

Indeed, as Marsh itself has emphasized, these relationships are one of the key reasons why brokers "frequently switch firms." McCoy Decl. at Exh. A at 2.

### B.    Marsh's failed promises and hardball negotiations caused Defendants to explore a better platform.

In 2021, Marsh asserted its "employee-focused approach" and pledge to provide "strong support to [its new] recruits" and "outstanding compensation packages" were what attracted Parrish, Lugones, Lynn, Layton, and others to leave Aon and join Marsh. McCoy Decl. at Exh. A at 3. But four years was long enough for the individuals who left Aon to recognize Marsh had failed to deliver on its promises. *See* Parrish Decl. ¶ 10; Lugones Decl. ¶ 13; Lynn Decl. ¶ 12.

When Lugones and Parrish sought to renegotiate their employment contracts earlier this year, they raised the issues they had experienced since joining, including the disorganized management structure that was detrimental to broker success. Lugones Decl. ¶ 7-8; Parrish Decl. ¶ 15. Marsh responded by proposing to dramatically reduce Lugones's and Parrish's compensation and remove material terms and conditions designed to protect them, such as "for cause" termination provision. Lugones Decl. ¶ 8; Parrish Decl. ¶ 15. The change from guaranteed compensation, the standard practice for high-level brokers like Lugones and Parrish, to production-based compensation would require Lugones and Parrish to compete against more junior members of their own teams as they developed business within the same client group. Lugones Decl. ¶ 8-9. Of course, such self-cannibalization destroys a team.

Lynn also experienced substantial problems due to Marsh's business practices. Lynn was frustrated by the lack of competitive compensation to attract and keep talent on his team, by

procedural obstacles that made hitting sales goals challenging, and by the fact that different Marsh entities competed for the same clients. Lynn Decl. ¶ 8.

The issues with Marsh did not end there. Over a four-year period, Marsh cycled through three different CEOs in quick succession, including South. Parrish Decl. ¶ 10; Lugones Decl. ¶ 7. The turbulence in the C-Suite upset the corporate culture. Parrish Decl. ¶ 10. Also, Marsh implemented policies that drained authority from leadership positions, such as Parrish's role, and reduced its workforce by outsourcing employees to other countries. *See id.* at ¶ 10, 13. These actions were detrimental to Defendants' teams, as long-standing members of the teams were affected by Marsh's headcount and outsourcing reduction efforts. *See id.* at ¶ 13. Marsh's policies also directly impacted Defendants' service delivery to their clients. *See id.*

During their interviews and as part of the recruitment process, Howden did not condition Defendants' job offers on any of their colleagues or clients leaving Marsh. Parrish Decl. ¶ 18, 26; Lugones Decl. ¶ 16; Lynn Decl. ¶ 11. Although Defendants informed their team members they were leaving Marsh, Defendants left it to each individual member to decide what to do, with some deciding to stay at Marsh. Parrish Decl. ¶ 22; Lugones Decl. ¶ 19; Lynn Decl. ¶ 14-15.

### C.    The Marsh restrictive covenants at issue.

Defendants originally had to sign a Non-Competition and Non-Solicitation Agreement (the "2021 RCAs") as a pre-condition of their employment (and future awards) with Marsh. Parrish Decl. ¶ 8. Defendants' 2021 RCAs had a non-competition provision. The 2021 RCAs incorporate by reference a separate Confidentiality Agreement. *See id.*

The 2021 RCAs were superseded in 2022, and the 2022 RCAs were then superseded in 2025. Indeed, this February, Marsh provided, and Defendants acknowledged, a new set of RCAs. The 2025 RCAs expressly stated that they "shall supersede all non-competition or non-solicitation agreements or provisions signed in connection with or as a condition to prior Awards." Lugones

Decl. ¶ 14; Lynn Decl. ¶ 18; Parrish Decl. ¶ 9. 2025 RCAs § 10. The 2025 RCAs did not have non-competes. And for client solicitations they purported to impose restrictions only on the solicitation of *Marsh's* clients, not the personal clients Defendants had for decades before their employment with Marsh.

Marsh's Motion wrongly asserts that Defendants are subject to a non-competition provision contained in the 2021 RCAs. ECF Doc. No. 15 at 6. In fact, Marsh's motion ignores the 2025 RCAs altogether. *Id.* at 6. As explained below, the 2025 RCAs say they supersede all other non-competition and non-solicitation agreements or provisions.

The 2025 RCAs and the General RCAs also have liquidated damages clauses that provide a formula for calculating damages in the event an employee solicits clients in which Marsh holds a lawful interest. 2025 RCAs § 8; General RCAs § 7.

### D. Defendants sought to cooperate with Marsh to return information and develop a fair protocol for transition, but Marsh chose litigation.

On July 21, 2025, Defendants provided notice to Marsh of their intent to resign. Parrish Decl. ¶ 21; Lugones Decl. ¶ 18; Lynn Decl. ¶ 2. Defendants are still Marsh employees and have not yet started employment at Howden.

In connection with their resignation notices, Defendants, through undersigned counsel, reached out to Marsh to learn Marsh's expectations for devices, data, confidential information, and communications with both clients and employees during the transition from Marsh to Howden. In a letter dated July 23, 2025, counsel for Defendants informed Marsh that Defendants wished to "establish protocols to address a host of emerging issues" and to ensure "a smooth and amicable separation" and "avoid misunderstandings concerning [Defendants'] conduct or intentions." Mufson Decl., ECF Doc. No. 20 at Ex. 48. On July 24, 2025, Defendants' counsel wrote a letter explaining that Defendants' Marsh-owned phones and laptops had been returned. Counsel also

welcomed Marsh to identify specific documents Marsh considered confidential or trade secret information so that Defendants could work through a protocol to return or destroy them. Mufson Decl., ECF Doc. No. 20 at Ex. 49.

