**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARSH USA LLC,

                    Plaintiff,

      v.

MICHAEL PARRISH, GISELLE LUGONES,
ROBERT LYNN, and JULIE LAYTON,

                Defendants.

**Civil Action No**. 25-cv-6208 (GBD)

---

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF ITS APPLICATION FOR A TEMPORARY RESTRAINING
ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT .................................................................................................................... 3

I.     Defendants' Own Admissions Prove the Case for Relief.................................................. 3

II.    A Temporary Restraining Order and Preliminary Injunction is Necessary. ....................... 5

       A.     Defendants Fail to Undermine Marsh's Likelihood of Success ............................ 5

       B.     Defendants' Attempt to Minimize Harm Ignores the Record.............................. 12

       C.     Preserving the Status Quo Imposes No Meaningful Burden on Defendants ........ 14

CONCLUSION ............................................................................................................... 15

## TABLE OF AUTHORITIES

Page(s)

*BDO Seidman v. Hirshberg*,
    93 N.Y.2d 382 (N.Y. 1999) ......................................................................................13, 14

*Bittner v. United States*,
    598 U.S. 85 (2023) ........................................................................................................5

*In re Document Technologies Litigation*,
    275 F. Supp. 3d 454 (S.D.N.Y. 2017) ..........................................................................6

*Estee Lauder Companies Inc. v. Batra*,
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) .........................................................................12

*Int'l Bus. Machs. Corp. v. Papermaster*,
    2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) .............................................................12

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) ...........................................................................6

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
    323 F.Supp.2d 525 (S.D.N.Y. 2004) ...........................................................................12

*King v. Marsh & McLennan Agency, LLC*,
    2020 WL 1498537 (N.Y. Sup. Ct. N.Y. Cnty. Mar. 27, 2020), *aff'd*, 191 A.D.3d 507 (N.Y.
    App. Div. 2021) ...........................................................................................................14

*Lagemann v. Spence*,
    2019 WL 4014846 (S.D.N.Y. Jan. 24, 2019) ..............................................................14

*Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc.*,
    2025 WL 304500 (N.Y. Sup. Ct. Jan. 27, 2025) ...........................................6, 7, 8, 9, 10, 11, 14

*Marsh USA, Inc. v. Alliant Insurance Services, Inc.*,
    2015 WL 6499525 (N.Y. Sup. Ct. 2015) .....................................................................14

*Marsh USA Inc. v. Karasaki*,
    2008 WL 4778239 (S.D.N.Y. 2008) ..................................................................6, 8, 10

*Marsh USA Inc. v. Schuhriemen*,
    183 F. Supp. 3d 529 (S.D.N.Y. 2016) ...........................................................................7

*McRoberts Prot. Agency Inc. v. Lansdell Prot. Agency Inc.*,
    61 A.D.2d 652 (1st Dep't 1978) ..................................................................................11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Mercer Health & Benefits LLC v. DiGregorio,*
    307 F. Supp. 3d 326 (S.D.N.Y. 2018).........................................................................15

*Natsource LLC v. Paribello,*
    151 F. Supp. 2d 465 (S.D.N.Y. 2001)...........................................................................6

*Singas Famous Pizza Brands Corp. v. New York Advert. LLC,*
    468 F. App'x 43 (2d Cir. 2012) .................................................................................13

*Tchrs. Ins. & Annuity Assoc. Of Am. V. Simon,*
    2023 WL 6386955 (S.D.N.Y. Sept. 29, 2023).........................................................8, 10

*Tera Grp., Inc. v. Citigroup, Inc.,*
    2019 WL 3457242 (S.D.N.Y. July 30, 2019) ...............................................................3

*Ticor Title Ins. Co. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999)......................................................................................8, 12

*Tiffany & Co. v. Lloyd's of London Syndicates,*
    83 Misc. 3d 1211(A), (N.Y. Sup. Ct. 2024) ................................................................9

*Willis Re Inc. v. Herriott,*
    550 F. Supp. 3d 68 (S.D.N.Y. 2021)......................................................................12, 15

## PRELIMINARY STATEMENT

In a single day, more than 90 Marsh employees resigned en masse to join Howden. None interviewed with Howden. They got jobs there, because of Defendants, without lifting a finger. Within hours, Marsh clients began switching brokers—some submitting broker-of-record letters the very same day. That kind of synchronized departure of employees and clients does not happen by accident. It was orchestrated. And Defendants' own sworn declarations confirm it.

