**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARSH USA LLC,

                        Plaintiff,

       v.

MICHAEL PARRISH, GISELLE LUGONES,
ROBERT LYNN, AND JULIE LAYTON,

                        Defendants.

Case No.  1:25-cv-06208-GBD-GS

**PLAINTIFF MARSH'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS PROPOSED ORDER TO SHOW CAUSE**
**<u>FOR CONTEMPT OF THE COURT'S PRELIMINARY INJUNCTION</u>**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

I.    Defendants' Contracts Require Their Return of All Marsh Property Upon
      Termination of Employment. ....................................................................................3

II.   Marsh Promptly Seeks the Return of its Property, and Defendants State They Have
      None. .............................................................................................................................4

III.  The Court Orders Defendants to Return All Marsh Property by September 23. ..................5

IV.   Defendants Assure Marsh of Their Compliance with the Court's Order. ...........................7

V.    More than a Month Past the Court's Deadline, Defendants Parrish, Lugones, and
      Lynn Produce Marsh Property They Had Retained on Personal Devices. ...........................7

VI.   Marsh Seeks an Explanation for Defendants' Wrongful Retention; in Response,
      Defendants Layton, Lugones, and Lynn Produce *More* Marsh Property. ...........................8

VII.  Marsh Petitions This Court for Relief. ..................................................................................12

ARGUMENT ........................................................................................................................12

I.    The Court Should Hold Defendants in Contempt of the Preliminary Injunction. ...............13

      A.   The Court's Order Was Clear: Defendants Were Obligated to Return the
           Documents by September 23. ....................................................................................14

      B.   Defendants Failed to Comply with the Order. ...........................................................16

      C.   Defendants Falsely Represented Their Compliance Having Made No Diligent
           Effort. ........................................................................................................................17

II.   The Court Should Fashion Appropriate Remedies for Defendants' Contempt. ..................19

      A.   Defendants Should Submit to Additional Discovery Regarding Their Retention
           and Use of Marsh's Confidential Information. ...........................................................20

      B.   Defendants Should Pay a Daily Fine Until Their Full Compliance with the
           Preliminary Injunction. .............................................................................................22

      C.   Defendants Should Pay Marsh's Attorneys' Fees and Costs in Bringing This
           Motion. ......................................................................................................................23

CONCLUSION ....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Advantacare Health Partners v. Access IV*,
  2004 WL 1837997 (N.D. Cal. Aug. 17, 2004) ................................................................20, 22

*Am. Health Inc. v. Chevere*,
  37 F. Supp. 3d 561 (D.P.R. 2014) ...............................................................................22

*Am. Int'l Grp., Inc. v. Chung*,
  2007 WL 9813607 (S.D.N.Y. Apr. 23, 2007) ..............................................................23

*Aviv v. Brainard*,
  2018 WL 10529738 (S.D.N.Y. Aug. 30, 2018) ...........................................................22

*Badgley v. Santacroce*,
  800 F.2d 33 (2d Cir. 1986) ...........................................................................................12

*Bankers Life & Cas. Co. v. Derouin*,
  2021 WL 3910143 (N.D. Ill. Sept. 1, 2021) ...............................................................24

*Benthos Master Fund, Ltd. v. Etra*,
  2022 WL 17819592 (S.D.N.Y. Dec. 20, 2022) ............................................16, 18, 20, 23

*Benthos Master Fund, Ltd. v. Etra*,
  2023 WL 4350594 (S.D.N.Y. July 5, 2023) ................................................................18

*Citibank, N.A. v. McPartland*,
  2023 WL 4424352 (S.D.N.Y. July 7, 2023) ..............................................................13, 19, 23

*Matter of Dickinson*,
  763 F.2d 84 (2d Cir. 1985) ...........................................................................................19, 22

*Donovan v. Sovereign Sec. Ltd.*,
  726 F.2d 55 (2d Cir. 1984) ...........................................................................................13

*GlaxoSmithKline, LLC v. Brooks*,
  2022 WL 1443735 (D. Md. May 6, 2022) ...................................................................15, 22

*H&R Block Tax Servs., LLC v. Money Tr. Fin. Servs., LLC*,
  2024 WL 5445340 (W.D. Mo. Nov. 14, 2024) ...........................................................22

*King v. Allied Vision, Ltd.*,
  65 F.3d 1051 (2d Cir. 1995) .........................................................................................13

*Levin v. Tiber Holding Corp.*,
  277 F.3d 243 (2d Cir. 2002) .........................................................................................13

*M. Harvey Rephen & Assocs., P.C. v. Chase Bank USA, N.A.*,
  853 F. App'x 690 (2d Cir. 2021) ................................................................................24

*Marsh USA LLC v. Parrish*,
  2025 WL 2676389 (S.D.N.Y. Sept. 18, 2025)............................................2, 5, 6, 15, 17, 21, 23

*Matthews Int'l Corp. v. Lombardi*,
  2021 WL 1929266 (W.D. Pa. May 13, 2021)..........................................................................15

*Murrell v. Cooper Tire & Rubber Corp.*,
  2006 WL 2708361 (D. Utah Sept. 19, 2006)..........................................................................20

*N.Y. State Nat'l Org. for Women v. Terry*,
  886 F.2d 1339 (2d Cir. 1989)..........................................................................................19, 23

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
  369 F.3d 645 (2d Cir. 2004)....................................................................................................13

*SDSE Networks, Inc. v. Mathur*,
  2022 WL 18539944 (E.D. Va. Dec. 28, 2022)........................................................................24

*Spallone v. United States*,
  493 U.S. 265 (1990)................................................................................................................12

*Weitzman v. Stein*,
  98 F.3d 717 (2d Cir. 1996)......................................................................................................24

### Statutes

18 U.S.C. § 401 ........................................................................................................................12

### Rules

L.R. 83.6(a)................................................................................................................................23

## PRELIMINARY STATEMENT

Marsh filed this lawsuit against former top leaders of its Florida region—Defendants Michael Parrish, Giselle Lugones, Robert Lynn, and Julie Layton—who duplicitously schemed to lift out nearly an entire region of Marsh employees and many clients for the benefit of a direct competitor, Howden US Services LLC, in violation of their clear and enforceable contractual and legal obligations to Marsh.    ECF No. 1 (Compl.) ¶¶ 2, 11, 102–103, 106, 108–110, 112. Defendants have been executing this methodical raid, including the near simultaneous departure of over 90 Marsh employees *in a single day* (July 21, 2025), as well as a growing number of Marsh's clients. *Id.* ¶¶ 5–6, 103, 117.  Before July 21, Howden had no employees, no clients, and no operations in the U.S. *Id.* ¶¶ 8, 10.  Within hours of this coordinated raid, Howden had a fully operational U.S. insurance brokerage business. *Id.* ¶¶ 2, 8, 87.