Marsh never identified such documents. Instead, in a letter dated July 26, 2025, Marsh took the position that it had no responsibility to identify the documents or information in Defendants' possession. *See* ECF Doc. No. 20-44. Marsh further demanded that Defendants agree that non-competes currently exist, even though they do not, and that Defendants would adhere to the grossly overbroad positions that Marsh takes concerning Defendants' post-resignation conduct. *Id.*

Faced with Marsh's overreach, Defendants, Howden, and an additional Marsh employee, Michael Landa, filed an action for declaratory relief in the Commercial Division of the New York Supreme Court. The state court action was filed before this action commenced. (*Compare* ECF No. 1 *with* ECF No. 51-1). As explained in Defendants' motion to dismiss and Howden's motion to intervene, this entire case represents Marsh's intent to forum-shop and claim-split. (*See* ECF Nos. 41, 50).

Separate from Defendants' efforts to engage Marsh in a dialogue, Howden told each Defendant to (i) comply with any applicable contractual notice periods; (ii) "return all Marsh property, documents or information to Marsh, and not [ ] bring any such materials to Howden and/or utilize them in any way"; and (iii) honor non-solicitation provisions restricting them from soliciting their former colleagues at Marsh. Mufson Decl., ECF Doc. No. 20 at Ex. 40. Howden so instructed all new hires. *See id.* Howden also wrote to Marsh of these efforts to ensure Marsh's legitimate interests are protected and welcomed a dialogue on the application of non-solicitation provisions to certain clients in "the hope that an acceptable resolution can be reached." ECF Doc. No. 20-38. Marsh declined to engage on a protocol that would have addressed many of the issues

it now presents to the Court. Marsh preferred litigation instead of a professional, managed transition.

## LEGAL STANDARD

"Temporary restraining orders and preliminary injunctions are extraordinary and drastic[;] [they] are never awarded as of right, or as a routine matter." *Davis v. Bank of N.Y. Mellon*, No. 1:24-cv-7303-GHW, ECF No. 3, at 1 (S.D.N.Y. Sept. 27, 2024) (internal citations and quotations omitted); *see also JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990).

To prevail, Marsh must establish: "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *State of N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citation omitted). Marsh must establish each of the elements by a preponderance of the evidence. *Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, No. 08 Civ. 02152(PKL), 2008 WL 759353, at *4 (S.D.N.Y. Mar. 20, 2008).

## ARGUMENT

### I.    Marsh Has Not Shown Imminent Irreparable Harm.

A "showing of probable irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citation omitted). Thus, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction" will be considered. *Id.* The threatened injury must be shown "to be imminent, not remote or speculative," and "must be one incapable of being fully remedied by monetary damages." *Id.*

Marsh has not met this considerable burden.

### A. Marsh's allegations are conclusory and based on supposition and speculation.

Marsh's Motion and the supporting materials provide no detail about the purported basis on which it will suffer irreparable harm absent an injunction. Marsh presents no evidence of the theft or misuse of confidential information or trade secrets, or of harm to any other legitimate interest that would support Marsh's proposed injunction. Nor has Marsh alleged that it invested any specialized training or development in Defendants, or their teams, or their clients that would justify the restraint of trade it asks this Court to impose. Despite Plaintiffs' complete failure to carry this burden, Defendants have come forward to specifically refute Marsh's bald assertions. *See generally* Lugones Decl.; Parrish Decl.; Lynn Decl. Marsh's speculation and conclusory statements do not support an injunction.

### B. Marsh's allegations of past harm are insufficient.

"Preliminary injunctions are appropriate only to prevent prospective harm until the trial court can decide the case on the merits." *Kane v. De Blasio*, 19 F.4th 152, 172 n.20 (2d Cir. 2021). Courts in this district routinely deny temporary restraining orders and preliminary injunctions when a movant establishes only past injury. *See, e.g.*, *Smith v. City of New York*, 754 F. Supp. 3d 581, 584 (S.D.N.Y. 2024); *AVCO Fin. Corp. v. Commodity Futures Trading Comm'n*, 929 F. Supp. 714, 719 (S.D.N.Y. 1996); *Davis*, ECF No. 3, at 1. Despite that well-settled law, Marsh's Motion is based largely on alleged actions done or completed on or before the date of Defendants' resignations. *See* ECF Doc. No. 15 at 13-16.

**C.      Marsh has not established continuing harm.**

Marsh claims continuing harm in two ways: (1) a loss of client relationships and "attendant losses" to reputation and good will; and (2) a risk of disclosure of confidential information. *Id.* at 21. But Marsh alleges no facts supporting either assertion.

### 1.      Marsh cannot prove future loss of reputation or customer goodwill.

Loss of customer goodwill will not support injunctive relief when the claimed loss is "doubtful." *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 472 F. Supp. 3d 88, 93 (S.D.N.Y. 2020) (citation omitted). Marsh has nothing more than conclusory arguments on this front.

Indeed, Marsh cannot show an imminent risk of *future* and irreparable harm concerning the loss of client goodwill. The personal clients who already left to follow Defendants do not pose future harms, and the suggestion that other clients may leave in the future is too speculative.

Nor does Marsh explain how this perceived future risk relates to the loss of any goodwill. Marsh presents no evidence to the Court that Defendants are defaming Marsh in the marketplace. Marsh has no evidence that any confidential or other information is being used to win unnamed prospective clients away from Marsh. Nor is there any risk of market confusion by use of Marsh's trademarks. Marsh's failures in this regard expose what it really seeks: to quash legitimate competition in the marketplace.

### 2.      There is no risk of disclosure.

The Motion does not offer evidence of any imminent breaches that would occur absent judicial intervention. Nor could it. Defendants and Howden have done all they can to allay Marsh's concerns. Defendants have returned their devices, have offered to work with Marsh to identify and return confidential information, and have no intent to solicit Marsh's clients or employees during

the non-solicitation period. *See* Mufson Decl., ECF Doc. No. 20 at Ex. 49. And the burden to show

otherwise is on Marsh.