Boldly, Layton admits she offered to pass on to Howden her Marsh team's contact information (Layton Decl. ¶ 13) and, just days before receiving her offer, directed her team to upload key client documents to SharePoint—despite Marsh's instructions to use a different system. *Id.* ¶¶ 2, 22–25. Lugones concedes she gathered her team for lunch, announced her departure, and encouraged them not to return to work. Lugones Decl. ¶ 17. Most of those lunch attendees resigned the next business day or shortly after. Schnabolk Decl. ¶ 12. Lugones also admits she solicited and will continue to solicit clients she deems "personal," Lugones Decl. ¶ 26, even though she developed and/or maintained these accounts with the use of Marsh's funds and platform. *See id.*; *see also* Second Schnabolk Decl. ¶ 10. Lynn likewise doesn't deny that he promised a Marsh employee a promotion at Howden, asked for her personal email, and that she then received an offer from a Howden recruiter within 48 hours. *Compare* R. Lynn Decl. ¶ 15, *with* Dahan-Roxin Decl. ¶¶ 6–9. And Parrish—the raid's chief architect—told his team he was leaving to lead Howden and admits he expected them to follow. Parrish Decl. ¶ 27. He doesn't deny that he discussed with at least one employee what they would earn if they joined him.

These are not coincidences. They are undisputed facts that amount to textbook unlawful solicitation and confirm Defendants' pattern of wrongdoing. Beyond Defendants' own admissions, Marsh has shown that Lynn spread false rumors about Marsh's intention to fire him and

Parrish (Dahan-Roxin Decl. ¶ 6), Parrish used his direct reports to solicit Marsh employees (Abboud Decl. ¶¶ 5–6), and several Marsh clients serviced by Defendants have left—even though three of four Defendants remain subject to a notice period (McClellan Decl. ¶ 10). *See* Dkt. 15 at 6–11. The record is clear: Defendants violated restrictive covenants that they freely signed at arm's-length and for which they received lucrative compensation in exchange. While Defendants have profited handsomely, they are depriving Marsh the benefit of its bargain.

Unable to offer a credible explanation for this record, Defendants pivot to distraction. Even though they just agreed to *longer* and *broader* non-solicitation provisions with their new employer Howden, they claim their contracts with Marsh are "overly broad," that they are merely taking "personal" clients, and that later Marsh equity award documents somehow erased their obligations. None of that holds up. Defendants' non-solicitation and non-competition provisions are narrowly tailored and enforceable under settled New York law. Parrish, Lugones, and Lynn negotiated the non-competition agreements they agreed to with the benefit of counsel, and received extraordinary compensation in exchange. The "personal client" theory is fiction—these relationships were cultivated and maintained using Marsh's platform, data, personnel, and financial resources. And the plain terms of the later Marsh equity agreements are clear they did not supersede Defendants' operative covenants, which they signed as conditions of employment.

This case is not about suppressing competition. It is about supporting *fair* competition. Marsh seeks to enforce clear contractual promises and stop a coordinated raid that continues to inflict irreparable harm. Undeterred, Defendants are still soliciting restricted Marsh clients and employees, still misusing confidential information, and still refusing to comply with their obligations. Defendants' last-minute state court filing is a procedural gambit that does nothing to change this Court's obligation to halt ongoing breaches and prevent irreparable harm. The Court should

issue a temporary restraining order and preliminary injunction to halt this misconduct and preserve

the status quo pending a full hearing, and it should authorize expedited discovery to permit the

adjudication of this dispute on a complete and accurate record.

## ARGUMENT

### I.    Defendants' Own Admissions Prove the Case for Relief

Defendants do not dispute the core facts—and their own sworn testimony confirms

Marsh's claims.  They purport to deny unlawful solicitation but admit to engaging in conduct New

York courts routinely deem unlawful solicitation: alerting teams of their intent to resign, offering

to share contact information with a new employer, and laying the groundwork for client defections.

Rather than confront this record, Defendants attempt to distract with previous litigation involving

Aon (their employer before Marsh) and forum arguments.  The evidence shows a coordinated raid,

immediate client departures, and ongoing misuse of confidential information; the reality is clear:

- **Coordinated Offers and Unexplained Solicitation:** Defendants each ran the same play-book to target employees: personal outreach, followed almost immediately by Howden offers.  Dahan-Roxin Decl. ¶¶ 7–9; Maffai Decl. ¶¶ 5–8; Martino Decl. ¶¶ 9–10.  One Marsh employee confirms that Lynn promised her a promotion and asked for her personal email. Dahan-Roxin Decl. ¶ 6. Lynn offers no other explanation for how Howden recruiter Hannah Cowie obtained the email to send an offer less than 48 hours later.  *Id.* ¶¶ 6–9; R. Lynn Decl. ¶ 15. Mark Minton similarly confirms that a week before the mass resignations, Parrish's assistant asked for his personal contact information—and on July 18, Howden emailed him an offer.  Minton Decl. ¶¶ 3, 7.  Parrish denies involvement, but Minton had given his personal email to no one else.  *Id.* ¶ 8.