Recognizing the irreparable harm Defendants' conduct was causing to Marsh's business, this Court granted Marsh a preliminary injunction.    Among other relief, the Court ordered Defendants to return "all Marsh property, including Confidential Information and Trade Secrets," by no later than September 23. ECF No. 129 at 3.[1]  This order mirrored and reinforced Defendants' Confidentiality Agreements with Marsh, which contractually obligated them to return all such property by the last day of their employment. *E.g.*, ECF No. 16-3 at § 4 (Parrish Confidentiality

---

[1] Confidential Information and Trade Secrets "is defined as it is in Schedule 1 to the Marsh Confidentiality Agreement." ECF No. 129 at 2 n.1.  Specifically, "'Confidential Information and Trade Secrets' are items of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees that derive independent economic value, actual or potential, from not being generally known or available to the general public, but have been developed, compiled or acquired by the Company at its effort and expense, and which the Company has made reasonable efforts to protect its confidentiality." *E.g.*, ECF No. 16-3 at 6 (Parrish Confidentiality Agreement).  Examples include (but are not limited to) Marsh's "financial and business information," "plans for future business," "product and technical information," "client information," including information about clients' policies, and "any and all information in whatever form relating to any client or prospective client of the Company." *Id.*

1

Agreement).  At the Court's deadline, Defendants represented to Marsh that they had "nothing to return."  Yet, about a month past the deadline, Defendants produced a combined 440 documents (and counting) from their personal electronic devices that they admit are Marsh's property.  The produced documents are also replete with Marsh's Confidential Information and include proposals for prospective Marsh clients, business strategy presentations, a playbook Defendants created for employee solicitation, and details of existing Marsh clients' insurance policies, limits, and premiums—which Defendants obtained, in some instances, by sending the documents to personal email addresses and phone numbers or by taking pictures of Marsh computer screens.  These documents contain the very sort of information whose use or disclosure, the Court found, would pose a "substantial risk" of irreparable injury to Marsh.  *Marsh USA LLC v. Parrish*, 2025 WL 2676389, at *3 (S.D.N.Y. Sept. 18, 2025) (hereinafter, "*Parrish*").  Defendants retained the documents, unilaterally and unjustifiably, for over a month past the deadlines set by the Court and by their Confidentiality Agreements, while working for Marsh's direct competitor.  They likely have even more Marsh property that they have not yet returned, as Defendants state that their review of the electronic devices is "ongoing."

Defendants' misrepresentations and brazen disregard for the Court's preliminary injunction amounts to contempt, as well as a clear violation of their Confidentiality Agreements. Defendants made no attempt to return Marsh's property by the deadline and lied about it.  They have not committed to any timeline for reaching compliance, and they have rebuffed Marsh's attempts to verify the volume of Marsh property they wrongfully retained.  Only an invocation of the Court's contempt powers will cure Defendants' disregard of the preliminary injunction.  Marsh seeks coercive sanctions until Defendants can demonstrate full compliance with the preliminary injunction, payment of Marsh's attorneys' fees in bringing this motion, and discovery into

Defendants' retention and use of Marsh property.

## STATEMENT OF FACTS

I.    **Defendants' Contracts Require Their Return of All Marsh Property Upon Termination of Employment.**

As senior Florida Zone leaders—and in connection with receiving significant compensation, including salary, bonuses, and equity grants—each Defendant executed a Confidentiality Agreement with Marsh.  Each Defendant agreed to not "directly or indirectly use, disseminate or disclose . . . Confidential Information and Trade Secrets, except as required to carry out [their] duties as an employee of the Company, and except as expressly authorized by the President or highest executive of the Company."  ECF No. 16-3 at § 3 (Parrish); ECF No. 16-9 at § 3 (Lugones); ECF No. 16-16 at § 3 (Lynn); ECF No. 16-21 at § 3 (Layton).  These Confidentiality Agreements also required Defendants, upon the termination of their employment, to return all Marsh property, including but not limited to "any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in [their] possession or control which contain or pertain to Confidential Information or trade secrets."  ECF No. 16-3 at § 4 (Parrish); ECF No. 16-9 at § 4 (Lugones); ECF No. 16-16 at § 4 (Lynn); ECF No. 16-21 at § 4 (Layton).  "Confidential Information or Trade Secrets" is a defined term in these agreements and includes information relating to Marsh's business, "its products, services, clients, suppliers, vendors, business partners, and employees," including (but not limited to) "financial and business information," "plans for future business," "product and technical information," "client information," including information about clients' policies, and "any and all information in whatever form relating to any client or prospective client of the Company."  ECF No. 16-3 at 6 (Parrish); ECF No. 16-9 at 6 (Lugones); ECF No. 16-16 at 6 (Lynn); ECF No. 16-21 at 6 (Layton).

## II. Marsh Promptly Seeks the Return of its Property, and Defendants State They Have None.

Immediately upon receipt of Defendants' resignations, Marsh reiterated, and repeatedly demanded, Defendants' compliance with their legal and contractual obligations, including the return of all Marsh property, documents, and information and the nondisclosure of Confidential Information.  *See* Mufson Aff. Ex. 1 (July 22, 2025 Ltr. from J. Schwartz to M. Parrish); Ex. 2 (July 22, 2025 Ltr. from J. Schwartz to G. Lugones); Ex. 3 (July 22, 2025 Ltr. from J. Schwartz to R. Lynn); Ex. 4 (July 24, 2025 Ltr. from J. Schwartz to J. Layton).

In response, on July 24, counsel for Defendants Parrish, Lugones, and Lynn represented that they were working on the requisite "return of equipment and information."  Mufson Aff. Ex. 5 (July 24, 2025 Ltr. from K. McCoy to R. Stewart).   Defendants Parrish, Lugones, and Lynn confirmed they had "returned their Marsh phones and computers," but they coyly punted responsibility to Marsh to "provide a list of specific documents that Marsh would consider trade secret or confidential business information," which they would "return or destroy" if located.  *Id.* at 1–2.  Marsh responded on July 26, 2025, that Defendants "are in the best position to know what they took or retained that belongs to Marsh," and reiterated that Defendants "do not have permission to retain any Marsh information or other property and must return all of it immediately."  Ex. 6 (July 26, 2025 Ltr. from R. Stewart to K. McCoy).