Defendants' precautions all militate against finding risk of imminent, irreparable harm.

Marsh, represented by the same litigation counsel at Gibson Dunn, made the same point four years

ago, when it hired Defendants away from Aon:

> Finally, the notion that the specific relief Aon seeks will avert irreparable harm is
> flawed. Aon asks for an order directing that Marsh's new employees comply with
> their contracts . . . . Marsh is doing exactly that: instructing its employees to honor
> their contractual obligations, including with respect to non-solicitation, non-
> competition, protecting confidential information, and preserving their notice
> period . . . . ***There is no need for judicial intervention here and no actual
> irreparable harm Aon will suffer*** absent immediate, emergency relief.

McCoy Decl. at Exh. A at 30 (emphasis added). Here, Defendants followed the exact same

protocol Marsh believed appropriate four years ago when Defendants left Aon for Marsh. But

Marsh takes an opposite position now.

**D.    Marsh has an adequate remedy at law.**

Marsh's Motion fails for the added reason that Marsh has an adequate remedy at law. As

an initial matter, Marsh's suggestion that "it would be very difficult to calculate monetary damages

that would successfully redress" its harm, ECF Doc. No. 15 at 22–23, is at odds with the arguments

Marsh has advanced to this Court stating that eight (8) clients have elected to leave. Marsh surely

knows the names of those clients, the revenue associated with those clients, and the revenue it

projected to earn from those clients. Marsh can reasonably calculate whatever damages it claims

in association with those clients electing to follow their long-time brokers if liability is ultimately

determined on the presentation of the full merits of the case.

Even if that were not so, Marsh included a liquidated damages provision in the RCAs with

each Defendant. As the New York Court of Appeals has noted, the very purpose of a liquidated

damages provision is to "fix[] . . . in advance" a "reasonable measure of the anticipated probable

harm." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 396 (1999). Once parties have reached agreement on the formula for calculating money damages to address the alleged harm, such harm is no longer "irreparable."

Marsh is well aware of this principle. In *Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*, Marsh sought a temporary restraining order and preliminary injunction following another competitor's hiring of Marsh personnel. *See* No. 651994/15, 2015 WL 6499525, at *6 (N.Y. Sup. Ct. 2015). Marsh alleged that "the Individual Defendants solicited Marsh clients immediately after Alliant hired them, and the clients terminated their relationships with Marsh shortly thereafter." *Id*. The court denied Marsh's requested injunctive relief, pointing to liquidated damages provisions in the departed employees' agreements. Those liquidated damages provisions showed "the damages that Marsh incurred by losing clients to Alliant can be quantified as lost profits" and the agreements "provide[d] for specific monetary relief." *See id; see also Eastview Mall, LLC v. Grace Holmes, Inc.*, 182 A.D.3d 1057, 1058 (4th Dep't 2020) (denying preliminary injunction where contract had a liquidated damages provision so plaintiff had an adequate remedy at law); *Long Island Conservatory, Ltd. v. Jaisook Jin*, 14 Misc. 3d 1219(A), at *3 (N.Y. Sup. Ct. 2007) (same); *Prebon Fin. Prods., Inc. v. GFI Grp., Inc.*, Nos. 603085/2000, 115749/2000, 2000 WL 35790805 (N.Y. Sup. Ct. June 7, 2007) (same).

So too here. The liquidated damages provision expressly provides for a method to calculate damages in the event of a violation. The provision further states that the liquidated damages "amount is a reasonable approximation of the damages likely to occur following a breach."

In sum, Marsh's efforts to obtain injunctive relief despite having an actual way to calculate and recover losses due to clients who chose to leave should end the Court's analysis. Marsh has no need for the extraordinary remedy of injunctive relief.

14

**II.    Marsh Failed to Establish a Likelihood of Success on the Merits.**

**A.    Marsh is unlikely to prevail on its restrictive covenant claims.**

"As a general rule, New York courts disfavor restrictive covenants in the employment context." *Banner Indus. of N.E. Inc. v. Wicks*, 631 F. App'x 79, 80 (2d Cir. 2016) (citation omitted). And as the New York Court of Appeals has summarized, "judicial disfavor of these covenants is provoked by 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.'" *Reed, Roberts Assoc. v. Strauman*, 40 N.Y.2d 303, 307 (N.Y. 1976) (citation omitted). As the Court of Appeals noted, "our economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas." *Id.* "Therefore, no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment." *Id.* Thus, the N.Y. Court of Appeals has emphasized that a restrictive covenant can be enforced only if it (i) is "***no greater*** than is required for the protection of the ***legitimate interest*** of the employer," (ii) does not impose undue hardship on the employee, and (iii) is not injurious to the public. *BDO Seidman*, 93 N.Y.2d at 388–89 (emphasis in original).

Here, Marsh cannot satisfy any of the foregoing elements.

**1.    Marsh has no protectable interest.**

Marsh lacks a valid protectable interest in suppressing Defendants' conduct, making the provision entirely unenforceable. That is why Marsh refused to engage when Defendants asked Marsh to identify any confidential information of concern before this lawsuit. In fact, Marsh provides nothing beyond generic references to trade secrets and confidential information; it does not identify what protectable interest exists to support its restraint of trade.