- **Coordinated Resignations:** 90 Marsh employees resigned on the same day to join Howden.  Schnabolk Decl. ¶¶ 5–6; Compl. ¶ 5.  Nearly all of Defendants' direct reports left immediately or soon after.  Schnabolk Decl. ¶¶ 8, 12, 14, 16.  Howden extended offers to every member of Layton's team—except the one person she apparently disliked.  Gon-zalez Decl. ¶ 13.  Solicited direct reports then went on to solicit more of their co-workers.  *See* Minton Decl. ¶¶ 3, 5–6.  Defendants' claim that these were "independen[t]" decisions (Defs.' Mem. 24) defies logic, especially when employees received job offers without ap-plying, submitting resumes, or interviewing.  *See, e.g.*, Abboud Decl. ¶¶ 7–8; Dahan-Roxin Decl. ¶¶ 8–9; Gonzalez Decl. ¶¶ 7–8; Minton Decl. ¶¶ 5–7; Milani Decl. ¶¶ 3–10.

- **Immediate Client Departures:** Clients began switching brokers within hours of the July 21 resignations.  McClellan Decl. ¶ 10; Marsh TRO Br. 2.  Two clients submitted broker-of-record letters the same day (Second Schnabolk Decl. ¶ 8) and six others followed suit

immediately after, most of whom were associated with Lugones. McClellan ¶ 10; Marsh TRO Br. 15. Lugones and the other Defendants chalk this up to "loyalty" (Defs.' Mem. 26; *see* Lugones Decl. ¶¶ 2–4; R. Lynn Decl. ¶¶ 16–17), but the timing shows coordination. *Tera Grp., Inc. v. Citigroup, Inc.*, 2019 WL 3457242, at *18 (S.D.N.Y. July 30, 2019) (Sullivan, J.) ("synchronized response" suggests coordination). Layton, meanwhile, admits she has not yet solicited her institutional Marsh clients because "Howden is in a start-up posture," and she would not expect them to "consider moving business away from Marsh until Howden is more established, if ever," (Layton Decl. ¶ 31), further emphasizing the significant risk that Defendants will continue and escalate their solicitation.

- **Use of Confidential Information:** Marsh cites sworn declarations showing Defendants had access to—and misused in their solicitation efforts—pricing models, renewal timelines, growth strategies, and detailed employee compensation and benefits. *See* Schnabolk Dec. ¶¶ 9, 17–19; McClellan Decl. ¶ 4, 6; Gonzalez Decl. ¶ 4; Marsh TRO Br. 5, 15–16; Compl. ¶ 52. This is the very information Defendants promised to protect under robust confidentiality agreements. Instead of addressing these facts, Defendants trivialize the issue by pointing to their access to innocuous details, like client birthdays, hoping to distract from the reality: they leveraged Marsh's proprietary data to poach its clients.

Beyond what they fail to contest, Defendants' own words confirm the misconduct: they unlawfully solicited Marsh's employees and clients, using Marsh's confidential information.

- **Layton** admits she informed her team of her departure, explained why she chose Howden over Marsh, and offered to pass her team's contact information to Howden. Layton Decl. ¶ 13. Days before receiving her offer, she directed the team to upload key client documents to SharePoint—despite company instructions to use a different system (*id.* ¶¶ 22–27).

- **Lugones** concedes she took her team to lunch, announced her move to Howden, explained her reasons, and told them not to return to work. Lugones Decl. ¶ 17. By the next business day and shortly thereafter, most attendees had resigned. Schnabolk Decl. ¶ 12. She also admits she planned to take clients she deemed "personal"—some acquired at Marsh (Lugones Decl. ¶¶ 26–30)—in direct violation of her non-solicitation agreement. Schnabolk Decl. ¶¶ 21–25; Compl. ¶ 72.

- **Lynn** acknowledges he contacted team members to announce his departure, explained why he was leaving, and disparaged Marsh's sales model. R. Lynn Decl. ¶¶ 13–15. He does not deny suggesting to at least one employee she could get a promotion if she joined Howden. Dahan-Roxin Decl. ¶ 6; R. Lynn Decl. ¶ 15.

- **Parrish** admits he told his team he was leaving to lead Howden's new business and said he expected "that there would be members of my team who decided to follow me once they hear that I was leaving for a new opportunity, and that did happen." Parrish Decl. ¶¶ 22, 27. He does not deny telling a direct report how much that person could make if he moved with Parrish to Howden. Maffai Decl. ¶ 5; Parrish Decl. ¶ 23.

Defendants' declarations are also proof that they cannot be trusted and that discovery will reveal even more wrongdoing. The declarations are riddled with false representations to the Court,

4

proven not just by competing testimony but by contemporaneous documentary evidence.