On August 21, 2025, each Defendant submitted to the Court a sworn affidavit attesting that they had complied with their obligations to Marsh—which included the duty to return Marsh's property and Confidential Information upon termination of employment.  ECF No. 82-5 ¶¶ 34, 38 (Parrish Decl.); ECF No. 82-8 ¶ 20 (Lugones Decl.); ECF No. 82-11 ¶ 20 (Lynn Decl.); ECF No. 81 ¶¶ 4–5 (Layton Decl.).  Defendant Layton also represented in initial disclosures on August 29 that she "is not in possession of any Marsh materials."  Mufson Aff. Ex. 7, at 3 (Layton's Rule

26(a) Initial Disclosures).  Apart from physical equipment (Defendants' Marsh-issued computers), Marsh received no other returns of its property or Confidential Information from Defendants during this period.  Therefore, we now know Defendants' sworn statements were untrue.

**III.    The Court Orders Defendants to Return All Marsh Property by September 23.**

On September 18, following extensive briefing, evidence submission, and a half-day hearing, this Court entered a preliminary injunction to restrain Defendants from further solicitation of Marsh employees and clients and misuse of Marsh's Confidential Information.  ECF No. 129. In so holding, the Court found that Marsh has demonstrated a likelihood of success on the merits that Defendants breached their contractual obligations to Marsh, including not to solicit Marsh employees and clients and not to misuse Marsh's Confidential Information.  *Parrish*, 2025 WL 2676389, at *2.  The Court credited sworn evidence that Defendants promised promotions and pay raises to Marsh employees, directed the uploading of confidential client files, and arranged for job offers to appear in Marsh employees' personal inboxes.  *Id.*  At the hearing, the Court also rejected as "disingenuous" Defendants' claim that the exodus of nearly 100 Marsh employees was merely coincidental.  Mufson Aff. Ex. 8, at 48:16–21, 67:22–25, 68:1–2 (Sept. 4, 2025 Hr'g tr.).

With respect to Confidential Information, the Court explained that Defendants' Confidentiality Agreements prohibit them from directly or indirectly using, disseminating, or disclosing Marsh's Confidential Information, except as required to carry out their duties as Marsh employees.  *Parrish*, 2025 WL 2676389, at *2.  The Court clarified that "Confidential information" is defined in Defendants' Confidentiality Agreements to "include both 'personnel information' and 'client information.'"  *Id.*  The Court then held that Marsh "is likely to succeed on its claim that [Defendants] breached their Confidentiality Agreements by accessing Marsh's confidential client and employee information in relation to their anticipated move from Marsh to

Howden." *Id.* It rejected Defendants' argument that, "to the extent Marsh believes the Defendants possess confidential information about Marsh, Marsh is 'protected by the terms of its Confidentiality Agreements,'" citing Marsh's evidence that Defendants accessed and misused in their solicitation efforts "pricing models, renewal timelines, growth strategies, and detailed employee compensation benefits." *Id.* Marsh also presented evidence that Defendant Layton instructed her direct reports to place confidential Marsh client information in a newly created SharePoint a month before the mass exodus of Marsh's employees, including Layton, and the associated departure of Marsh's clients. *Id.*

Having found a likelihood of success on the merits, this Court also held that Marsh "demonstrated that it will likely suffer further irreparable harm, absent injunctive relief, through the loss of client relationships, employees, and disclosure of its confidential information." *Parrish*, 2025 WL 2676389, at *3. "Besides the more than 90 Marsh employees who immediately followed Defendants to Howden," at least 17 Marsh clients (as of the Court's ruling) had also moved to Howden. *Id.* And "there is evidence," the Court noted, "that Defendants possess knowledge of Marsh's confidential business strategies and information, including details about Marsh employees and clients." *Id.* The Court found "there is a substantial risk that the Defendants will use and/or disclose [Marsh's] confidential information." *Id.*

Based on these findings, the Court entered a preliminary injunction barring Defendants from soliciting Marsh's employees and clients or retaining or using its Confidential Information. ECF No. 129 at 2–3. The Court mirrored the injunction on Defendants' "existing obligations in their contracts." *Parrish*, 2025 WL 2676389, at *3. The Court also ordered each Defendant to return "all Marsh property, including Confidential Information and Trade Secrets, on the last date of his or her employment or within five (5) days of this Order, whichever date is later." ECF No.

129 at 3. The order explicitly borrowed the definition of "Confidential Information and Trade Secrets" from Schedule 1 of the Marsh Confidentiality Agreement. *Id.* at 2 n.1. Defendant Layton was no longer employed by Marsh at the time the Court entered its order, and Defendants Parrish, Lugones, and Lynn each concluded their employment on September 19. Mufson Aff. Ex. 8, at 7:11–15, 21:5–19, 131:24–132:3. Accordingly, Defendants' deadline to comply with the preliminary injunction was September 23, five days after the order.

## IV.    Defendants Assure Marsh of Their Compliance with the Court's Order.

After the Court entered the preliminary injunction, Marsh directly inquired whether Defendants had any Marsh property to return aside from their Marsh-issued laptops and phones. Mufson Aff. Ex. 9, at 2 (Sept. 22, 2025 Email chain between A. Machin and K. McCoy). On September 22, counsel for Defendants Parrish, Lugones, and Lynn responded that "[t]hey have nothing to return besides the laptops and the phones." *Id.* at 1. On September 26, counsel for Defendant Layton responded that she was "not in possession of any 'Marsh property'" and had "nothing to 'return[.]'" Mufson Aff. Ex. 10 (Sept. 26, 2025 Ltr. from J. Deutsch to A. Machin). Again, we now know that these statements were untrue.

## V.    More than a Month Past the Court's Deadline, Defendants Parrish, Lugones, and Lynn Produce Marsh Property They Had Retained on Personal Devices.

On October 21—nearly a month *after* the Court-imposed deadline to return Marsh's property—Defendants Parrish, Lugones, and Lynn produced **280** Marsh documents they claim are "relat[ed] to Marsh's business" that were retrieved from "various electronic devices" they own. Mufson Aff. ¶ 10 & Ex. 11 (Oct. 21, 2025 Ltr. from K. McCoy to H. Mufson).[2] These documents are replete with Marsh's Confidential Information. As some examples, Defendants Parrish,

---

[2] Defendant Layton, represented by separate counsel, made her document production a week later. That production is discussed in the next Section.