The decision in *In re Document Technology Litigation* is instructive. *See* 275 F. Supp. 3d 454 (S.D.N.Y. 2017). There, the plaintiff sought a preliminary injunction against four former

employees and a competitor seeking, *inter alia*, to prohibit the defendants from soliciting the plaintiff's other employees. *See id.* at 466. The court declined to award this relief, holding that the plaintiff's allegations, even if true, failed to identify a protectable interest: "'[T]he potential harm to a company's operations arising from the coordinated *en masse* resignation of several employees is not a legally cognizable interest for the purposes of a restrictive covenant." *Id.* (cleaned up). The "legitimate interest of the employer must protect against unfair competition, not simply . . . competition in a general sense." *Id.* That is why "the New York Court of Appeals has 'limited the cognizable employer interests . . . to the protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are 'unique or extraordinary.'" *Id.* (emphasis added). Marsh's effort to enforce the Employee Non-Solicitation Provision here fails for the same reason.

Marsh argues that the insurance brokerage industry is "highly competitive" and that it takes "years" to develop "expertise," ECF Doc. No. 15, but Marsh does not (and cannot) argue that Defendants or other Marsh employees are unique or extraordinary as defined by the law. Indeed, "New York courts have repeatedly held that insurance brokers and agents do not provide 'unique or extraordinary' services that might entitle an employer to greater protection from restrictive covenants." *QBE Ams., Inc. v. Allen*, No. 22-cv-756 (JSR), 2022 WL 889838, at *11 (S.D.N.Y. Mar. 25, 2022); *accord Arthur J. Gallagher & Co. v. Marchese*, 36 Misc. 3d 1219(A), at *3 (N.Y. Sup. Ct. Feb. 25, 2011) ("Plaintiff has not established that the Defendants were unique employees. They were insurance brokers.").

If Marsh believed Defendants were as unique as it now claims, it should not have played hardball in negotiating terms for a new contract. Marsh refused the terms Defendants required to continue with Marsh. In effect, Marsh asks this Court to protect it from the results of its own failed negotiations. "Heads I win, tails you lose" is not a cause of action.

### 2. The Client Non-Solicitation provision is overbroad and unenforceable.

*a. Marsh cannot bar Defendants from soliciting their personal clients.*

As Marsh knows, it has no legitimate interest in preventing Defendants from soliciting or servicing their "personal clients"—*i.e.*, clients Defendants developed "as a result of [their] own independent efforts, rather than being generated and maintained primarily" by Marsh. *Marsh USA Inc. v. Doerfler*, 46 Misc. 3d 1208(A), at *5 (N.Y. Sup. Ct. 2015); *see also BDO Seidman*, 93 N.Y.2d at 393; *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 537 (S.D.N.Y. 2016) ("[T]he injunction must be made compatible with *BDO Seidman* by exempting any personal clients of Mr. Schuhriemen.").

In the case of personal clients, the goodwill developed with the client belongs to the Defendants, rather than to Marsh, and the Client Non-Solicitation Provision is unenforceable. *See BDO Seidman*, 93 N.Y.2d at 393. Defendants cultivated such personal relationships here. *See* Parrish Decl. ¶ 5; Lugones Decl. ¶ 5; Lynn Decl. ¶ 17.

Here, as in the above cases, Defendants have well-documented pre-existing relationships with their clients, who have been personally loyal to them for many years. *See* Parrish Decl. ¶ 32; Lynn Decl. ¶ 17. Many of these client relationships predate Defendants' employment with Marsh, Lugones Decl. ¶ 5, and they followed Defendants from Aon to Marsh just four years ago. Parrish Decl. ¶ 6. There are essentially three groups of clients at issue: (1) clients Defendants had pre-existing relationships with before they came to work at Marsh; (2) clients Defendants personally developed while working at Marsh; and (3) clients of Marsh with whom Defendants were not involved. The first group of clients are indisputably personal clients Marsh has no legitimate interest in preventing Defendants from soliciting or servicing. The second group are also Defendants' personal clients because they came to Marsh because the Defendants were there.

17

Marsh played no role in the Defendants' successful efforts to obtain those clients. And Marsh has failed to meet its burden to show that these clients were generated and maintained by it as opposed to the Defendants' independent efforts. As for the third group, Defendants do not intend to solicit or service them, and Marsh has not met its burden to demonstrate otherwise.

    b. *Marsh cannot prevent Defendants from soliciting Marsh's "prospective" clients.*

 "A prohibition against the solicitation of prospective clients is impermissible as there is no protectable client relationship." *Prager Metis CPAS LLC v. Koenig*, No. 652000/2023, 2025 WL 1446802, at *5 (Sup. Ct., N.Y. Cnty. May 13, 2025). Marsh therefore lacks a legitimate interest in preventing Defendants from soliciting "prospective" clients.

 Once again, a previous case involving Marsh is on point. In *Marsh USA Inc. v. Karasaki*, Marsh sought a preliminary injunction that, *inter alia*, would have prohibited a former employee from soliciting "prospective clients" he solicited while employed at Marsh. *See* No. 08 Civ. 4195(JGK), 2008 WL 4778239, at *21 (S.D.N.Y. Oct. 31, 2008). The court rejected this request, noting the lack of any evidence that the former employee used Marsh's confidential information in connection with such solicitations, and thus the lack of any protectible interest. *See id.* at *17.[2]

    c. *Marsh's definition of "solicitation" is incompatible with New York law.*

 Marsh's Motion and proposed order show its definition of "solicitation" is grossly overbroad.

 New York courts, including the New York Court of Appeals, look to dictionary definitions to define solicitation. *E.g.*, *Koffler v. Joint Bar Ass'n*, 51 N.Y.2d 140, 146 (1980) ("To 'solicit'

---

[2] The court in *Karasaki* applied the non-solicitation clause to existing Marsh clients that the former employee began servicing after he had joined Marsh. Unlike Defendants here, Mr. Karasaki did not have any personal client relationships before joining Marsh and conceded as much. *Id.* at *17.

means to move to action, to endeavor to obtain by asking, and implies personal petition to a particular individual to do a particular thing") (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY and BLACK'S LAW DICTIONARY (5th ed. 1979)). *Merriam-Webster*'s online dictionary defines "solicit" as: "to approach (someone) with a request or plea;" "to make petition to;" "to try to obtain (something) by usually urgent requests or pleas." *Solicit*, MERRIAM-WEBSTER DICTIONARY (2025), https://www.merriam-webster.com/dictionary/solicit. Thus, solicitation requires that an individual initiate contact with someone and make a request or plea for that person to do something. *E.g.*, *Bajan Grp., Inc. v. Consumers Interstate Corp.*, 28 Misc. 3d 1227(A), at *7, (N.Y. Sup. Ct. 2010) (collecting cases, including a Fourth Circuit decision, holding that solicitation requires the initiation of contact and holding that no solicitation occurred because party did not initiate contact).