- **Layton** claims she would "not recruit" the employee that submitted a declaration about her solicitation efforts because he was on a "performance improvement plan" and that she had relayed concerns about his performance to Marsh Human Resources ("HR"). Layton Decl. ¶ 18. But Marsh HR has confirmed that Marsh has no record of that employee receiving performance counseling at any point. Kamwand Decl. ¶¶ 3–4. In fact, Layton's own feedback to HR regarding the employee was uniformly positive. *Id.* ¶¶ 4–5.

- **Layton** falsely claims she only told her direct reports about her decision to leave starting on July 18 and had no involvement in Howden's offers, Layton Decl. ¶¶ 11-14, but even without the benefit of discovery, another Marsh employee has now come forward with contemporaneous evidence that Layton solicited her to Howden and used her confidential Marsh salary information to do so—on July 10 and July 21. Milani Decl. ¶¶ 3–10.

- **Layton** even misleadingly represents she only once accessed the SharePoint page she created for her team members to upload key employee and client documents in one centralized place. Layton Decl. ¶¶ 25–26. A simple review of her ShareFile activity reveals she accessed that folder at least twice, including on the very same day she received her Howden offer and likely accessed multiple documents related to Marsh personnel and client finances while she was soliciting team members, in the days leading up to her resignation. Second Schnabolk Decl. ¶¶ 11–14.

- **Parrish** argues he was not sourcing an office for Howden in Spring 2025 but rather just gave multiple generic office leads to a real-estate broker friend. Parrish Decl. ¶¶ 28–29. That's false: Parrish specifically told the broker that Parrish "was aware of a UK company relocating to the U.S.," and weeks later that same broker emailed Parrish and a Marsh employee writing: "[w]ith regards to the opportunity Mike mentioned. . . " clearly indicating that Parrish only provided one recommendation. *Id.* ¶ 3.

## II.    A Temporary Restraining Order and Preliminary Injunction is Necessary.

The question now is not whether Defendants breached their obligations—the record makes that clear—but whether this Court should act to stop the ongoing harm. It should. A temporary restraining order and preliminary injunction are necessary to enforce the covenants.

### A.    Defendants Fail to Undermine Marsh's Likelihood of Success

Defendants' legal attacks collapse. Each covenant they challenge is enforceable under settled New York law. And each has been breached. Moreover, Defendants' objections ring hollow given the terms of Howden's own offer letters—which Defendants presumably signed—impose restrictive covenants that are as restrictive, if not more so, than those Marsh seeks to enforce. The

agreements provide, for example: (i) client and employee non-solicitation restrictions lasting two years (twice the term in Marsh's agreements); (ii) an acknowledgement that the covenants are "reasonable, including in connection with duration, geographical area, and scope" to protect Howden's "goodwill and Confidential Information"; (iii) a definition of "Confidential Information" that includes personnel data, recruiting plans, lists of clients, and specific client needs; and (iv) a provision expressly authorizing injunctive relief for breach.  Abboud Decl. Ex. G, 5–6; Gonzalez Decl. ¶ 9.  *Cf. Bittner v. United States*, 598 U.S. 85, 97 n.5 (2023) (when a litigant "speaks out of both sides of its mouth, no one should be surprised" if its utterances are not "the most convincing").

  *1. The employee non-solicitation provision is enforceable.*  Defendants' claim that Marsh lacks a protectable interest (Defs.' Mem. 15–16) fails both legally and factually.  Courts consistently hold that employers have a legitimate interest in protecting their workforce from targeted solicitation—particularly where, as here, the targeted employees possess confidential information (Schnabolk Decl. ¶ 17), client relationships developed or maintained at the employer's expense (*id.* ¶ 18; McClellan Decl. ¶¶ 4, 6), and institutional knowledge critical to the employer's operations (Schnabolk Decl. ¶ 8; McClellan Decl. ¶¶ 4, 6).  As multiple courts have explained, the training of a company's brokers and the investment in helping them develop and maintain customer relationships constitute unquantifiable assets that support injunctive relief.  *See, e.g.*, *Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 31, 2008); *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001).

  Defendants' cited case, *In re Document Techs. Litig.*, 275 F. Supp. 3d 454 (S.D.N.Y. 2017), underscores why injunctive relief is warranted here.  In that case, the court denied relief because the employer failed to show misuse of confidential information, the covenants were overbroad,

and the employees had not influenced others to resign. *Id.* at 464, 466–68. Marsh's case is the opposite. Its covenants are narrowly tailored and directly tied to legitimate interests in protecting confidential information, client relationships, and business continuity. They are limited to mitigate losses caused by the employee's departure and apply only to clients and employees with whom Defendants had contact or about whom they obtained confidential information. Schnabolk Decl. ¶¶ 23–26; *Marsh & McLennan Agency, LLC v. Alliant Ins.,* 2025 WL 304500, at *5 (S.D.N.Y. Jan. 27, 2025). Marsh has presented direct and circumstantial evidence of 90 coordinated resignations, pre-resignation planning, and post-resignation recruitment efforts—conduct far beyond the minor, passive departures in *Document Technologies* and squarely implicates Marsh's protectable interests. *Cf. Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 331 (E.D.N.Y. 2020).