Lugones, and Lynn retained possession of:

- Multiple photographs taken of Marsh computer screens displaying Marsh client proposals with detailed proprietary information regarding Marsh's bid and entries in Marsh's prospective client tracking system. *E.g.*, Mufson Aff. ¶ 11.a–c.

- A strategic business planning document focused on Marsh's approach to the Florida insurance market, including its business strategy, analysis of organizational strengths and weaknesses, identification of growth opportunities, revenue data, and a comparative assessment of industry peers. Mufson Aff. ¶ 11.d.

- Slide decks outlining Marsh's renewal strategies for a specific client, including an overview of the client's insurance policies, associated premiums, comparative analyses, and Marsh's assessment of prevailing market conditions. Mufson Aff. ¶ 11.e.

- A Marsh client's draft Broker of Record letter ("BOR") appointing Marsh as its insurance representative. Mufson Aff. ¶ 11.f.

- Text messages with a Marsh client regarding quotes and coverage. Mufson Aff. ¶ 11.g.[3]

- Documents summarizing clients' insurance policies and associated fees, including information regarding the carrier, policy limits, and premiums. *E.g.*, Mufson Aff. ¶ 11.h–i.

Many of these documents have "Marsh" clearly visible on them. And they facially pertain to Marsh's clients, bids, and business strategies. As such, the documents produced by Defendants Parrish, Lugones, and Lynn were covered by the Court's preliminary injunction *and* their Confidentiality Agreements. Under the contracts, these documents should have been returned to Marsh by September 19—the date on which Defendants Parrish, Lugones, and Lynn ended their employment. Under the preliminary injunction, Defendants were *ordered* to return the documents no later than September 23. ECF No. 129 at 3.

## VI. Marsh Seeks an Explanation for Defendants' Wrongful Retention; in Response, Defendants Layton, Lugones, and Lynn Produce *More* Marsh Property.

On October 24, 2025, Marsh sent a letter to Defendants' counsel addressing Defendants'

---

[3] In October, this same client sent a BOR indicating that it was transferring certain policies to a new broker, which is likely Howden.

clear violations of both the Court's preliminary injunction and their contractual obligations to Marsh.  Mufson Aff. Ex. 12 (Oct. 24, 2025 Ltr. from H. Mufson to K. McCoy & J. Deutsch).[4] Marsh expressed concern regarding the adequacy of the investigative steps taken by Defendants to identify and recover Marsh documents, particularly given that even basic search terms should have revealed the materials at issue.  *Id.* at 3.  In light of the prejudice to Marsh's ability to protect its Confidential Information, Marsh requested that Defendants provide detailed responses to several questions, including: (i) the steps to taken to identify Marsh's property and Confidential Information; (ii) the date on which Marsh materials were first identified; and (iii) the location in which the documents were found.  *Id.* at 4.

On October 30, 2025, Defendant Layton produced **20** documents, including messages and screenshots, revealing that despite earlier representations to the contrary, she too was in possession of Marsh property and Confidential Information.  Mufson Aff. ¶ 13.  For example, Defendant Layton produced images of a phone screen (taken from another device) displaying team members, growth data, and revenue statistics.  *Id.*  Defendant Layton's Confidentiality Agreement required the return of these documents by July 21, the date of her separation from Marsh.[5]  And under the preliminary injunction, Defendant Layton, too, was *ordered* to return the documents no later than September 23.  ECF No. 129 at 3.

That same day, Defendants Lugones and Lynn supplemented their production with **142** documents, revealing that they had *even more* Marsh property and Confidential Information than they had produced the week prior.  Mufson Aff. ¶ 14.  Examples include a message thread

---

[4] Marsh addressed this letter to Defendant Layton as well, correctly anticipating that she also possessed Marsh property and Confidential Information which she had not yet produced.

[5] Defendant Layton lacked the contractual notice period of Defendants Parrish, Lugones, and Lynn; therefore, her separation date was earlier.

discussing whether Marsh should take on a client or refer it to another subsidiary, *id.* ¶ 14.a; a spreadsheet detailing Marsh's "2024 New Business," including revenue amounts, for about a dozen "new" or "expanded" clients, *id.* ¶ 14.b; a draft Marsh response to a client request for proposal, *id.* ¶ 14.c; and a spreadsheet compiling Marsh employees' titles and salaries, with notes on how to contact them—a clear playbook for prohibited employee solicitation, *id.* ¶ 14.d.[6]

Defendants' transmittal letters for the October 30 productions doubled as their responses to Marsh's inquiry of October 24.  Defendants Parrish, Lugones, and Lynn self-servingly stated that they "have no interest in possessing Marsh's confidential information," and deflected responsibility to Marsh for purportedly failing "to identify any other information it deemed 'confidential' that it believed [Defendants] possessed."  Mufson Aff. Ex. 13, at 1 (Oct. 30, 2025 Ltr. from K. McCoy to H. Mufson).  They asserted that "the Court's Order focuses on 'Confidential Information and Trade Secrets,'" *id.* at 1–2, without acknowledging its application to "all Marsh property," ECF No. 129 at 3.  Defendants Parrish, Lugones, and Lynn then detailed their supposed "Good Faith Efforts To Comply," stating that they "*began* running searches" across forensically imaged electronic devices the day after the order issued.  *Id.* at 2 (emphasis added).  This review evidently was not completed by the Court's deadline of September 23, nor even by their October 21 production.  As Defendants Parrish, Lugones, and Lynn explained, they subsequently "identified a subset of documents that contain Marsh information which Marsh may believe is 'confidential,'" which they produced on October 30 and had unilaterally decided to delete from their devices.  *Id.* at 3.  Finally, Defendants Parrish, Lugones, and Lynn confirmed that their review "is continuing, and if and when [they] identify other information that [they] believe Marsh may allege is 'Confidential,' [they] will return it to Marsh."  *Id.*

---

[6] The metadata for this document indicates that Defendant Lugones created it on June 5, 2025, weeks *before* she notified Marsh of her resignation.