To avoid overbreadth, any non-solicitation provision must prohibit Defendants only from initiating contact and making a request or plea for the individual (employee or client) they contacted to move to Howden. Valid non-solicitation provisions are not violated if, for example, individuals contact Defendants to inquire about their move to Howden and Defendants confirm they are moving to Howden. Nor is a valid non-solicitation provision violated if Defendants respond to an inquiry by providing a neutral statement: "If you would like to work with Marsh, please contact Mr. Smith. If you would like to work with Howden, please contact Ms. Jones." That is not solicitation. It is fair competition. And it is exactly why Defendants proposed such a protocol to Marsh before Marsh rushed to file this suit. Marsh addresses none of this in its pleas to this Court to muzzle Defendants under any and all circumstances. This is another indicator that Marsh's true intention is to stifle the free market through a grossly overbroad injunction that far exceeds the bounds permitted under New York law.

### 3.    *The Non-Competition Clause is inoperable and unenforceable.*

Marsh's focus on the non-competition provision in the 2021 RCAs is misplaced for several reasons.

#### a.  *The 2021 RCAs have been novated and superseded.*

The 2021 RCAs are inoperative, having been novated by the 2022 RCAs,  which were in turn novated by the 2025 RCAs. The 2025 RCAs "supersede[d] all non-competition or non-solicitation agreements or provisions signed in connection with or as a condition to prior Awards," 2025 RCAs § 10. That includes the 2021 RCAs, which are non-competition and non-solicitation agreements that were signed in connection with Defendants' eligibility for multiple Awards. Those Awards include certain "Special Awards," "Additional Awards," "Deferred Stock Units" awards, and "long-term incentive awards," in accordance with the terms of their respective 2021 Offers of Employment. *See* Mufson Aff. Exh 1; *accord* Mufson Aff. Exh. 1 [Parrish Offer Letter]; Exh. 7 [Lugones Offer Letter]; Exh. 15 [Lynn Offer Letter].

In fact, Defendants' execution of the 2021 RCA was an explicit pre-condition to eligibility for or receipt of a "Special Award" of cash, an "Additional Award" of cash, a "Deferred Stock Units" award, "long-term incentive awards," and participation in a bonus plan in accordance with the terms of their Offer of Employment. *See, e.g.,* Mufson Aff. Exh 1 ("In order to be eligible for and receive the Special Award, you will have to execute the Company's restrictive covenant and confidentiality agreements as listed below. … In order to be eligible for and receive the Additional Award, you will have to execute the Company's restrictive covenant and confidentiality agreements as listed below."); Lugones Decl. ¶ 14; Lynn Decl. ¶ 18.[3]

---

[3]    Also, the 2021 RCAs' own recitals connect the contracts to Marsh's bonus plan: "This Agreement between the Company and Employee is entered into in consideration of the Employee's (a) employment…, (b) *eligibility to participate in certain bonus compensation plan(s)* of Employer …, and (c) access to Confidential Information and Trade Secrets belonging to the Company, as defined in the Confidentiality Agreement." (Emphasis added).

The cash awards, equity awards, and plans above were, of course, all prior to 2025. Thus, the 2025 RCAs explicitly supersede the 2021 RCAs because the 2025 RCAs "supersede[d] all non-competition or non-solicitation agreements or provisions signed in connection with or as a condition to prior Awards." 2025 RCAs § 10.

And because the 2025 RCAs do not contain non-competition provisions, Defendants are not bound by any such restriction.

### b. *The 2021 RCAs are unenforceable even if they remain in effect.*

Even if the 2021 RCAs' non-competition provisions remained in effect, the provisions would be unenforceable as they do not satisfy *BDO Seidman*'s most basic touchstone: it is more restrictive than necessary to protect Marsh's legitimate interest. *See* 93 N.Y.2d at 388–89.

The non-competition provision is unlimited in geographic scope, and "New York courts rarely find worldwide restrictions reasonable in any context." *Silipos, Inc. v. Bickel*, No. 1:06-cv-02205, 2006 WL 2265055, at *6 (S.D.N.Y. Aug. 8, 2006); *see also Garfinkle v. Pfizer, Inc.*, 162 A.D.2d 197, 197 (1st Dep't 1990) (summarily affirming the unreasonableness of a worldwide restriction on competition); *Heartland Sec. Corp. v. Gerstenblatt*, No. 99 CIV 3694 WHP, 2000 WL 303274, at *7 (S.D.N.Y. Mar. 20, 2000) (refusing to enforce—fully or partially—a non-compete without geographic limitations).

The non-competition provision is also far broader than is needed to protect any legitimate interests. The 2021 RCAs sought to justify the non-competition provision solely on the Defendants' relationships with and knowledge of *Marsh* clients, but the text of those provisions is far stricter than their rationale. If enforced, they would improperly prevent the Defendants from providing "prospective clients" with "any services" "similar" to those Defendants provided to Marsh, or from "assist[ing] others" providing such services. 2021 RCAs § 4. To the extent Marsh believes that the Defendants possess confidential information about Marsh, Marsh is protected by

the terms of its Confidentiality Agreements. Indeed, the New York Court of Appeals has rejected non-competes that with no "limitations [not] keyed to uniqueness, trade secrets, confidentiality, or even competitive unfairness." *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496, 499 (N.Y. 1977) ("[R]estrictive covenants which tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored by the law.").