Finally, Howden's own employee non-solicit restriction is *more* restrictive than what the Defendants' are subject to under the Marsh agreements because the Howden agreements apply to *any* employee of Howden, Abboud Decl. Ex. G at 5, whereas their Marsh agreements are tailored to only certain employees with whom Defendants had contact.

**2. The client non-solicitation provision is enforceable.** Defendants' overbreadth argument (Defs.' Mem. 17–19) fails for the same reasons: this covenant is narrowly tailored, supported by substantial consideration, and directly tied to Marsh's legitimate interests. It applies for one year and only to clients with whom Defendants had contact or confidential information during the last two years of employment. Compl. ¶ 72; *see e.g.* Mufson Decl. Ex 2 § 2(b). Courts routinely uphold similar restrictions, recognizing employers have a strong interest in protecting client relationships and goodwill. *Alliant*, 2025 WL 304500 at *5 (collecting cases).

Defendants' suggestion that these covenants bar them from "speaking with their own personal clients" is pure fiction. Defs.' Mem. 1. The agreements prohibit solicitation—not casual

conversation—and Defendants accepted these terms at arm's-length, accepted lucrative compensation in exchange.  Many of the clients they now claim as "personal" (*id.* at 17) were serviced at Marsh using its proprietary tools, data, and personnel.  *See* Schnabolk Dec. ¶¶ 9, 17–19; Second Schnabolk Decl. ¶ 10.  Marsh invested substantial resources to institutionalize and retain these clients, giving it a cognizable interest in protecting them from solicitation.  *Cf. Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 535 (S.D.N.Y. 2016) (cited at Defs.' Mem. 17) (no protectable interest where—by contrast—employer "neither subsidized nor otherwise financially supported [the relationship]").

Defendants' argument regarding "prospective" clients (at 18) is equally unpersuasive.  The covenant does not reach speculative opportunities—it protects concrete, existing relationships developed through Marsh's platform.  *See* Compl. ¶¶ 72–73.  Courts have upheld nearly identical language.  In *Alliant*, for example, the court rejected an overbreadth challenge to Marsh's agreements because the restriction "is limited to clients or prospective clients of [Marsh] with whom the employee had contact during the last two years of his employment." 2025 WL 304500, at 7.

Nor does Defendants' attempt to narrow the definition of "solicitation" (Defs.' Mem. 18–19) withstand scrutiny.  Caselaw—not *Merriam-Webster*—controls: courts applying New York law hold that solicitation includes discussions about compensation and joining a competitor. *See Karasaki*, 2008 WL 4778239, at *20; *Tchrs. Ins. & Annuity Assoc. Of Am. v. Simon*, 2023 WL 6386955, at *13 (S.D.N.Y. Sept. 29, 2023).  Defendants' conduct falls squarely within the scope of the provision, and their efforts to rewrite its meaning should be rejected.

*3. **The non-compete provision is enforceable.***  Defendants Parrish, Lugones, and Lynn attempt to disown the non-compete clause (Defs.' Mem. 20–23)—despite having negotiated it

through their counsel (Schnabolk Decl. ¶ 20; Compl. ¶ 28) and accepted extraordinary compensation in exchange.  Their argument fails.  The clause applies for one year and only to extremely highly compensated senior executives (Parrish, Lugones, and Lynn) who had access to Marsh's strategic plans, client data, and personnel information.  Courts routinely uphold similar non-competes for senior leaders, especially where the employer operates globally and the employee is highly compensated.  *See, e.g.*, *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 71 (2d Cir. 1999) (affirming enforcement of non-compete against insurance executive and noting that "uniqueness" turns on the employee's relationship to the employer's business).  Marsh's business is global, and Defendants were paid millions—including salary, sign-on bonuses, and performance-based incentives—in exchange for these commitments.  Mufson Decl. Exs. 1, 7, 15.  Their attempt to invalidate the non-compete after accepting its benefits is not a legal defense; it's a breach of contract.

   **3.  *Defendants' supersession theory fails.***  Unable to contest the substance of the covenants, Defendants pivot to a theory of contractual supersession—claiming the 2021 Restrictive Covenant Agreements were displaced by later stock award agreements.  Defs.' Mem. 20–21.

   Defendants' supersession theory fails as a matter of law and contract.  Later stock award agreements did not displace these covenants, and Defendants' contrary argument collapses.  Under New York law, a prior agreement is not revoked unless the parties use "clear and unequivocal language."  *Tiffany & Co. v. Lloyd's of London Syndicates*, 83 Misc. 3d 1211(A), at *10 (Sup. Ct. 2024).  The 2022 and 2025 Stock Agreements revoke only non-solicitation provisions "signed in connection with or as a condition to prior Awards"—defined narrowly to mean equity grants made on or after February 1 of the relevant year (2022 or 2025)—and explicitly do not affect any other restrictive covenants, including those agreed to as a condition of employment.  *See* R. Lynn Decl. Ex. 2 § 10.  The 2021 RCAs were executed in June 2021 as a condition of employment, not in

connection with any equity award.  Mufson Decl. Exs. 2, 8, 16 at 1.  They remain fully enforceable.