Defendant Layton's letter was broadly consistent with that of Defendants Parrish, Lugones, and Lynn.  Defendant Layton stated that, as her counsel has "been preparing to make document productions to [Marsh] in response to [its] discovery demands, we believe that we may have identified materials which Marsh might regard as 'Marsh property.'"  Mufson Aff. Ex. 14, at 2 (Oct. 30, 2025 Ltr. from J. Deutsch to H. Mufson).  These are the records Defendant Layton produced on October 30 and "removed from [her] device."  *Id.*  Defendant Layton "confirm[ed] that [she] is in compliance with the requirements of the order," yet she "will continue, to the extent that further information like this is identified in [counsel's] review of [her] electronically stored information, to produce it on a rolling basis and not stand on any formality."  *Id.*  Defendant Layton "decline[d]" to provide the further information requested in Marsh's letter regarding the steps she had taken to identify and return Marsh's property and Confidential Information.  *Id.* at 3.

Defendants' responses leave more questions than they answer.  They fail to explain how the documents are not "Marsh property" *at a minimum*, even if confidentiality is disputed.  They fail to explain why their review of their own electronic devices could not begin before the Court's order, given that each Defendant was contractually obligated (independent of the preliminary injunction) to return these records at the end of their employment.  They fail to explain why they previously certified under oath that they had complied with their contractual duties or how they could assure Marsh in good faith that they had complied with the preliminary injunction when they had not reviewed their devices.  They do not commit to any timeline for complying fully with the preliminary injunction—which they apparently view as a mere "formality"—and they offer no plan for providing verifiable assurance that all records have been returned, not retained, and not disclosed to any third party including but not limited to Howden.

### VII.  Marsh Petitions This Court for Relief.

Defendants' October 30 responses did provide clarity on two points: each Defendant has produced Marsh property that they were obligated to return over a month ago, and each Defendant has confirmed that their review is *still* not complete.  All the while, Defendants are working for Marsh's direct competitor, raising the precise danger of misappropriation that this Court sought to avert.  Due to Defendants' clear misrepresentations and continuing noncompliance with the preliminary injunction, Marsh hereby petitions the Court for relief.

### ARGUMENT

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt."  *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)); *see also* 18 U.S.C. § 401 (authorizing courts "to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority . . . as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command").  "The purpose of civil contempt, broadly stated, is to compel a reluctant party to do what a court requires of [it]."  *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986).

Marsh respectfully moves the Court to exercise that inherent power in this case and hold each Defendant in contempt of the preliminary injunction for their ongoing failure to return Marsh's property and Confidential Information.  Marsh requests that the Court impose coercive monetary sanctions, via a daily fine or exemplary award, until Defendants certify, under oath, that they have fully complied with the injunction and have returned all Marsh property.  Marsh further requests an award of its attorneys' fees and costs incurred in connection with the prosecution of this contempt motion.  Lastly, to confirm Defendants' compliance with the preliminary injunction, Marsh requests that the Court order Defendants to submit to targeted forensic imaging of their

electronic devices and accounts (e.g., email, photos, cloud-based storage) to identify the retention of Marsh documents, determine the misuse or dissemination thereof, and ensure their permanent and irretrievable destruction.

**I.    The Court Should Hold Defendants in Contempt of the Preliminary Injunction.**

"A party may be held in civil contempt for failure to comply with a court order if '(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'" *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)). "It need not be established that the violation was willful." *Id.* (citing *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984)). "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (citation omitted). These "standards . . . are well-settled" in the Southern District. *Citibank, N.A. v. McPartland*, 2023 WL 4424352, at *3 (S.D.N.Y. July 7, 2023) (collecting cases), *report & recommendation adopted*, 2023 WL 8478799 (S.D.N.Y. Dec. 7, 2023).

Each of the three factors supports a ruling of contempt. First, the Court's order was clear: Defendants were to return "all Marsh property, including Confidential Information and Trade Secrets" by September 23. ECF No. 129 at 3. Second, Defendants have not complied: now over a month later, they have returned over **440** documents (and counting) of Marsh's property and Confidential Information. Third, Defendants' lackluster efforts fall well short of a diligent attempt to comply: they made no attempt to complete a review of their electronic devices, nor even to search for obvious documents, before summarily (and falsely) declaring themselves in compliance

with their contracts, under oath.

### A. The Court's Order Was Clear: Defendants Were Obligated to Return the Documents by September 23.

The Court ordered Defendants to return "all Marsh property, including Confidential Information and Trade Secrets" by no later than September 23. ECF No. 129 at 3. The documents produced by Defendants on October 21 were unambiguously within the scope of that order.

"Confidential Information and Trade Secrets" is a defined term in Schedule 1 of the Marsh Confidentiality Agreement, as the Court expressly stated. ECF No. 129 at 2 n.1 ("When used herein, this term is defined as it is in Schedule 1 to the Marsh Confidentiality Agreement."). That definition includes a range of information relating to Marsh's business, "its products, services, clients, suppliers, vendors, business partners, and employees," including (but not limited to) "financial and business information," "plans for future business," "product and technical information," "client information," including information about clients' policies, and "any and all information in whatever form relating to any client or prospective client of the Company." *See, e.g.*, ECF No. 16-3 at 6 (Parrish Confidentiality Agreement). The produced documents meet this definition, as they relate to Marsh's products, services, and clients, along with other sensitive Confidential Information—all of which Marsh developed, compiled, or acquired with considerable effort and expense. *E.g.*, Mufson Aff. ¶¶ 11.g (MP0000029, communications with a Marsh client discussing quotes and coverage), 14.c (GL0000746, draft response to client RFP), 11.d (RL0000059, business strategy presentation), 13 (JLAYTON0000034, team members' revenue figures and targets); *see supra*, at 8–10. If used, the information could help a competitor to undercut Marsh's service offerings and pricing and lure away both new and prospective clients.

Moreover, the Court did *not* limit its order to "Confidential Information and Trade Secrets." It expressly directed Defendants to "return *all* Marsh property, *including* Confidential Information

14

and Trade Secrets." ECF No. 129 at 3 (emphases added). Even if Defendants contest that the documents qualify as "Confidential Information and Trade Secrets," they are indisputably "Marsh property." The produced documents were generated during Defendants' employment with Marsh for the purpose of servicing Marsh clients and otherwise conducting Marsh business. Many of the documents, including photos of computer screens and other mobile devices, show Defendants' attempt to misappropriate Marsh's confidential information through means not easily susceptible to Marsh's detection. The Court, having already found a risk of "irreparable harm" from "Defendants' use and disclosure of [Marsh's] confidential information," *Parrish*, 2025 WL 2676389, at *3, elected *not* to split hairs and sensibly ordered the prophylactic return of Marsh property. This makes sense since the Defendants are actively competing with Marsh (in open violation of their non-competition agreements), including Defendant Parrish who is Howden's Chief Executive Officer. The order left no ambiguity: these documents needed to be returned. *See Matthews Int'l Corp. v. Lombardi*, 2021 WL 1929266, at *1–2 (W.D. Pa. May 13, 2021) (explaining that "there is no reasonable ambiguity within the order" requiring return of "all documents and information that belong to, or originated from," the former employer); *GlaxoSmithKline, LLC v. Brooks*, 2022 WL 1443735, at *10 (D. Md. May 6, 2022) (TRO requiring former employee "to return all [employer] property in her possession to [employer's] office within 24 hours of receipt of the TRO" was "clear and unequivocal").