Furthermore, the non-competition provision is "impermissibly vague and overbroad," as it prohibits Defendants from performing or supervising "similar" products or services to those they provided at Marsh. *See Crye Precision, LLC v. Duro Textiles, LLC*, No. 15cv1681 (DLC), 2016 WL 1629343, at *5 (S.D.N.Y. Apr. 22, 2016) (declining to enforce non-compete provision that barred licensee from making "similar" products but offered "no criteria to provide notice of what [the licensor] considers to be similar"), *aff'd*, 689 F. App'x 104 (2d Cir. 2017).

Finally, Marsh's reliance on *MasterCard Int'l Inc. v. Nike, Inc.*, is entirely misplaced, as that case did not involve an agreement barring the defendants from competing in a particular industry. Rather, *Mastercard* concerned non-solicitation provisions. *See* 164 F. Supp. 3d 592, 601 (S.D.N.Y. 2016).

### 4.    The Court should reject the restrictive covenants and not blue-pencil the agreements to correct Marsh's overreach.

Because Marsh's restrictive covenants are overbroad and unenforceable, they should be invalidated. The Court should decline to "blue pencil" any of the restrictive covenants to make them compliant with New York law because Marsh has "imposed the covenant in bad faith, knowing full well that [the restrictive covenants are] overbroad." *See BDO Seidman*, 93 N.Y.2d at 395. Where there are "numerous precedents" making clear a provision is "far broader than necessary to protect [a company's] legitimate business interests," courts have exercised their "equitable discretion" and refused to enforce the provision. *See Elexco Land Servs. v. Hennig*, No.

22

11-cv-00214, 2011 WL 9368970, at \*5 (W.D.N.Y. Dec. 28, 2011) ("Since [Plaintiff] has demonstrated neither good faith nor diligence in seeking to protect a legitimate business interest, I conclude that 'blue penciling' of the Agreement would not be a proper exercise of this court's discretion.").

Here, not only are there "numerous precedents" suggesting that Marsh's restrictive covenants are overbroad, but Marsh, an entity headquartered in New York, is intimately familiar with the precedent because of its experience litigating over such agreements. Indeed, courts applying New York law have refused to enforce Marsh's covenants, holding instead that they were too broad to be enforced as-is. *See Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 534–35 (S.D.N.Y. 2016) (acknowledging overbreadth of Marsh's restrictive covenants); *Marsh USA, Inc. v. Alliant*, 49 Misc. 3d 1210(A), at \*6 (N.Y. Sup. Ct. 2015). Yet Marsh continues to draft these overbroad covenants and require employees to sign them. Marsh then engages in aggressive litigation against former employees to leverage its considerable financial strength. Marsh's pattern of knowingly forcing overbroad restrictive covenants on its employees exemplifies bad faith and should not be rewarded. This Court has the equitable discretion to eschew blue penciling where the covenant at issue is imposed in bad faith and should do so here. *See BDO Seidman*, 93 N.Y.2d at 395.

## B.    Even if the restrictive covenants were enforceable, Marsh has failed to show its breach claims are likely to succeed.

Marsh relies on conclusory and speculative allegations and pervasive hearsay to argue Defendants "likely" breached the RCAs. It makes key allegations on information and belief and asks the Court to draw inferences where Marsh lacks substance. That isn't enough. *See Sterling v. Deutsche Bank Nat. Tr. Co.*, 368 F. Supp. 3d 723, 728 (S.D.N.Y. 2019) ("While [the plaintiff]

asserts that he is 'likely to succeed on the merits . . . , this conclusory statement is insufficient to demonstrate a likelihood of success.").

### 1. Marsh has not shown a breach of the Employee Non-Solicitation Provision.

Marsh argues that Defendants breached the Employee Non-Solicitation provision when they "induced Marsh employees to defect to Howden from Marsh." ECF Doc. No. 15 at 13. Marsh alleges that Parrish "induced" a direct report by telling him "he was considering leaving Marsh and going to start and run Howden's new United States operation." *Id.* at 13–14. When faced with identical allegations of improper employee solicitation in *Aon v. Marsh*, Marsh argued that Parrish had "'stockpiled a significant amount of loyalty' from other Aon employees," so "[i]t should therefore come as no surprise that Mr. Parrish's resignation would precipitate the rapid departure of many other employees." McCoy Decl. at Exh. A at 17. Nothing suggests anything is different this time.

Marsh also asks the Court to infer Defendants' breaches from the "mass resignation" of employees, but in the past Marsh gave a perfectly "credible explanation" for such parallel movement. In *Aon v. Marsh*, Marsh argued "[e]ven if parallel movement could in some circumstances be sufficient to show a restrictive covenant violation, there are many other far more credible explanations for the departure of employees from Aon." Marsh Aon Opp. at 16. The same is true here. Reduced compensation, lack of autonomy, disorganized management, and the resulting worsening corporate culture, all prompted Defendants (and likely many other Marsh employees) to leave Marsh for a more promising opportunity at Howden. Parrish Decl. ¶ 10-14. As Marsh argued in *Aon v. Marsh*, "it is no surprise that they would independently decide to leave." McCoy Decl. at Exh. A at 17.

Finally, to the extent Marsh claims that an employee non-solicitation covenant is necessary to protect its confidential information, "it is hard to imagine how this would be true given that

Defendants are subject to non-disclosure provisions" in their Confidentiality Agreements (as discussed below). *See In re Document Techs. Litig.*, 275 F. Supp. 3d 454, 467 & n.13 (S.D.N.Y. 2017) ("DTI does not contend that the employee non-solicitation covenant is necessary to protect its trade secrets or confidential information. Indeed, it is hard to imagine how this would be true given that Defendants are subject to non-disclosure provisions.").