    ***4.  Defendants breached their contracts.***  Defendants argue that Marsh has not shown a breach, dismissing Marsh's evidence as mere "inference."  Defs.' Mem. 23.  But inference is not a weakness—it is a recognized form of proof.  Courts routinely rely on circumstantial evidence, particularly where direct evidence lies in the defendants' exclusive control.  *See Alliant*, 2025 WL 304500, at *6 (holding that Marsh's evidence permitted the court to infer solicitation of employees and clients).  Here, the record shows a synchronized wave of resignations, immediate client departures, evidence of outreach to employees who did not resign with Defendants, and pre-resignation data aggregation—all pointing to a coordinated raid.  Dismissing this as "just inference" is like watching twenty friends walk into a restaurant carrying balloons, birthday cards, and a cake and insisting no one coordinated the party because the invitation isn't yet in evidence.  The law does not require a confession when the coordination is written all over the scene.  At a minimum, Marsh's evidence raises "serious questions on the merits and a balance of hardships decidedly favoring [it]" sufficient to warrant preliminary relief.  *Id*. at *5–8.

    Moreover, Defendants' own admissions confirm solicitation of Marsh's employees and clients.  *See supra* pp 1.  In *Simons*, the court held that a defendant's discussions with colleagues about leaving her employer and what "needed to happen" to join her new firm may violate a non-solicitation covenant.  *Tchrs. Ins. & Annuity of Am. v. Simons*, 2023 WL 6386955, at *13 (S.D.N.Y. Sept. 29, 2023).  Defendants conduct here is worse: they contacted teammates to announce their move to Howden, touted purportedly higher compensation, promotions, better benefits, and a stronger culture; and offered to connect them to Howden if interested.  *See* Layton Decl. ¶¶ 13, 16; Lugones Decl. ¶ 17; R. Lynn Decl. ¶¶ 13–15; Parrish Decl. ¶ 22; *see also* Gonzalez Decl. ¶ 6; Maffai Decl. ¶ 5; Dahan-Roxin Decl.  ¶ 6.  This undoubtedly constitutes solicitation.

In *Karasaki*, the court held that providing names for a new employer to approach was indirect solicitation. 2008 WL 4778239, at *10–11, 20. That is precisely what Defendants admit they did here. *See* Layton Decl. ¶¶ 13, 16; Lugones Decl. ¶ 17; R. Lynn Decl. ¶¶ 13–15; Parrish Decl. ¶¶ 22–23, 27; *see* Maffai Decl. ¶¶ 5–8 (employee contacted by Howden shortly after Parrish offered to forward personal information); Gonzalez Decl. ¶ 6 (Layton doing same); Dahan-Roxin Decl. ¶¶ 6–8 (Lynn doing same); Abboud Decl. ¶¶ 6–7 (Parrish's direct report doing the same).

*Karasaki* also held that discussing compensation constitutes solicitation. 2008 WL 4778239, at *20. Parrish and Lynn did that. Maffai Decl. ¶ 5; Parrish Decl. ¶ 23; Dahan-Roxin Decl. ¶ 6; R. Lynn Decl. ¶ 15; *see also Alliant*, 2025 WL 304500, at *6 (evidence defendant informed team of "his plan in advance of his resignation" supported inference that he endeavored to cause them to leave). Layton similarly told a Marsh employee that Howden would increase her base compensation by 40%; five days later, that employee received an offer from Howden reflecting that raise. Milani Decl. ¶ 6. When the employee declined, Layton responded that Howden would increase its offer—just minutes later, it did. *Id*. ¶ 10.

**5. Common law.** Defendants' final attempt to avoid liability is to dismiss Marsh's common law claims as duplicative or speculative. Defs.' Mem. 27–28. But that effort fails for the same reason as their contract arguments: it ignores the substance of the conduct and the roles Defendants played. Marsh's fiduciary duty and unfair competition claims are grounded in conduct that goes beyond mere breach of contract—including misuse of confidential information, coordinated solicitation of employees and clients, and efforts to divert Marsh's business while still employed. Courts routinely recognize such conduct as actionable under common law, particularly where the defendants held senior leadership roles and owed heightened duties of loyalty. *See McRoberts Protective Agency Inc. v. Lansdell Protective Agency Inc.*, 61 A.D.2d 652, 654–55 (1st

Dep't 1978).  Marsh's allegations are supported by detailed declarations and circumstantial evidence, and Defendants' blanket denials do not defeat the showing required for preliminary relief.