Defendants, for their part, seem to recognize that these documents needed to be returned long ago. Defendants Parrish, Lugones, and Lynn conceded in their cover letter to the October 21 production that the documents "relat[e] to Marsh's business." Mufson Aff. Ex. 11. Defendant Layton stated that she was producing "materials which Marsh might regard as 'Marsh property.'" Ex. 14, at 2. And all Defendants have arranged to have those documents removed from their

devices.  Ex. 11 (suggesting arrangements to "confirm deletion of this material so it cannot be accessed from their devices"); Ex. 13, at 3 n.1 (confirming Defendants Parrish, Lugones, and Lynn will "proceed and have this information deleted from [their] devices/clouds"); Ex. 14, at 2 (confirming "these materials have since been removed from Ms. Layton's device, under [counsel's] supervision").[7]

If Defendants had any uncertainty about what documents they were obligated to locate and produce, they needed to seek clarification of the Court's order prior to the deadline.  Their failure to do so and their subsequent production of these hundreds of documents demonstrates that the order was clear all along.  *See Benthos Master Fund, Ltd. v. Etra*, 2022 WL 17819592, at *9 (S.D.N.Y. Dec. 20, 2022) (noting that the contemnor never "indicate[d] that he did not understand what he was being required to produce").  The Court spoke clearly from the start; Defendants simply chose to disregard the order.

### B.    Defendants Failed to Comply with the Order.

Equally clear was the deadline for compliance.  The Court directed each Defendant to return Marsh property "on the last date of his or her employment or within five (5) days of this Order, whichever date is later."  ECF No. 129 at 3.  For each Defendant, the relevant deadline was September 23, five days from the preliminary injunction.  Defendants never raised to Marsh, nor to the Court, that they would be unable to comply with the stated deadline.

The Court's deadline was not a suggestion.  It was set intentionally, in recognition that Defendants *must not* retain access to Marsh's Confidential Information and property when they start work at Howden.  The Court had just held that Marsh demonstrated a likelihood of success

---

[7] Any such deletion should be overseen by a third-party forensics firm, not Defendants themselves, to ensure that (1) the documents are irretrievably removed from Defendants' devices, and (2) all relevant evidence (including metadata) is preserved in a separate location.  *See infra* Section II.A.

on other breaches of Defendants' Confidentiality Agreements, and that "Defendants' use and disclosure of [Marsh's] confidential information" would cause Marsh to "continue suffering irreparable harm." *Parrish*, 2025 WL 2676389, at *3. The Court attempted to avoid these precise harms by ordering the prompt return of documents.

Yet, inexplicably, Defendants retained these documents for nearly a month while actively working for Marsh's direct competitor. Thus, their noncompliance with the Court's order is beyond dispute. No matter what explanation Defendants might proffer in response, the fact remains that they retained these documents long past the Court's September 23 deadline.

### C. Defendants Falsely Represented Their Compliance Having Made No Diligent Effort.

Defendants also actively misled Marsh regarding their compliance with the Court's order. After issuance of the order, Marsh inquired (through counsel) whether Defendants had any Marsh property to return aside from their Marsh-issued laptops and phones. Mufson Aff. Ex. 9, at 2. On September 22, Defendants Parrish, Lugones, and Lynn responded that "[t]hey have nothing to return besides the laptops and the phones." *Id.* at 1. And on September 26, Defendant Layton responded that she was "not in possession of any 'Marsh property'" and had "nothing to 'return.'" Ex. 10. As their document productions would later reveal, those representations were false.

It is unclear what, if any, diligence Defendants undertook to comply with the Court's order by the September 23 deadline. Any reasonable search for Marsh property would have identified the documents Defendants later produced. Many are clearly labeled "Marsh" and plainly include Marsh's Confidential Information concerning its Florida Zone business, clients, and prospects. Many others were emailed from Defendants' Marsh work email addresses. And the documents were, of course, in Defendants' direct possession on their personal electronic devices. Basic search terms run across Defendants' personal devices would have uncovered these documents for

Defendants to return by the deadline.  The ease with which these documents *could have* been identified strengthens the conclusion that Defendants failed to use reasonable diligence.  *See Benthos Master Fund*, 2022 WL 17819592, at *9 n.20 ("Because many of the requested materials should be readily available to [the contemnor], there is more than clear and convincing evidence that he has not used reasonable diligence to comply with this Court's orders.").

Following the Defendants' production of Marsh's property, Marsh attempted to gather more information regarding Defendants' efforts to comply with the preliminary injunction.  Marsh asked, *inter alia*, for "a detailed explanation of the steps, if any, taken to search for and sequester Marsh's property, confidential information, or trade secrets on Defendants' personal devices"; "the first date [Defendants] identified Marsh's property, confidential information, or trade secrets on Defendants' devices"; and identification of the "device(s) and/or account(s) [on which] the Marsh documents [Defendants] produced were found."  Mufson Aff. Ex. 12, at 4.

In response, Defendants provided very limited information on their efforts to locate and return Marsh's property, while making general overtures to their "good faith."  Mufson Aff. Exs. 13, 14.  But Defendants' "say-so" does not establish reasonable diligence, especially given that their prior representations have been proven false.  *See Benthos Master Fund, Ltd. v. Etra*, 2023 WL 4350594, at *6 (S.D.N.Y. July 5, 2023) (refusing to "credit" the contemnor's "say-so" on his diligent effort to comply, "given his documented pattern of making false statements to the Court").  Moreover, Defendants do not say why they chose to initiate a review of their electronic devices only *after* the Court's order (issued two months after their respective resignations), why they could not identify obvious Marsh property (such as PowerPoints stamped with the Marsh logo) during the five days allotted by the Court, or why they assured Marsh they were in compliance when they had not (and *still* have not) completed their review.