### 2. Marsh has not shown a breach of the Client Non-Solicitation Provision.

Marsh alleges that Lugones breached the Client Non-Solicitation Provision, but fails to show how.[4] Not only does Marsh fail to identify any of the 8 clients allegedly solicited, or which Defendant worked with them, but it also fails to ascribe any particular conduct to any particular Defendant vis-a-vis these allegedly solicited clients.[5] Rather, Marsh again relies on base speculation, and it asks this Court to infer from the departure of 8 unidentified clients following Defendants' resignation that Defendants must have violated their covenants. All Marsh can muster is conjecture that there would be "no reason" for its clients to leave Marsh for Howden unless Defendants inappropriately solicited them to do so. ECF Doc. No. 15 at 15. That is not good enough, and Marsh's willful failure to see why its clients might follow Defendants to Howden— without the need for any solicitation—tells all.

Marsh also fails to acknowledge alternative credible explanations for how clients may have been alerted to Defendants' departure from Marsh to Howden. Marsh's own public smear campaign in the weeks leading up to and amid Defendants' departure may have backfired and

---

[4]    As to the remaining Defendants, Plaintiff argues they "likely" violated the Client Non-Solicitation Provision, without providing any support for such speculation. ECF Doc. No. 15 at 15.

[5]    Plaintiff's group pleading fails to give Defendants fair notice of the claims against them. *See Agudelo v. Recovo Mortg. Mgmt. LLC*, No. 22-cv-4004 (JMA)(LGD), 2025 WL 1674486, at *9 (E.D.N.Y. June 13, 2025).

alerted its own clients (and employees) to departures of key talent, thereby causing clients and employees to leave Marsh and follow Defendants to Howden.[6]

Yet another credible explanation is that these clients, with whom Defendants have spent careers building relationships, left on their own initiative with no intervention by Defendants. These clients' loyalty was on full display when they followed Defendants from Aon to Marsh, exactly as Marsh expected them to do. *See* Lugones Decl. ¶ 6. And now these clients wish to follow Defendants again from Marsh to Howden, which is not something Marsh wants them to do. That falls well short of proving any breach of the Client Non-Solicitation Provision by Defendants.

### 3. Marsh has not shown a breach of confidentiality obligations.

Marsh argues Defendants likely breached the Confidentiality Agreement by using confidential information to solicit employees and clients. But Marsh does not provide facts to support that argument.

As to employees, Marsh argues Lynn used an employee's compensation information when he told an employee that the employee could earn more at Howden. Even if the conversation occurred, no one needs confidential information to speculate that an employee could make more elsewhere. And Marsh does not allege that Lynn, or any other Defendants for that matter, removed any such information from Marsh or gave such information to Howden.

To the extent Marsh seeks to enjoin Defendants from breaching the Confidentiality Agreements in the future, such relief is unnecessary. Defendants have already been directed by

---

[6]    *See, e.g.*, James Thaler & David Bull, *Exclusive: Marsh McLennan CEO Doyle Accuses Howden of Encouraging His Employees to Violate Employment Covenants*, *The Insurer* (July 25, 2025), https://www.theinsurer.com/ti/news/marsh-mclennan-ceo-doyle-accuses-howden-of-encouraging-his-employees-to-violate-2025-07-25; Mufson Decl. Ex. 34 (ECF No. 20-32), at 5 (*Insurance Insider* reporting that Marsh CEO John Doyle stated that "he was 'disappointed' by Howden's strategy 'to encourage former colleagues to break covenants' that they agreed to when they worked at Marsh"); Ex. 25 (article noting "Howden is a much more entrepreneurial firm" compared to Marsh).

Howden to return to Marsh any confidential information and to avoid bringing such information with them to Howden.

### C.    Marsh has not shown a likelihood of success on its common law claims.

Marsh's common law claims fail for the same reasons as its breach claims.

Marsh alleges Defendants violated their duties of loyalty when they "used Marsh's resources to poach its employees and misappropriated its confidential information—all to build an entirely new competing business." ECF Doc. No. 15 at 20. That claim, which "is based upon a comprehensive written contract between the parties," is duplicative of Marsh's breach of contract claims and must be dismissed. *See Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 244 (S.D.N.Y. 2014) (dismissing fiduciary duty claim as duplicative of contract claim). And like the breach of contract claims, the breach of duty claims rely on conclusory allegations.

Marsh's unfair competition claims fail for the same reason, as Marsh fails to allege how Defendants "misappropriated the plaintiff[]'s labors, skills, expenditures, or good will," let alone how Defendants showed "bad faith." ECF Doc. No. 15 at 20 (reciting the elements of an unfair competition claim). Marsh accuses Defendants of having "endeavor[ed] to reap where [they have] not sown." Mot. at 21 (quoting *Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co.*, 610 F. App'x 69, 70 (2d Cir. 2015)). But even if Marsh had specific evidence of Defendants soliciting clients (it does not), it would be evidence only of Defendants reaping ***precisely*** what they have sown over the course of long careers by building ironclad client relationships before becoming employed by Marsh. That is not "any form of commercial immorality." *Big Vision Private*, 610 F. App'x at 70. And Marsh's citation of *McRoberts Prot. Agency Inc. v. Lansdell Prot. Agency Inc.* is inapposite because (i) the employees there had worked for the plaintiff for twenty-years and lacked any client relationships of their own; and (ii) the employees had told clients that "plaintiff

was losing accounts and would be going out of business," which has not been alleged here. *See* 61 A.D.2d 652 (1st Dept. 1978).

As such, Marsh cannot satisfy its burden to prove a likelihood of success on the merits on its common law claims.

### III. The Balance of the Equities Tips in Defendants' Favor.

Finally, Marsh's motion for a preliminary injunction should be denied because the balance of equities strongly militates against such relief.