**B.    Defendants' Attempt to Minimize Harm Ignores the Record.**

Defendants cannot credibly dispute the irreparable harm their conduct continues to inflict on Marsh.  Far from being a "past" event, Defs.' Mem. 11, the harm is ongoing—a coordinated effort to divert Marsh's business to Howden, an overnight upstart built on Marsh's talent and clients.  Defendants' misconduct is happening now, while Marsh is still paying them.  Three of the four Defendants remain in their notice periods, yet they have been actively breaching their contractual and fiduciary duties during that time.  Lugones openly admits that even while still employed by Marsh, she is plotting the transition of certain Marsh clients to Howden, claiming them to be her "personal clients" (Lugones Decl. ¶¶ 26–32), even though Marsh shows those clients were institutionalized, developed, and maintained using Marsh's resources and are therefore covered by her non-solicitation covenant.  *See* Compl. ¶¶ 72–73.  Despite Defendants' promises, since Marsh filed its motion, it has learned nine additional clients have left for Howden—bringing the total to seventeen—ten of which were tied to Lugones.  Second Schnabolk Decl. ¶¶ 7–8.  And Defendants make clear they do not intend to honor their non-competition obligations when their notice periods end on September 22.  Parrish Decl. ¶ 34; R. Lynn Decl. ¶ 19; Lugones Decl. ¶ 18.

*1. Monetary Damages Cannot Remedy the Harm Defendants Are Causing.*  Defendants' argument that Marsh has an adequate remedy at law fails for two reasons.  Defs.' Mem. 13–14.

*First*, it is well established that monetary damages cannot adequately compensate for the loss of client relationships that generate ongoing, indeterminate business.  *See Ticor*, 173 F.3d at 68–69 ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532

(S.D.N.Y. 2004); *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 105–06 (S.D.N.Y. 2021). Courts likewise recognize the difficulty of quantifying harm from the disclosure of confidential information. *See, e.g.*, *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006); *IBM Corp. v. Papermaster*, 2008 WL 4974508, at \*7 (S.D.N.Y. Nov. 21, 2008). Defendants offer no authority to the contrary. Instead, they rely solely on a liquidated damages provision—misstating its scope and effect—in a way that is both disingenuous and misleading. Defs' Mem. 13–14. That clause appears only in Layton's non-solicitation agreement and the equity award restrictive covenants and expressly preserves Marsh's right to seek equitable relief.

*Second*, far from negating irreparable harm, the agreements expressly preserve equitable relief—an acknowledgment that money damages cannot make Marsh whole. Layton agreed that "[r]ecognizing the difficulty of calculating actual damages," Marsh would be entitled to both damages for past harm and equitable remedies to stop harm from continuing to recur—conceding expressly that "damages cannot be readily ascertained and will not make the Company whole or fully remedy the breach." Compl. ¶ 74. The other defendants likewise acknowledged monetary damages for breach of their restrictive covenants "would not be readily calculable" and Marsh "would not have an adequate remedy at law." *Id.* ¶ 73. As the Second Circuit has held, such contractual language "might arguably be viewed as an admission . . . that plaintiff will suffer irreparable harm were [defendant] to breach the contract's [restrictive covenant]." *Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 468 F. App'x 43, 46 (2d Cir. 2012) (citing *Ticor Title*, 173 F.3d at 69).

### 2. Defendants' Solicitation Threatens Marsh's Hard-Earned Goodwill.

Contrary to Defendants' misstatement of law, their admitted efforts to solicit Marsh clients threaten the loss of customer goodwill. Schnabolk Decl. ¶ 18. Marsh has expended significant resources to develop and institutionalize client relationships. Schnabolk Decl. ¶¶ 17–20; McClellan Decl. ¶ 4. By virtue

of Defendants "work[ing] closely with [Marsh's clients] over a long period of time, especially when [Defendants'] services are a significant part of the total transaction," Defendants have "been enabled to share in the goodwill of" Marsh's clients, which Marsh's "overall efforts and expenditures created." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 391–92 (1999).  Defendants' solicitation of Marsh's clients threatens the loss of that goodwill.

Defendants' unsupported claims that all clients they seek to solicit are "personal" are untrue, and their argument that future loss of clients is speculative is belied by the facts.  Since Marsh's motion, it has learned of nine more Marsh clients tied to its recently resigned employees have been lost to Howden.  Second Schnabolk Decl. ¶¶ 7–8.  Far from speculative, Marsh continues to lose clients due to Defendants' raid and continued breaches of their contractual obligations.