18

Even now, Defendants have not certified full compliance. Defendants Parrish, Lugones, and Lynn confirmed that their review "is continuing, and if and when [they] identify other information that [they] believe Marsh may allege is 'Confidential,' [they] will return it to Marsh." Mufson Aff. Ex. 13, at 3. Defendant Layton stated she "will continue, to the extent that further information like this is identified in [counsel's] review of [her] electronically stored information, to produce it on a rolling basis and not stand on any formality." Ex. 14, at 2. Evidently, Defendants consider themselves free to return Marsh's property at their whim, in striking defiance of the Court's order.

Despite invitation, Defendants have offered no satisfactory explanation for how these documents were retained over a month past the Court's deadline. At a minimum, Defendants' retention betrays a serious disregard for their contractual obligations and the authority of this Court. There was no earnest attempt to comply with the Court's order *by* the stated deadline—and Defendants had no basis on which to assure Marsh of their compliance.

## II.    The Court Should Fashion Appropriate Remedies for Defendants' Contempt.

Once contempt is established, "courts have broad discretion to determine an appropriate contempt sanction." *Citibank*, 2023 WL 4424352, at *4. The Court must consider "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989). "The primary purpose of the imposition of a sanction for civil contempt is to coerce the contemnor into future compliance and to remedy past non-compliance[.]" *Matter of Dickinson*, 763 F.2d 84, 87 (2d Cir. 1985). Ultimately, the question "is whether the coercive sanction is reasonable in relation to the facts, which is a matter in the

Court's discretion." *Benthos Master Fund*, 2022 WL 17819592, at *17.

To procure compliance and remediate the costs of Defendants' contempt, Marsh requests that the Court order the following remedies: (1) discovery directed at verifying Defendants' compliance with the preliminary injunction; (2) a coercive fine; and (3) compensation for Marsh's attorneys' fees in bringing this motion.

### A.   Defendants Should Submit to Additional Discovery Regarding Their Retention and Use of Marsh's Confidential Information.

Marsh seeks an order directing each Defendant to cooperate in special, expedited discovery directed at verifying their compliance with the preliminary injunction and at their cost. Where, as here, the contemnor's compliance is in doubt, courts may order such discovery. In *Benthos Master Fund*, the court authorized the moving party "to conduct a forensic examination of [the contemnor's] electronic devices to determine whether any of the documents [the contemnor] has been ordered to produce but has not produced are recoverable from the [device]." 2022 WL 17819592, at *12 n.31 & *19. In *Murrell v. Cooper Tire & Rubber Corp.*, the court ordered the contemnor (a contract legal assistant deemed to have violated the case's protective order) to "appear for [a] deposition . . . regarding any and all . . . confidential material she obtained," to provide "an accounting" of all such material, and to produce documents "to determine whether or not the material has been disseminated." 2006 WL 2708361, at *1–2 (D. Utah Sept. 19, 2006). In *Advantacare Health Partners v. Access IV*, the court authorized the contemnors' former employer to "examine Defendants' hard drives to ensure that the files have been deleted," noting that "the least obtrusive way to ensure that Defendants have returned all of Plaintiffs' property and are not using Plaintiffs' property to operate a business is to require Defendants to demonstrate compliance affirmatively." 2004 WL 1837997, at *9 (N.D. Cal. Aug. 17, 2004). And in *SRA Insurance Agency, LLC v. Virtus LLC*—arising, quite notably, from the "en masse" departure of employees

from one insurance broker to an upstart competitor—the court found the former employees in contempt of a preliminary injunction for engaging in prohibited client solicitation and ordered "[e]xpedited discovery" for the purpose of "discern[ing] the nature and scope of any breaches that may have occurred of the Preliminary Injunction." 2021 WL 1840065, at *1, *7 (D. Kan. May 7, 2021).

Marsh lacks the information to know whether additional Marsh property resides with Defendants, whether that property has been misused for solicitation of Marsh employees or clients, and whether Defendants have ensured the *complete* deletion of Marsh property identified to date. "Defendants are in sole possession of the evidence showing the extent and substance" of the Confidential Information they wrongly retained. *SRA Ins. Agency, LLC*, 2021 WL 1840065, at *6. Defendants also have proven, via their false assurances of compliance, that their responses cannot be taken at face value.

Accordingly, for the purpose of determining Defendants' compliance with the preliminary injunction, Marsh asks the Court to authorize the following expedited discovery:

- Forensic imaging of Defendants' electronic devices and accounts, at Defendants' expense, targeting (1) the retention of Marsh documents and information, (2) the dissemination of Marsh documents and information, and (3) contact with Marsh clients during the resignation period. Marsh would provide search parameters to a third-party forensics firm,[8] which would review the results, identify any "Marsh property," and certify its permanent deletion from Defendants' devices and accounts (while preserving all relevant evidence in a separate location).

- Defendants' immediate production of any documents relevant to conduct enjoined by the Court: "(1) communicating with current Marsh employees regarding employment with Howden, or any form of solicitation thereof, (2) communicating with existing Marsh clients regarding provision of services or products by Howden, or any form of solicitation thereof, and (3) any use or disclosure of Marsh's confidential information." *Parrish*, 2025 WL 2676389, at *3.

---

[8] For example, given that Defendants' production contained several photographs of Marsh computer screens, Marsh would request that the forensics firm review all photographs containing text recognizable by OCR or otherwise identified by the forensics firm as likely to contain text.

- A deposition of each Defendant, not counting for purposes of Fed. R. Civ. P. 30(a)(2)(A), regarding Defendants' compliance with the preliminary injunction.

**B.    Defendants Should Pay a Daily Fine Until Their Full Compliance with the Preliminary Injunction.**

The Court's "discretion" to fashion an appropriate contempt remedy "clearly permits, as a coercive device, the imposition of a fine." *Matter of Dickinson*, 763 F.2d at 88. Daily or weekly fines are commonly used in this District and other federal courts as a coercive sanction. *See id.* at 87–88 (affirming a $1,500 fine "for each day [contemnor] persists in his refusal to testify" as ordered by the court); *see also Aviv v. Brainard*, 2018 WL 10529738, at *3 (S.D.N.Y. Aug. 30, 2018) (imposing an initial fine of $5,000 for each contemnor, followed by an additional fine starting at $1,000 and doubling "each week thereafter that the contemnor fails to comply fully" with the court's orders); *GlaxoSmithKline*, 2022 WL 1443735, at *11 ($200 daily fine for contempt of TRO requiring the return of all property defendant took from her former employer); *H&R Block Tax Servs., LLC v. Money Tr. Fin. Servs., LLC*, 2024 WL 5445340, at *4–6 (W.D. Mo. Nov. 14, 2024) ($500 daily fine for contempt of TRO requiring ex-franchisee to return franchisor's confidential information); *Am. Health Inc. v. Chevere*, 37 F. Supp. 3d 561, 563 (D.P.R. 2014) ($500 daily fine for contempt of preliminary injunction requiring former contractor to return confidential information); *Advantacare Health Partners*, 2004 WL 1837997, at *11 ($20,000 exemplary sanction for contempt of preliminary injunction requiring the return of all property defendants took from their former employer).