To obtain a preliminary injunction, a plaintiff must show that "the balance of convenience and relative hardship—the harm to plaintiff from denial of the injunction as against the harm to defendant from granting it"—tips in the plaintiff's favor. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Serv.*, 769 F.3d 105, 110 (2d Cir. 2014).

As a matter of black letter law, "restrictive covenants are disfavored in New York and will be enforced only after careful analysis." *JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 106 (2d Cir. 2024) (citations omitted). In addition to the "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood," an injunction would pose severe reputational risk to Defendants. *Id.* Marsh made this exact point when it opposed an injunction after hiring Defendants from Aon in 2021: "entering an injunction against the Individual Defendants absent any evidence of wrongdoing would impose a severe, unnecessary, and inappropriate reputational sanction." *See* McCoy Decl. at Exh. A at 32.

Also, as Marsh argued when defending its 2021 hiring of Defendants, the injunction sought "would undermine the public interest." McCoy Decl. at Exh. A at 30. In its defense, Marsh cited a then-pending Department of Justice ("DOJ") Complaint challenging a proposed merger between Aon and Willis Towers Watson, which described "the negative effect of Aon's restrictive covenants on customer choice" and suggested that "the prevalence of post-employment non-

compete and non-solicit clauses in the insurance broking industry, including by Aon and [Willis Towers Watson], serve as barriers to attracting clients away from the Big Three."[7] *See id.* Marsh argued that Aon should not be allowed to suppress "more choice in . . . the marketplace." *See id.* at 2; *see also Alliant Ins. Servs., Inc*., 49 Misc. 3d 1210(A), at \*6 (injunction denied as ban on "soliciting any of Marsh's 57,000 employees is needlessly punitive and anticompetitive").[8]

And to the extent that Marsh seeks injunctive relief in the form of divestiture—*i.e.*, of an order requiring Defendants to stop doing business with any clients—such relief is contrary to the broader public interest. *See Kanan, Corbin, Schupak & Aronow, Inc. v. FD Intl., Ltd.*, 8 Misc. 3d 412, 422 (Sup. Ct. N.Y. Cnty. 2005) ("[A]s to KCSA's current clients, an injunction will not serve to prevent them from exercising their own preferences by moving elsewhere, including FD, should they decide that their business needs are better served outside of KCSA."); *Aitkin v. USI Insurance Services, LLC*, No. 2:21-cv-00267, 2021 WL 2179254, at \*7 (D. Or. May 28, 2021) ("An injunction that would prevent Alliant . . . from servicing the clients who have chosen to follow Plaintiff would be unjust to the clients.").

Marsh itself argued against the remedy of "divestment" when it hired Defendants from Aon in 2021. In its opposition to Aon's motion for a preliminary injunction, Marsh cited the axiom that "equity abhors a forfeiture" (McCoy Decl. at Exh. A at 33 n. 13) and asserted that an order "bar[ring] Marsh from accepting business from any clients . . . would plainly not be in the public interest." McCoy Decl. at Exh. A at 31 n. 11. Citing the highly consolidated nature of the U.S. insurance brokerage industry, in which three firms (Marsh, Aon, and Willis Towers Watson)

---

[7]  Marsh's Opposition did not mention the fact that Marsh itself was the other member of the "Big Three" that the DOJ described. *See* McCoy Decl., Exh A at Exhibit 1.

[8]  According to Marsh's website, its workforce has grown substantially since 2021, such that rather than 57,000 employees, it now employs "more than 90,000" individuals. *See* Marsh McLennan Homepage, https://www.marshmclennan.com (last visited Aug. 20, 2025).

dominate the market, Marsh argued that "the public interest is better served with open competition . . . and access to advisors of clients' choice." *See id*. Marsh also noted that clients may use more than one insurance broker, and thus that insurance brokers often share client relationships. And Marsh argued that insurance brokers share many clients and that "divestiture would be highly inappropriate" there because "so many Aon clients are long-standing customers of Marsh as well." *Id.* at 33 n.13. These principles remain true, and they make plain how the relief Marsh now seeks would harm the public interest.

## CONCLUSION

For all the above reasons, the Defendants respectfully request that the Court deny Marsh's Motion in full.

Dated: New York, New York
       August 21, 2025

                        Respectfully Submitted,

                        CARLTON FIELDS, P.A.

By:    /s/ *Michael L. Yaeger*
            Michael L. Yaeger

            Chrysler Building
            405 Lexington Avenue, 36th Floor
            New York, New York 10174
            (212) 380-9623 (Telephone)
            (212) 785-5203 (Facsimile)
            Email: myaeger@carltonfields.com

            Steven J. Brodie
            CARLTON FIELDS, P.A.
            2 MiamiCentral
            700 NW 1st Avenue, Suite 1200
            Miami, FL 33136
            (305) 539-7302 (Telephone)
            (305) 530-0055 (Facsimile)
            Email: sbrodie@carltonfields.com

Kevin P. McCoy
CARLTON FIELDS, P.A.
Corporate Center Three at International Plaza
4221 W. Boy Scout Boulevard, Suite 1000
Tampa, FL 33607
(813) 229-4272 (Telephone)
(813) 229-4133 (Facsimile)
Email: kmccoy@carltonfields.com

*Attorneys for Defendants Michael Parrish, Giselle Lugones, and Robert Lynn*

**CERTIFICATION**

I hereby certify that this Memorandum of Law was produced on a computer using Microsoft Word 365 and contains 9,487 words, as determined by the computer software's word-count function, excluding the caption, any indices, table of contents, table of authorities, signature blocks, or any required certificates, pursuant to Local Civil Rule 7.1(c).

Dated: August 21, 2025
      New York, New York

By: */s/ Michael L. Yaeger*
      Michael L. Yaeger