These ongoing losses underscore why courts consistently recognize that restrictive covenants serve a critical role in protecting client relationships and goodwill.  Against this backdrop, Defendants' reliance on *Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*, 2015 WL 6499525 (Sup. Ct. 2015), does not salvage their position.  Defs. Mem. 14.  That decision has been widely rejected as an outlier.  *See Alliant*, 2025 WL 304500, at *6–7 (noting Justice Ramos "appears to have overlooked the distinction between a covenant not to compete and covenants respecting solicitation and confidential information"); *King v. Marsh & McLennan Agency, LLC*, 2020 WL 1498537, at *4 (Sup. Ct. Mar. 27, 2020), *aff'd*, 191 A.D.3d 507 (1st Dep't 2021).  Defendants have no response to the "great weight" of New York authority—cited in Marsh's motion (at 18)—that confirms Marsh has a legitimate interest in protecting its client relationships and goodwill.  *Alliant*, 2025 WL 304500, at *7; *BDO Seidman*, 93 N.Y.2d at 391; *King*, 2020 WL 1498537, at *4.

### C.    Preserving the Status Quo Imposes No Meaningful Burden on Defendants

The balance of hardships decisively favors Marsh.  Enforcing contracts does not "stifle competition"—it preserves the level playing field the parties agreed to when Defendants accepted

handsome compensation in exchange for these covenants.  A temporary restraining order would simply "preserve the *status quo ante* and prevent irreparable harm until" the Court can hold a hearing.  *Lagemann v. Spence*, 2019 WL 4014846, at *2 (S.D.N.Y. Jan. 24, 2019) (Daniels, J.).  The relief Marsh seeks is narrowly tailored to mirror the defendants' existing obligations.

It is not credible for Defendants to claim, as they do (*e.g.* Parrish Decl. ¶ 26), that they have no intention of violating their agreements.  They are violating them now (*supra* pp 10–12).  But even if that assertion were believable, an order preserving the status quo would impose no burden.  If Defendants truly intend to comply, the injunction enforces what they claim they are already doing.  R. Lynn Decl. ¶¶ 14–15, Layton Mem. 11, Lugones Decl. ¶ 19, Parrish Decl. ¶¶ 21–23.  New York courts routinely hold restrictive covenants barring solicitation of a former employer's clients for a limited period do not impose undue hardship.  *See, e.g.*, *Willis Re*, 550 F. Supp. 3d at 104; *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 351 (S.D.N.Y. 2018).

Defendants' reliance on Marsh's position in the *Aon* litigation, involving different facts, is misplaced.  Defs' Mem. 28–30.  Marsh does not seek to bar Howden "from accepting business" or to prevent defendants from working.  *Id.* at 29.  The proposed order targets only the four named defendants and enjoins them from violating their restrictive covenants—by soliciting covered clients and employees, misusing confidential information, or working at a competitor for one year after their departure.  Moreover, in the *Aon* matter, Marsh *stipulated* to a status quo TRO—precisely the relief it seeks here.  If Defendants have truly done nothing wrong—and intend to do no wrong in the future—they should do what Marsh did in that case and stipulate to a standstill.  That they have declined confirms the urgent need for this Court's intervention.

## CONCLUSION

The Court should issue a temporary restraining order and preliminary injunction and authorize expedited discovery.

Dated: August 28, 2025                    Respectfully submitted,

                                          */s/ Harris M. Mufson*
                                          _____
                                          Harris M. Mufson
                                          Lee R. Crain
                                          Kelly Herbert
                                          GIBSON, DUNN & CRUTCHER LLP
                                          200 Park Avenue
                                          New York, New York 10166
                                          212.351.4000
                                          hmufson@gibsondunn.com
                                          lcrain@gibsondunn.com
                                          kherbert@gibsondunn.com

                                          Jason C. Schwartz[†]
                                          Ryan C. Stewart[†]
                                          Amanda C. Machin[†]
                                          GIBSON, DUNN & CRUTCHER LLP
                                          1700 M Street, N.W.
                                          Washington, D.C. 20036
                                          202.955.8500
                                          jschwartz@gibsondunn.com
                                          rstewart@gibsondunn.com
                                          amachin@gibsondunn.com

                                          Karl G. Nelson*
                                          Rachel W. Robertson*
                                          Brian A. Richman
                                          GIBSON, DUNN & CRUTCHER LLP
                                          2001 Ross Avenue, Suite 2100
                                          Dallas, TX 75201
                                          214.698.3100
                                          knelson@gibsondunn.com
                                          rrobertson@gibsondunn.com
                                          brichman@gibsondunn.com

                                          *Attorneys for Plaintiff*

\* *pro hac vice*
[†] *pro hac vice* forthcoming

**CERTIFICATION**

I, Harris M. Mufson, hereby certify that the attached document complies with the Court's

order permitting Plaintiff to file a consolidated reply brief not to exceed fifteen pages.  Dkt. 97.


Dated:  August 28, 2025
        New York, New York

                                 */s/ Harris M. Mufson*

                                 Harris M. Mufson