Here, Marsh requests that the Court coerce compliance with its preliminary injunction via a daily fine, payable to the Court, running from the finding of contempt until each Defendant purges their contempt by submitting a sworn certification that they have fully complied with the preliminary injunction and have returned all Marsh property. Marsh submits that a daily fine of $10,000 per Defendant would be reasonably calculated to coerce compliance.

This coercive fine is a fitting remedy under the Second Circuit's considerations.  It suits "the character and magnitude of the harm threatened by the continued contumacy," *N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353, as this Court has already found a risk of "irreparable harm" to Marsh through "Defendants' use and disclosure of [Marsh's] confidential information," *Parrish*, 2025 WL 2676389, at *3.  A fine in this amount is likely to be effective, as it is "high enough to be meaningful" to Defendants considering their financial positions, *Citibank*, 2023 WL 4424352, at *5, without exceeding their ability to pay, *see N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353.  Each Defendant was highly compensated at Marsh through a combination of base salary, incentive compensation, and equity awards, worth millions of dollars each and tens of millions of dollars between them.  Compl. ¶¶ 14, 18, 22, 26; *see* ECF No. 16-1 (Parrish offer letter, stating these amounts); ECF No. 16-7 (Lugones offer letter); ECF No. 16-14 (Lynn offer letter); ECF No. 16-18 (Layton offer letter).  And Defendants no doubt continue to earn lucrative compensation at Howden.  If the Court has any doubt about Defendants' ability to pay this fine, it may permit them an opportunity to "prove[] with credible, admissible evidence that [they are] financially unable to pay all or part of that sum." *Benthos Master Fund*, 2022 WL 17819592, at *18.

### C.    Defendants Should Pay Marsh's Attorneys' Fees and Costs in Bringing This Motion.

In addition to coercing "future compliance with the court's order," contempt remedies should also "compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women*, 886 F.2d at 1352.  "Compensatory sanctions should reimburse the injured party for its actual damages," *id.* at 1353, which may include a "reasonable counsel fee, necessitated by the contempt proceedings," L.R. 83.6(a).  Attorneys' fees and costs are a common element of contempt sanctions, including in this precise fact pattern. *See, e.g.*, *Am. Int'l Grp., Inc. v. Chung*, 2007 WL 9813607, at *2, *4 (S.D.N.Y. Apr. 23, 2007)

(awarding over $25,000 in legal fees for contemnor's violation of a preliminary injunction requiring him "to immediately return to AIG any of its privileged, confidential and/or trade secret information and the two laptops and Blackberry in [his] possession"); *Bankers Life & Cas. Co. v. Derouin*, 2021 WL 3910143, at *5 (N.D. Ill. Sept. 1, 2021) (where contemnors violated a TRO requiring the return of former employer's confidential information, "fees spent on the motion for a rule to show cause would reasonably compensate the plaintiff for losses incurred as a result of the defendants' contumacy"); *SDSE Networks, Inc. v. Mathur*, 2022 WL 18539944, at *1 (E.D. Va. Dec. 28, 2022) (imposing fees and costs for contemnor's violation of a TRO prohibiting the contemnor from accessing his former employer's trade secrets).

An award of attorneys' fees is warranted here. Marsh incurred substantial fees in bringing this contempt motion—fees which would not have been necessary if Defendants had complied with the Court's original order. To the extent the Court focuses on the "willfulness" of Defendants' noncompliance, willfulness may be found in their decision to forego reasonable diligence before declaring compliance with the preliminary injunction. *See Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996) ("while willfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them"); *M. Harvey Rephen & Assocs., P.C. v. Chase Bank USA, N.A.*, 853 F. App'x 690, 693 (2d Cir. 2021) (affirming over $230,000 in attorneys' fees and costs, noting that the contemnor "demonstrated its intent to consciously disregard the district court's order by doing absolutely nothing to comply"). As explained more fully above, very basic searches of Defendants' personal devices—such as the word "Marsh," or communications received from their work email addresses—would have identified the documents that were belatedly produced on October 21 and 30. *Supra*, at 17–18. Defendants' decision not to take these steps before the Court's September 23 deadline—nor before assuring Marsh of their

compliance with the order—was "willful."

     As such, Defendants should bear Marsh's attorneys' fees to compensate for the costs of their noncompliance.  Marsh proposes to provide the Court with supporting documentation on the amount of its attorneys' fees after a finding that Defendants are in contempt.

## CONCLUSION

     For the foregoing reasons, Marsh respectfully requests that the Court direct Defendants Parrish, Lugones, Lynn, and Layton to show cause why they should not be held in contempt of the September 18, 2025 preliminary injunction.  After appropriate proceedings, the Court should hold Defendants in civil contempt and impose the sanctions requested herein, or such other relief as the Court deems proper.

Dated: November 10, 2025

New York, New York

MARSH USA LLC

By its attorneys,

By:  _/s/ Harris M. Mufson_____

Harris Mufson
Lee R. Crain
Kelly Herbert
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel.: 212.351.3805
Fax: 212.817.9505
hmufson@gibsondunn.com
lcrain@gibsondunn.com
kherbert@gibsondunn.com

Jason C. Schwartz (*pro hac vice*)
Ryan C. Stewart (*pro hac vice forthcoming*)
Amanda C. Machin (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, D.C. 20036
jschwartz@gibsondunn.com
rstewart@gibsondunn.com
amachin@gibsondunn.com

Karl G. Nelson (*pro hac vice*)
Rachel W. Robertson (*pro hac vice*)
Brian Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
knelson@gibsondunn.com
rrobertson@gibsondunn.com
brichman@gibsondunn.com

*Attorneys for Plaintiff Marsh USA LLC*

26