# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARSH USA LLC, | Civ. No. 1:25-cv-06208-GBD |
|       Plaintiff, | |
| v. | |
| MICHAEL PARRISH, GISELLE LUGONES, ROBERT LYNN, and JULIE LAYTON, | |
|       Defendants. | |

**DEFENDANTS PARRISH, LUGONES, AND LYNN'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S PROPOSED ORDER TO SHOW CAUSE FOR CONTEMPT OF THE COURT'S PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS............................................................................................... 8

I.    Defendants Promptly Complied with Their Contractual and
      Discovery Obligations. ......................................................................................... 8

      A.    Defendants Complied with Their Obligations by Immediately
            Returning Property and Requesting Clarification on
            "Confidential Information and Trade Secrets." ......................................... 8

      B.    Defendants Promptly Collected Potentially Returnable Electronically
            Stored Information. ................................................................................. 10

      C.    Without Participation by Marsh and in an Abundance of Caution,
            Defendants Produced Information that Marsh May Claim as Confidential
            and Trade Secret Information as Timely as Feasible. ............................. 12

II.   The Facts Show that Defendants Complied with the Order in Good Faith. ........ 13

LEGAL STANDARD.................................................................................................. 15

ARGUMENT .............................................................................................................. 17

I.    Marsh Has Not Met Its Burden to Prove a Finding of Contempt Is Warranted. ... 17

      A.    In Incorporating the Confidentiality Agreements, the Court's
            Preliminary Injunction Order Was Unclear and Ambiguous............................ 17

      B.    Defendants Complied with the Court's Order....................................... 23

      C.    Defendants Have Been Reasonably Diligent and Energetic in
            Attempting to Accomplish What Was Ordered...................................... 24

II.   Marsh's Other Proposed Obligations on Defendants Are
      Inappropriate and Premature.............................................................................. 25

      A.    Additional Discovery Is Unnecessary and Unwarranted Given
            Defendants' Ongoing Compliance Efforts. ............................................ 25

      B.    Marsh Asserts No Legitimate Basis for Fees or Costs.......................... 26

CONCLUSION .......................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Ad Lightning Inc. v. Clean.io, Inc.*,
  2020 WL 4570047 (S.D.N.Y. Aug. 7, 2020) .................................................................. 19

*Aspira of N.Y. v. Bd. of Educ. of the City of N.Y.*,
  423 F. Supp. 647 (S.D.N.Y. 1976) ........................................................................... 17, 23

*Badgley v. Santacroce*,
  800 F.2d 33 (2d Cir. 1986) ........................................................................................ 15

*BDO Seidman v. Hirshberg*,
  93 N.Y.2d 382 (N.Y. 1999) ....................................................................................... 21

*Benefitvision Inc. v. Gentiva Health Servs., Inc.*,
  2014 WL 298406 (E.D.N.Y. Jan. 28, 2014) ................................................................. 5

*Brown v. Barnes & Noble, Inc.*,
  474 F. Supp. 3d 637 (S.D.N.Y. 2019) ........................................................................ 25

*Chao v. Gotham Registry, Inc.*,
  514 F.3d 280 (2d Cir. 2008) ...................................................................................... 15

*Dewitt Stern Grp. v. Eisenberg*,
  257 F. Supp. 3d 542 (S.D.N.Y. 2017) ........................................................................ 20

*Drywall Tapers, Local 1974 v. Local 530*,
  889 F.2d 389 (2d Cir. 1989) ...................................................................................... 16

*Elsevier Inc. v. Doctor Evidence, LLC*,
  2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ................................................................ 19

*Grand v. Schwarz*,
  2018 WL 1583314 (S.D.N.Y. Mar. 27, 2018). ...................................................... 16, 17

*Harley Marine NY, Inc. v. Moore*,
  716 F. Supp. 3d 21 (N.D.N.Y. 2024) .......................................................................... 19

*Haroun v. ThoughtWorks, Inc.*,
  2020 WL 6828490 (S.D.N.Y. Oct. 7, 2020) ................................................................ 26

*King v. Allied Vision, Ltd.*,
  919 F. Supp. 747 (S.D.N.Y. 1996) ....................................................................... passim

*Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd.*,
  885 F.2d 1 (2d Cir. 1989) .......................................................................................... 27

*N.Y. Real Estate Inst., Inc. v. Jammula,*
    379 F. Supp. 3d 266 (S.D.N.Y. 2019) ........................................................ 16, 17

*N.Y. State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989) ................................................................... 27

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*,
    369 F.3d 645 (2d Cir. 2004) ..................................................................... 26

*Pearlman v. Bouchard*,
    1992 WL 125542 (S.D.N.Y. May 28, 1992) ............................................ 28

*Schmitz v. St. Regis Paper Co.*,
    758 F. Supp. 922 (S.D.N.Y. 1991) ...................................................... 16, 23, 24

*Shillitani v. United States*,
    384 U.S. 364 (1966) ................................................................................ 15

*Spallone v. United States*,
    493 U.S. 265 (1990) ............................................................................ 15, 25

*TNS Media Rsch., LLC v. TRA Glob., Inc.*,
    977 F. Supp. 2d 281 (S.D.N.Y. 2013) .................................................... 21

*United States v. United Mine Workers of Am.*,
    330 U.S. 258 (1947) ............................................................................ 15, 25

*Winfield v. City of New York*,
    2018 WL 840085 (S.D.N.Y. Feb. 12, 2018) ........................................... 26

*Zurich Am. Life Ins. Co. v. Nagel*,
    538 F. Supp. 3d 396 (S.D.N.Y. 2021) .................................................... 19

**Statutes**

18 U.S.C. § 401 ......................................................................................... 15

**PRELIMINARY STATEMENT**

Defendants Michael Parrish, Giselle Lugones, and Robert Lynn ("Defendants") have endeavored to comply timely and in good faith with the Court's September 18, 2025 preliminary injunction order (ECF No. 129), their employment agreements with Plaintiff Marsh USA LLC ("Plaintiff" or "Marsh"), and their general discovery obligations (including the avoidance of spoliation). Defendants have done nothing wrong. In fact, they have done everything asked of them in terms of making the personal data residing on their personal devices and email accounts available to counsel for review as part of discovery in this case and the efforts to comply with the September 18 order.

Marsh's motion essentially focuses on the timing of the production of certain electronically stored information ("ESI") identified on defendants' personal devices and email accounts through the diligence of counsel. But that focus is entirely misplaced. As a threshold matter, Defendants and their counsel do not believe that any of the ESI qualified for return under the Court's order. But it was clear to counsel that the documents would have to be produced at some point in the normal course of discovery in response to Marsh's pending Rule 34 document requests. As a result, Defendants' counsel made the decision to err on the side of caution and advance the return of the documents to Marsh early in response to Marsh's document requests. Defendants' counsel explained this in the cover letter accompanying the production. *See* ECF No. 164-11. Marsh now seeks to hold Defendants' and defense counsel's timely and reasonable efforts against them.

Assuming *arguendo* that the documents qualified under the Court's order—which they do not—any delay was ultimately due in part to the realities of the timing of the Court's order and the efforts engaged in by counsel, not due to the conduct of any Defendant. And, the ultimate production was a result of the good-faith efforts of counsel to produce what it found in response

to Marsh's Rule 34 document requests. All these reasonable efforts were intended to avoid the exact motion that Marsh has now filed.

In any event, Marsh's motion is not about a refusal or failure to comply with the order. Nor does Marsh demonstrate that the additional time it took Defendants' counsel to sort through troves of personal information collected from Defendants has harmed or prejudiced Marsh in any way. Instead, Marsh asks the Court to impose unwarranted monetary and other sanctions because Defendants' counsel identified information that Marsh may claim as qualifying under the September 18 order and advanced that information in the discovery production schedule—albeit after the Court's deadline of September 23. Marsh makes no individualized showing that any of that information qualified under the September 18 order, nor does it demonstrate that the individual conduct of any one of the Defendants justifies the sanctions Marsh requests. The motion should be denied on that basis alone.

Notwithstanding, to give the Court comfort and an understanding of the efforts counsel has taken on Defendants' behalf to ensure compliance with the September 18 order, undersigned counsel has provided a declaration along with declarations from each of the Defendants. As those submissions demonstrate, Defendants, through counsel, have repeatedly expressed to Marsh they have no interest in retaining or using the alleged Marsh property or confidential information and they want to engage in a process to identify, return, and satisfy Marsh as to any information that it considers as qualifying under the Confidentiality Agreements. But as a practical matter, full compliance cannot be certified because Marsh has consistently refused to meaningfully participate, as required, in crafting a mutually agreeable, workable solution concerning what qualifies under the definition the Court adopted from Schedule 1 of the Confidentiality Agreements. In fact, in the face of repeated efforts to engage Marsh on this issue and work through a solution, which efforts

started even before this case was filed, Marsh has either ignored or disclaimed any responsibility to engage in crafting a solution, insisting it is Defendants' sole burden to figure it out without Marsh's cooperation. Marsh has effectively orchestrated a game of "gotcha" by boxing Defendants into an untenable "damned if you do, damned if you don't" position that has frustrated and forestalled Defendants' reasonable, good-faith efforts. Viewed in that light, the issues raised by Marsh's motion are of Marsh's own making and could have been resolved months ago, even before the Court's order, and certainly without resort to motion practice seeking contempt and sanctions.

It is critical to note that Defendants' efforts to ensure the return of any Marsh "Confidential Information and Trade Secrets" began *before this case was even filed*. Defendants returned their Marsh phones and laptops and confirmed they did not have paper files for clients. If there were any "Confidential Information and Trade Secrets," it was most likely on Defendants' Marsh-issued business devices that were promptly turned over to Marsh. Defendants did not believe they had any residual information on their personal devices that would qualify for return. Still, Defendants proactively requested guidance from Marsh regarding the particular categories of documents Defendants should search for and return. Marsh stonewalled at every turn, placing the burden on Defendants to interpret the convoluted definition of "Confidential Information and Trade Secrets" in Marsh's Confidentiality Agreements. Without Marsh's guidance on what features or indicators may cause a document to be "confidential" or contain a "trade secret," and no guidance on what reasonable efforts Marsh undertook to develop or protect its information, Defendants could only identify and produce in good faith what they and their counsel guessed *Marsh* would deem to qualify under the definitions in the Confidentiality Agreements, the Court's order, and general discovery requirements. Defendants should not be held in contempt or sanctioned for their reasonable, good-faith efforts at compliance, which included Defendants' earnest and repeated

3

requests via email, letters, and conferences seeking clarity on what material Marsh deems "property," "confidential," or "trade secrets."

It is also critical to bear in mind the language of the September 18 order. The order required that "Defendants must return all *Marsh property, including Confidential Information and Trade Secrets*, on the last date of his or her employment or within (5) days of this Order, whichever is later." ECF No. 129 at 3 (emphasis added). The order did not define the term "Marsh property," but it did explicitly define the term "Confidential Information and Trade Secrets" "as it is in Schedule 1 to the Marsh Confidentiality Agreement." *Id.* at 2, n.1. For their part, the beginning of the Marsh Confidentiality Agreements defines "Confidential Information and Trade Secrets" as:

> [I]tems of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees *that derive independent economic value, actual or potential, from not being generally known or available to the general public, but have been developed, compiled or acquired by the Company at its effort and expense, and which the Company has made reasonable efforts to protect its confidentiality.*

ECF No. 16-3 at Schedule 1(a) (Parrish) (emphasis added); *see also* ECF Nos. 20-9 at Schedule 1(a) (Lugones), 20-16 at Schedule 1(a) (Lynn). Marsh buries this preliminary language in a footnote in its brief. ECF No. 163 at 1, n.1. The definition goes on to provide examples of "Confidential Information and Trade Secrets," but those examples are still subject to all the qualifiers quoted above. *See* ECF Nos. 16-3 at Schedule 1(a), 20-9 at Schedule 1(a), 20-16 at Schedule 1(a).

The threshold problem is that Marsh must provide guidance sufficient to inform Defendants which, if any, items of information in Defendants' possession relating to Marsh (1) derive independent economic value, actual or potential, (2) from not being generally known or available to the general public, and (3) have been developed, compiled, or acquired by Marsh (4)

4

at its effort and expense, and which (5) Marsh has made reasonable efforts to protect its confidentiality. *See id.* Marsh is in the best position to demonstrate what information satisfies those threshold standards and qualifications; yet Marsh refuses to participate in this process.

For example, but without limitation, nearly all the items of information and documents Defendants identified and produced to Marsh to date are stale—*i.e.*, so old and outdated that they cannot be said to have *any* economic value, actual or potential. Other documents Marsh alleges contain "Confidential Information"—including, but not limited to, a Broker of Record Letter ("BOR")[1]—are plainly not "developed, compiled or acquired by the Company at its effort and expense, and which the Company has made reasonable efforts to protect its confidentiality." *See* ECF No. 163 at 8. In fact, the BOR is signed by the client and is provided to the former broker, the new broker, as well as the insurance company that provides the client the insurance. This clearly does not meet the definition of "Confidential Information and Trade Secrets." And Defendants are unable to ascertain the reasonable efforts, if any, Marsh has made and is making to protect the confidentiality of any of the information or documents Defendants have produced, including but not limited to the stale material.

In effect, Marsh's motion seeks to flip the burden by asking this Court to find that *Defendants* must somehow intuit what property or information *Marsh* will be able to demonstrate: derives independent economic value from not being known to the public or generally; "ha[s] been developed, compiled or acquired by the Company at its effort and expense, and which the Company has made reasonable efforts to protect its confidentiality;" and meets the other

---

[1] "'[A] broker of record letter is a written statement signed by an insured advising an insurer that a particular broker or agent shall act as the insured's representative' and . . . is not a creation of statute or regulation[, but, rather,] was developed by the insurance industry as a means of conducting business transactions." *Benefitvision Inc. v. Gentiva Health Servs., Inc.*, 2014 WL 298406, at *7 (E.D.N.Y. Jan. 28, 2014) (quoting Broker of Record Letters, Opinion of the Office of General Counsel of the State of New York Insurance Department (Jan. 9, 2006)).

requirements of Schedule 1 to the Marsh Confidentiality Agreements. *See* ECF No. 16-3. Conspicuously absent from Marsh's 26-page memorandum, ECF No. 163, is any statement that Marsh can demonstrate that any of the documents or information attached to its counsel's declaration, ECF Nos. 164 and 164-1–164-14, are, in fact, "Confidential Information or Trade Secrets" within the meaning of the Court's order and Schedule 1 to the Confidentiality Agreements. Defendants in good faith do not believe any of the information at issue is "Confidential Information and Trade Secrets" and further they could not make that determination without Marsh's cooperation. Marsh itself fails to make the necessary showing even as it moves for a finding of contempt against Defendants. Marsh's gamesmanship is unfair to Defendants and their counsel who have put forth every reasonable effort to comply with this Court's order as Defendants have reasonably interpreted it. Even still, Defendants, through counsel, have taken up the task of sifting through 18,000 records to review for potentially confidential information, trade secrets, or responsiveness to discovery requests. Even after determining that no material met the definition set forth by Schedule 1 and this Court's order, out of an abundance of caution, Defendants began rolling out production of documents to facilitate and expedite discovery.

As demonstrated below, Marsh brings this motion not because it can show there is any information worthy of protection or that Defendants failed to timely return that is causing Marsh harm, but rather because Marsh's intention at the outset was to find anything that it could use to seek sanctions and contempt against Defendants as part of its overall litigation strategy. To hold Defendants in contempt despite their earnest, good-faith conduct to make information available to counsel, and counsel's good-faith efforts to review all of that data in three business days with no cooperation from Marsh is inequitable and does not rise to the level of contempt. Marsh should

not be rewarded for deliberately creating the obstacles to compliance that it now uses as part of its litigation strategy to leverage the Court's order against Defendants.

In light of the foregoing, Defendants have, out of an abundance of caution, taken it upon themselves to engage a forensic vendor to (1) make new forensic images of the Defendants' previously imaged personal devices and email accounts to further preserve that material and (2) delete the documents and information Plaintiffs now complain must be returned to them and removed from Defendants' possession.[2] Defendants do not believe that the Court's order or the Confidentiality Agreements require them to go to such lengths, but Defendants are agreeing to do so now in a good-faith effort to appease Marsh's over-reach.

To the extent the reasonable, good-faith efforts Defendants and their counsel undertook were not what the Court intended in the September 18 order, Defendants respectfully request that the Court clarify what was intended. Defendants did not previously seek clarification because Marsh's interpretation was unreasonable in light of the language of the employment agreements and Schedule 1 of the Confidentiality Agreements, and Defendants thought Marsh would eventually cooperate. But Marsh has made it clear through its contempt motion that that is not the case. At bottom, Marsh's interpretation of the employment agreements and Confidentiality Agreements is unreasonable and Defendants seek the Court's guidance as to what full compliance with the September 18 order requires.

---

[2] Marsh eventually conceded during a meet and confer discussion on November 24, 2025 that Defendants may proceed to delete from their personal devices and email accounts the documents Defendants previously produced on October 21 and 30. Had this concession been offered before Marsh filed the instant motion and had Marsh reasonably cooperated with Defendants, the issues Marsh now raises could have been avoided in their entirety.

## STATEMENT OF FACTS

**I.    Defendants Promptly Complied with Their Contractual and Discovery Obligations.**

**A.    Defendants Complied with Their Obligations by Immediately Returning Property and Requesting Clarification on "Confidential Information and Trade Secrets."**

On July 21, 2025, Defendants tendered their resignations to Marsh. *See* ECF No. 82 at 8 (citing Parrish Decl. ¶ 21 (ECF No. 82-5); Lugones Decl. ¶ 18 (ECF No. 82-8); Lynn Decl. ¶ 2 (ECF No. 82-11)). On July 22, 2025, one day after their resignation, Defendants received correspondence from Marsh's outside counsel, Gibson Dunn, asserting duties and obligations Defendants owed pursuant to various restrictive covenants and confidentiality agreements they executed as part of their employment with Marsh. *See* ECF Nos. 164-1, 164-2, 164-3, 164-4. The letters made various demands on Marsh's behalf, including a demand that Defendants immediately return any Marsh devices in their possession. *See, e.g.*, ECF No. 164-1. Gibson Dunn further demanded that Defendants return any information subject to Marsh's Confidentiality Agreements that Defendants executed in conjunction with their employment. *Id.*

On July 24, 2025, Defendants' outside counsel wrote that "[a]s of this writing, 4 of the 5 clients that I represent have returned their Marsh phones and computers. Michael Brodie [who is not involved in this litigation] is doing so tomorrow." *See* ECF No. 164-5. The response letter continued by asking that Marsh provide a list of specific documents that Marsh would consider trade secret or confidential business information so the parties can work through a protocol to return or destroy them. *Id.*; *see also* Kevin McCoy Decl. ¶ 6. Defendants' counsel sent a follow-up email on July 25, 2025, again requesting clarity on the nature of the confidential information requested. *See* McCoy Decl., Ex. A (July 23, 2025 Letter from K. McCoy to J. Schwartz). All of

this occurred before Marsh filed this action and well before the Court entered the preliminary injunction order.

As described in Kevin McCoy's declaration, these discussions continued through a series of correspondence. *See* McCoy Decl. ¶ 7. Despite Defendants' repeated request for clarity, Marsh continuously declined to engage in reasonable, indeed necessary, conferences on the nature and scope of the confidential material requested. *See, e.g.*, ECF No. 164-6 at 2–3. Given the many demands Marsh was making of Defendants, Defendants filed a declaratory judgment action in New York state court seeking a determination of their obligations under their various agreements. Marsh then filed the instant action, including its motion for preliminary injunction that led to extensive briefing and oral argument held on September 4, 2025. At no point during the exchanges leading to Marsh's initiation of this action, through the briefing, or even in Gibson Dunn's responses to this Court's inquiries about what specifically Marsh considered to qualify as "Confidential Information and Trade Secrets" that needed to be returned has Marsh (or Gibson Dunn) provided a meaningful response.

Marsh has consistently responded with ambiguous non-answers, similar to how they answered the Court at the September 4, 2025 preliminary injunction hearing. At that hearing, the Court repeatedly inquired as to the scope of Marsh's requests for injunction regarding employee recruitment, client solicitation, and confidential information and property return. Each time Marsh failed to offer the Court the specificity it requested. *See, e.g.*, Sept. 4, 2025 Prelim. Inj. Hr'g Tr. 16:10–15 ("I believe it's in our order to show cause – that specifically enjoins, preliminarily enjoins the defendants from violating any of the restrictive covenants that they've agreed to. Court: You need to be more specific than that. That's the problem. I need to know practically what it is I'm telling them that they can and can't do."); *Id.* at 16:10–15 ("We are requesting that the

defendants be primarily enjoined from directly or indirectly violating their duties of loyalty to Marsh and contractual agreements with Marsh and its subsidiaries and affiliates from engaging—COURT: That's too general."). While the Court readily foresaw the inevitable issue with Marsh's non-answer—*i.e.*, what if nobody knows what Marsh is seeking—Marsh's response was both "Defendants will know" and "all the information on the Marsh platform," without regard for whether the information on Marsh's platform was actually confidential or a trade secret. *See, e.g.*, *id.* at 16:17–18:19 ([After Marsh's counsel recited contract language] COURT: Can you simplify that in non-legalese. A: The reason that that is so much in legalese is because that mirrors their contractual obligation. COURT: I understand that. But I'm trying to figure out how I'm supposed to interpret that if you come in here tomorrow and say we think they violated and they say they haven't. A: Yeah, I think if they know and we know which clients they had contact with and have confidential information and trade secrets about.); *id.* at 20:3–25 ("COURT: And what is the nature of the confidential information that you have evidence of its misuse or is your greatest concern?" A: . . . "[W]ith respect to clients, these defendants had access to copious amounts of confidential information concerning pricing strategies, business strategies, all the information on the Marsh platform that they had access to.").

### B. Defendants Promptly Collected Potentially Returnable Electronically Stored Information.

Despite Marsh's consistent refusal to assist Defendants in ascertaining what "Confidential Information and Trade Secrets" Marsh reasonably deemed returnable, Defendants immediately endeavored to comply with Marsh's request.

As outlined in the McCoy Declaration, Parrish Declaration, Lugones Declaration, and Lynn Declaration, all filed in support of this memorandum of law: (1) counsel gave Defendants preservation instructions concerning information residing on their personal devices and within

personal email and other accounts in July 2025; (2) counsel interviewed Defendants to identify the personal devices and locations where relevant information may reside; (3) counsel hired third-party vendors to forensically image Defendants' personal devices, personal email accounts, and messaging accounts used for business purposes during their employment with Marsh. In all, the collections amounted to 18,000 records consisting of four years of communications and information that Defendants' counsel manually and individually reviewed on a compressed schedule without search terms.

Three days before the September 18 order, Defendants received Marsh's first set of discovery requests and started their efforts to identify responsive documents even though Marsh refused to work with Defendants' counsel to agree upon search terms and a protocol for handling ESI. The Court then issued the September 18 order. ECF No. 129. In immediate compliance with the order, Defendants and their counsel confirmed that (1) all Marsh property in the form of devices had been returned, (2) Defendants did not have traditional client files or work papers in their home offices, (3) they did not store working client files on personal devices, and (4) they did not have portable storage devices, thumb drives, or other media that may contain client files. McCoy Decl. ¶ 16. Counsel then informed Marsh of these facts.

Defendants hired forensic firms to run searches across personally owned equipment and personal email accounts, with broad search terms (*e.g.*, "Marsh"). These efforts involved 10 lawyers and practice technology professionals, cost hundreds of thousands of dollars, and involved review of the 668 GB of data.

C.  **Without Participation by Marsh and in an Abundance of Caution, Defendants Produced Information that Marsh May Claim as Confidential and Trade Secret Information as Timely as Feasible.**

Still with no participation or cooperation from Marsh, and even while the parties had not established any discovery protocols, on October 21, 2025, Carlton Fields wrote to Gibson Dunn: "As part of the discovery process, we have been reviewing documents collected from various electronic devices owned by our clients. In doing so, we have come across some materials relating to Marsh's business." ECF No. 164-11. The communication explained, "While we did not see any materials that would qualify as 'Confidential Information and Trade Secrets,' we want to err on the side of caution, so are advancing the return of these documents to you via the access credentials below while the parties are working through a complete discovery protocol." *Id*. Defendants' production was, therefore, both overly cautious and overly inclusive given the lack of affirmative guidance as to what Marsh considered "confidential" or "trade secret."

As Defendants had previously and repeatedly flagged, and as this Court presaged during oral argument, the parties had different understandings as to what constituted "Confidential Information and Trade Secrets" under the Confidentiality Agreements. Despite Defendants' every effort to request clarity on what Marsh considered compliant, Marsh stonewalled Defendants and have now sprung upon Defendants the instant motion alleging non-compliance, despite its own refusal to facilitate or engage with Defendants and their continued outreach for clarity. This is best shown by Marsh's October 27, 2025 Letter to Defendants, in which Marsh wrote through counsel:

> Defendants Lugones, Layton and Lynn have sworn under the penalty of perjury that they did not take Marsh's confidential information. And, as their counsel, you affirmed to us that all Marsh property had been returned weeks ago as required by the injunction. Defendants' declarations and your affirmations were false. This week you produced hundreds of Marsh documents still in Defendants' possession, nearly a month after their Court-ordered deadline to search for and return them.

12

ECF No. 164-12. Defendants, through counsel, replied: "As we repeatedly have assured Marsh, Defendants have no interest in possessing Marsh's confidential information." ECF No. 164-13. "From [Defendants'] earliest correspondence in this case, we have requested that Marsh identify any types of confidential documents it believes Defendants may possess so that counsel can search for such information and ensure that it is returned." *Id*.

Defense counsel re-raised the issue of Marsh providing direction on what types of categories or search terms it believed was appropriate to use. Counsel also flagged that, without Marsh engaging in the process, it would have to apply its own subjective interpretation, even though counsel did not believe any of the information qualifies under the definition adopted by the preliminary injunction order. Counsel also explained that Defendants were trying to fully comply with the order, but this was impossible to do without Marsh's cooperation. McCoy Decl. ¶ 24.

## II.    The Facts Show that Defendants Complied with the Order in Good Faith.

As Defendants have repeatedly articulated to Marsh, under the definition of "Confidential Information and Trade Secrets" as adopted by the Court in the September 18 order and as defined in Schedule 1 of the Confidentiality Agreements, Defendants did not retain any Marsh property beyond the five-day period ordered by this Court. Defendants returned all Marsh-issued devices, they retained no client files or work papers, and they did not have portable storage devices, thumb drives, or other media that may contain client files. The documents that counsel retained through forensic imaging of Defendants' personal devices did not fall within the definition of "Confidential Information and Trade Secrets" as that definition consists of "items of information relating to the Company, its products, services, clients, suppliers, vendors, business partners, and employees that derive independent economic value, actual or potential, from not being generally known or available to the general public," among other requirements. ECF No. 16-3 at 6. Defendants also

13

are uncertain of and expect they reasonably disagree on which, if any, documents "have been developed, compiled or acquired by the Company at its effort and expense," as certain materials were developed by Defendants prior to their employment at Marsh and others were plainly not created by Marsh (*e.g.*, BORs). *See id.*

Separately, in response to Marsh's written discovery requests, counsel conducted a manual search through the ESI that was preserved from Defendants' devices. In this review, counsel found 423 documents that related to Marsh and produced them to Marsh to comply with discovery obligations. Counsel also offered to delete those files so long as Marsh agreed that it would not consider the deletion of this data spoliation. Marsh has at no point before the instant motion offered additional explanation as to why any given document would fall within the scope of the Court's September 18 order in that the document had "independent economic value . . . from not being generally known or available to the general public" or was "developed, compiled or acquired by the Company at its effort and expense."

Defendants reasonably endeavored to comply with the Court's September 18 order. Marsh's counsel's assertion in their October 25 Letter that "[t]he hundreds of documents you produced . . . are unquestionably covered by the Court's preliminary injunction order and Defendants' contracts and thus should have been returned to Marsh long ago" is unfounded. *See* ECF No. 164-12 at 4. Marsh's sole basis for its argument is that "the documents relate to Marsh's products, services, and clients along with other sensitive confidential information all of which Marsh developed, compiled or acquired with considerable effort and expense." *Id.* But Marsh completely avoids the necessary threshold analysis of whether such documents meet the requirement of having an "independent economic value" derived from being non-public, nor does it advance any factual support for the claim that the documents were "developed, compiled or

acquired by the Company at its effort and expense," or any of the other requirements of Schedule 1 of the Confidentiality Agreements.

Without these essential, threshold determinations—which Marsh itself baked into its contract, and which this Court incorporated into its preliminary injunction order—Defendants have no means to determine how any given document is confidential or a trade secret. Defendants have noted this issue and requested Marsh's input repeatedly, yet Marsh has refused to engage and help inform Defendants as to what Marsh considers confidential—despite simultaneously reiterating how critical it is that Marsh receive these materials. Marsh's attempt to blanketly claim as confidential any document that so much as mentions Marsh or any person or organization who was a client of Marsh is too broad of a brush to reasonably apply. Much of the information is *not* Marsh property and indeed is information or material derived from Defendants' own relationships with their personal clients, information that has no economic value by nature of being private, was not developed, compiled, or acquired by Marsh at its effort and expense, or otherwise falls outside the scope of the reasonable understanding of Schedule 1 and the Court's order.

## LEGAL STANDARD

Courts have "have inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)); *see also* 18 U.S.C. § 401. The purpose of civil contempt is "to compel a reluctant party to do what a court requires of [it]." *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986). A punishment for civil contempt "coerce[s] the defendant into compliance with the court's order, and . . . compensate[s] the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–304 (1947).

The judicial power of contempt is circumscribed, and "[t]he failure to meet the strict requirements of an order does not necessarily subject a party to a holding of contempt." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 291 (2d Cir. 2008). A contempt order does not accomplish its purpose where defendants have complied or are endeavoring to comply with a court's order. *See Badgley*, 800 F.2d at 36.

Civil contempt proceedings are subject to a higher standard of proof than the "preponderance of the evidence" standard applicable to ordinary civil cases. *See King v. Allied Vision, Ltd.*, 919 F. Supp. 747, 752 (S.D.N.Y. 1996). The party seeking contempt must offer "proof of noncompliance by clear and convincing evidence." *Id.*

When proving by a clear and convincing standard that a party warrants a civil contempt punishment, the complaining party must offer "a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." *N.Y. Real Estate Inst., Inc. v. Jammula*, 379 F. Supp. 3d 266, 269 (S.D.N.Y. 2019). Indeed, Courts have regularly held that it is only proper to find a party in civil contempt "if the complainant proves: 1) the existence of a clear and unambiguous order; 2) that the contemnor has not complied with the order; and, 3) that the contemnor has not been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'" *King*, 919 F. Supp. at 752 (citing *Drywall Tapers, Local 1974 v. Local 530*, 889 F.2d 389, 394 (2d Cir. 1989)); *see also Jammula*, 379 F. Supp. 3d at 269; *Grand v. Schwarz*, 2018 WL 1583314, at *3 (S.D.N.Y. Mar. 27, 2018).

In analyzing whether a party has been "reasonably diligent and energetic" in attempting to accomplish a court's order, the Court must "examine the defendant's actions and consider whether they are based on a good faith and reasonable interpretation of the court order." *Schmitz v. St. Regis Paper Co.*, 758 F. Supp. 922, 927 (S.D.N.Y. 1991). Additionally, courts may consider "whether

16

the defendant in face of the requirements of a court order has neglected to marshal its own resources, to assert its own authority, and to demand needed results from subordinate individuals and agencies; and whether the defendant has 'displayed an evident sense of non-urgency bordering on indifference.'" *Id.* (declining to find a party in contempt because defendant's actions were "based on a good faith and reasonable interpretation of the court order"); *Aspira of N.Y. v. Bd. of Educ. of the City of N.Y.*, 423 F. Supp. 647, 654 (S.D.N.Y. 1976).

## ARGUMENT

### I.    Marsh Has Not Met Its Burden to Prove a Finding of Contempt Is Warranted.

A party requesting contempt must prove: (1) the existence of a clear and unambiguous order; (2) that the contemnor has not complied with the order; and (3) that the contemnor has not been reasonably diligent and energetic in attempting to accomplish what was ordered. *See King*, 919 F. Supp. at 752; *Drywall Tapers*, 889 F.2d at 394; *Grand*, 2018 WL 1583314, at *3; *Jammula*, 379 F. Supp. 3d at 269. Marsh cannot show that any of these elements are fully satisfied.

### A.    In Incorporating the Confidentiality Agreements, the Court's Preliminary Injunction Order Was Unclear and Ambiguous.

An unambiguous order is "one that leaves 'no uncertainty in the minds of those to whom it is addressed,' who 'must be able to ascertain from the four corners of the order precisely what acts are forbidden.'" *King*, 919 F. Supp. at 752, n.9. Given the Court's use of the contested phrase "property" and its incorporation of Marsh's Confidentiality Agreement, essential terms that contour Defendants' obligations are unclear and ambiguous such that contempt is inappropriate in this case. *See id.* at 752.

First, the order incorporated, but did not define, the term "Marsh property." In the absence of an explicit definition, Defendants turned to the language in their employment agreements, which generally uses the term "property" to refer to physical property like cell phones, laptops, and other

equipment. *See, e.g.*, ECF 16-3 ¶ 4(a)(ii) ("all property of the Company, including but not limited to, supplies, keys, access devices, cellphones, laptops, iPhones, iPads, books, identification cards, computers, telephones and other equipment . . . ."). All such physical items in Defendants' possession, custody, and control were promptly returned to Marsh before this case was filed. Marsh has not argued otherwise.

To the extent "Marsh property" arguably also included ESI, the employment agreements only require Defendants to return "media *or property* in my possession or control *which contain or pertain to Confidential Information or trade secrets*." *Id.* ¶ 4(a)(i) (emphasis added). So, to the extent "Marsh property" includes ESI, that information must contain or pertain to Confidential Information or Trade Secrets before there is any obligation to return it. That inquiry brought Defendants back to the definition of "Confidential Information and Trade Secrets" in Schedule 1 of the Confidentiality Agreements and all its qualifiers for determining what is actually confidential and trade secret. *See, e.g.*, ECF No. 16-3 Schedule 1(a). Marsh now argues that the term "Marsh property" had a much broader meaning—essentially every document that so much as mentioned Marsh. Defendants do not believe that that is what the Court intended. The lack of clarity as to what is encompassed by the term "Marsh property" and the relationship to the Employment Agreements and Schedule 1 of the Confidentiality Agreements created an ambiguity that has complicated compliance, and precludes contempt.

Second, the order's incorporation of the definition of "Confidential Information and Trade Secrets" in Schedule 1 of Defendants' Confidentiality Agreements (*e.g.*, ECF No. 16-3) created uncertainty as to how to determine whether specific documents met the qualifications to be considered "Confidential Information and Trade Secrets." Defendants reasonably interpreted the definitions relied on in the order and the term "property," and each of them determined that they

did not possess or retain any documents subject to the order. However, to the extent the Court understood the definition to be broader, the ambiguity must be resolved against Marsh. Marsh must weigh in on its own understanding of "economic value" and confidentiality to account for relevant factors that courts routinely consider (and Schedule 1 to the Confidentiality Agreements independently requires) to determine confidentiality and trade secret protection.

As New York courts have routinely held, a party cannot merely assert the information they seek is confidential or a trade secret without more supporting allegations. When one party seeks "confidential information" from another, more definition is needed to "generally define the trade secrets at issue[.]" *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018) ("Alleging the existence of general categories of 'confidential information,' without providing any details to 'generally define the trade secrets at issue,' does not give rise to a plausible allegation of a trade secret's existence.") (citations omitted).

Although the party asserting a trade secret need not "reveal its secrets . . . to prove that they exist . . . claim[ing] general categories of information and data as trade secrets does not state a claim . . . because it does not adequately put the defendant on sufficient notice." *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 404 (S.D.N.Y. 2021); *see also Ad Lightning Inc. v. Clean.io, Inc.*, 2020 WL 4570047, at *2 (S.D.N.Y. Aug. 7, 2020) ("'[A] party alleging that it owns a trade secret must put forth specific allegations as to the information owned,' such that the opposing party is given fair notice of the claim."); *Harley Marine NY, Inc. v. Moore*, 716 F. Supp. 3d 21 (N.D.N.Y. 2024). Without Marsh's input and guidance as to whether a document, among other qualifiers, had independent economic value by nature of being private and was developed by Marsh, Defendants in good faith believe that they were compliant in first determining they had no additional Marsh property, and secondly that they did not retain any "Confidential Information or Trade Secrets."

Marsh contends that "Confidential Information and Trade Secrets" is a defined term in these agreements and may include information relating to Marsh's business, "its products, services, clients, suppliers, vendors, business partners, and employees," including (but not limited to) "financial and business information," "plans for future business," "product and technical information," "client information," including information about clients' policies, and "any and all information in whatever form relating to any client or prospective client of the Company." ECF Nos. 16-3 at 6 (Parrish), 16-9 at 6 (Lugones), 16-16 at 6 (Lynn). However, Marsh ignores the integral prerequisites that, *inter alia*, such information must "derive independent economic value . . . from not being generally known."

To the extent this Court intended a broader definition, Defendants respectfully request the Court's guidance. Despite Defendants' best attempts to garner cooperation, Marsh did not offer any subjective determinations as to what information has "independent economic value." By refusing to share its position on this critical component of the definition, and by blanketly refusing to engage in any meaningful exercise to determine what would fall within the scope of confidentiality and trade secret, Marsh left Defendants to resolve the definitional ambiguity in the order by performing an a document-by-document assessment to see which materials may have "independent economic value from not being generally known" and were developed by Marsh at Marsh's expense.

Further complicating the review (and consuming additional time to complete it), New York case law makes clear the import of the "independent economic value" analysis and the determination as to whether Marsh developed the documents at their own expense, as several courts have found the same or similar types of documents are *not per se* protected. *See, e.g., Dewitt*

*Stern Grp. v. Eisenberg*, 257 F. Supp. 3d 542, 582–85 (S.D.N.Y. 2017). For example, courts have found:

- Client Lists: In some circumstances, client lists are not trade secrets, particularly where "[a] client list created through 'widespread canvassing of an obvious and highly competitive market.'" *TNS Media Rsch., LLC v. TRA Glob., Inc.*, 977 F. Supp. 2d 281, 313 (S.D.N.Y. 2013).

- Personal Client Information: Personal clients, and by extension information and documents about these clients, not generated by Marsh at Marsh's expense are not confidential information or Marsh property. Courts have found that "it would be unreasonable to extend the covenant to personal clients of defendant who came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, which [Former Employer] neither subsidized nor otherwise financially supported." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 393 (N.Y. 1999). Information about Defendants' personal clients are neither Marsh property nor Confidential Information. *See id.* (also holding "[b]ecause the goodwill of those clients was not acquired through the expenditure of BDO's resources, the firm has no legitimate interest in preventing defendant from competing for their patronage").

- Business Strategy: Material referencing business strategy is not universally determined to be a trade secret. For example, a party does misappropriate a secret business plan where records and references to that plan were merely to "perform a 'course correction' with the 'focus' of 'build[ing] [a] platform for [one hundred million dollars in] revenues" because "information consisting simply of business possibilities or goals is not a trade secret." *TNS Media Rsch.*, 977 F. Supp. 2d at 315.

- <u>Price Lists and 'Marketing Plans'</u>: Similarly, price lists, product samples, and marketing plans were "all items that are not, as a matter of law, protected as trade secrets." *Id.* at 315.

Here, Marsh has offered no argument or factual support for why any given document is confidential or a trade secret. Even setting aside the issue of economic value and non-disclosure, Marsh has made no credible or well-founded allegations that the materials Defendants have are derived from Marsh's own efforts—as opposed to Defendants' independent efforts to recruit and retain their personal clients. Nor has Marsh demonstrated that any material Defendants have is not otherwise derived from publicly available information.

Defendants also have navigated multiple layers of competing obligations that have complicated any reasonable understanding of "property," "confidential information," "trade secrets," particularly in relation to their separate discovery obligations. The Court's September 18 order was issued three days after Defendants received their first discovery requests from Marsh. This written discovery included broad requests for a sweeping set of documents, including: "All Documents and Communications concerning Marsh Clients and Prospective Marsh Clients, including, but not limited to, Communications with Marsh Clients," and "All Documents created, revised, or maintained at Marsh and/or using Marsh resources." *See* McCoy Decl., Ex. (Pl. Marsh USA's First Set of Reqs. for the Produc. of Docs. to Def. Michael Parrish). To interpret both the discovery requests and the preliminary injunction order as requiring the simultaneous return and deletion of documents per the order *and* the production of those materials in response to discovery would have been illogical. Defendants reasonably did not interpret the ambiguity in the preliminary injunction order as rendering the parties' ordinary discovery process and ongoing meet and confers as moot. Instead, Defendants justifiably understood that the order to return property

was narrower than the broad scope of normal discovery, and Defendants asserted that they had complied with the order by returning all devices and papers and were engaging in discovery of documents that may be responsive to Marsh's requests. Even if the Court were to disagree with Defendants' interpretation of their conflicting obligations, Defendants endeavored to comply in good faith and any mistake in compliance was due to the ambiguity and uncertainty under these contradictory obligations.

### B.  Defendants Complied with the Court's Order.

Defendants in fact did return the required Marsh property and Confidential Information and Trade Secrets. Defendants all immediately offered and turned over their Marsh-issued physical property before this case was filed, including: (1) company cellphones; (2) company laptops; and (3) hard copy files, where applicable.

Then, on October 21, 2025, Defense counsel noted that:

> As part of the discovery process, we have been reviewing documents collected from various electronic devices owned by our clients. In doing so, we have come across some materials relating to Marsh's business. While we did not see any materials that would qualify as "Confidential Information and Trade Secrets," we want to err on the side of caution, so are advancing the return of these documents to you via the access credentials below while the parties are working through a complete discovery protocol.

ECF No. 164-11.

Defendants' repeated outreach evinces their commitment to compliance, their immediate concerns about the ambiguity of their obligations, and a repeated effort to work with Marsh to ensure the return of property and confidential information. *See Schmitz*, 758 F. Supp. at 927. Still, counsel is unable to certify compliance where they do not know what measures are required or what "full compliance" means. Defendants marshaled their resources to act as expeditiously as feasible and consistently reported on collection efforts and preservation efforts, and Defendants

23

made productions even without the requisite participation from Marsh. *See id.*; *Aspira of N.Y.,* 423 F. Supp. at 654. And, to be clear, Marsh has not alleged that Defendants have themselves accessed or utilized these materials or shared them in any way. These are materials found in the recesses of devices and email accounts that were located via forensic search and were promptly returned.

From the beginning, Marsh has been far less interested in the return of information than in being able to allege that Defendants violated their obligations. On a meet and confer call on October 27, for example, when Defendants' counsel sought guidance and search terms Defendants could use to identify any purportedly confidential information. Marsh's counsel responded that it was not Marsh's responsibility to help Defendants comply with the Court's order. Parties seeking the urgent return of property, confidential information, and trade secrets would surely have endeavored to cooperate more than Marsh has.

Marsh has not met its burden to explain by clear and convincing evidence why Defendants' repeated, persistent, and energetic efforts to comply with the Court's order, despite the lack of clarity and ambiguity therein, should warrant a finding of contempt. *King*, 919 F. Supp. at 752–53; *Schmitz*, 758 F. Supp. at 927.

### C.    Defendants Have Been Reasonably Diligent and Energetic in Attempting to Accomplish What Was Ordered.

Marsh has not met its burden to show that Defendants were not "reasonably diligent and energetic in attempting to accomplish what was ordered.'" *See Schmitz*, 758 F. Supp. at 927. As outlined above, Defendants' prompt efforts to return all property in their possession within days of termination, their correspondence and attempts to have Marsh participate in the process of determining what is responsive, returnable property, and their subsequent, overly broad productions makes clear that at a minimum Defendants engaged in good-faith, energetic efforts to comply both with their contractual obligations and the order. *See id.* Defendants, through counsel,

leveraged the resources they had, collected the documents and files in their possession, and turned over what they had in the time they could.

Defendants have also complied with the spirit of the Court's order, *i.e.*, avoiding "any use and/or disclosure of Plaintiff's confidential information." *See* ECF No. 130 at 6. There is no allegation that Defendants themselves have improperly accessed or utilized these materials or shared them in any way.

## II.     Marsh's Other Proposed Obligations on Defendants Are Inappropriate and Premature.

### A.     Additional Discovery Is Unnecessary and Unwarranted Given Defendants' Ongoing Compliance Efforts.

The Court's power to "enforce compliance with their lawful orders through civil contempt," is designed "to compel a reluctant party to do what a court requires of [it]." *Spallone*, 493 U.S. at 276. Any punishment for civil contempt "coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." *United Mine Workers of Am.,* 330 U.S. at 303–304. Here, however, Defendants have complied both in that they returned property in their possession, made additional productions of material even beyond what Defendants reasonably believe is Marsh "Confidential Information and Trade Secrets," and have requested additional guidance and cooperation from Marsh at each step of the process. There is no legitimate basis for deeming Defendants to be non-compliant, and if they have, it is exclusively because Defendants are unable to read Marsh's mind.

"[N]othing in Rule 26(g) obligates counsel to disclose the manner in which documents are collected, reviewed and produced in response to a discovery request." *Brown v. Barnes & Noble, Inc.*, 474 F. Supp. 3d 637, 644 (S.D.N.Y. 2019). Further, this Court has found that "discovery on discovery" is not appropriate unless the party seeking such discovery has provided an "adequate

factual basis" to justify the discovery, and the Court "must closely scrutinize the request 'in light of the danger of extending the already costly and time-consuming discovery process ad infinitum.'" *Haroun v. ThoughtWorks, Inc.*, 2020 WL 6828490, at *1 (S.D.N.Y. Oct. 7, 2020) (citing *Winfield v. City of New York*, 2018 WL 840085, at *3 (S.D.N.Y. Feb. 12, 2018)). Indeed, counsel is not traditionally required "to disclose the manner in which documents are collected, reviewed and produced in response to a discovery request." *Id.*

Here, there is no adequate factual basis to justify "discovery on discovery." *See Haroun*, 2020 WL 6828490, at *1. The parties have produced all relevant correspondence between them regarding negotiations and discussions on the issue, and Defendants have squarely and plainly outlined the measures they have taken to preserve, collect, and produce not only documents that are potentially responsive or related documents in this case, but *all* documents and records in Defendants' personal possession. If that were not enough, and it is, both counsel and Defendants have each attached declarations to this response explaining in detail the measures each has taken to comply. Even though counsel is not ordinarily or traditionally required to make such disclosures, in a proactive effort to comply, Defendants have outlined their preservation and collection efforts at the outset of this litigation. Further, Defendants *have* produced additional material out of an abundance of caution and have invited Marsh to provide other specific requests if they believe prior productions are insufficient. For these reasons, additional discovery on these measures is unnecessary, overly burdensome, and not productive to the needs of this case.

**B.    Marsh Asserts No Legitimate Basis for Fees or Costs.**

"[T]he imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir.

2004). However, any such per diem sanction "may not be imposed as a purely punitive measure." *Id.* "Compensatory sanctions should reimburse the injured party for its actual damages." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989). Before imposing such a sanction, the Court should consider "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *Id.*

Marsh suggests a "daily fine, payable to the Court, running from the finding of contempt until each Defendant purges their contempt by submitting a sworn certification that they have fully complied with the preliminary injunction and have returned all Marsh property." *See* ECF No. 163 at 22. This fine, however, would not remedy Marsh's concern, as Defendants are unable to certify compliance or proceed in satisfying any outstanding obligations until Marsh participates and offers guidance on what types of material require return. Defendants have energetically attempted to comply, have requested Marsh's participation, produced overbroad material in response to discovery, and are continuing to negotiate additional discovery parameters through meet and confers. Marsh's proposed fine of $10,000 per Defendant per day does not accomplish any non-punitive goal, and is certainly disproportionate to the needs of this case, especially where Defendants have already produced and are in the process of deleting documents.

Additionally, while Courts have held that a contemnor's actions need not be willful to warrant a punishment of contempt, the Second Circuit has determined that "the contempt had to have been willful in order for the victorious party to receive attorney's fees for the cost of prosecuting the contempt." *King*, 919 F. Supp. at 752; *Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd.*, 885 F.2d 1, 8 (2d Cir. 1989). A complaining party "must show by clear and convincing

evidence" that the contemnor's actions were willful for there to be an award of attorney's fees for prosecuting the contempt. *King*, 919 F. Supp. at 752; *Pearlman v. Bouchard*, 1992 WL 125542, *3 (S.D.N.Y. May 28, 1992).

Even if this Court were to determine that a finding of contempt is appropriate, there is no evidence suggesting Defendants' (asserted) non-compliance was willful. Defendants, since the date they resigned, have undertaken proactive outreach, proactive collection, and diligent search and production efforts to comply in good faith with their obligations and this Court's order. Even if the Court were to determine that were not enough to sufficiently comply, Defendants have additionally produced and returned over 400 documents including the term "Marsh" in an overly broad effort to *ensure* compliance. There is no question that Defendants have been striving for compliance, taking as expeditious measures as possible to go beyond what they believed was required.

Marsh's motion is unnecessary, wasting this Court's resources when meet-and-confer efforts would have been sufficient. Marsh could have avoided this situation had they participated in meaningful dialogue and cooperated with Defendants at any step in this process prior to filing their contempt motion. If anything, it is Marsh that should pay Defendants' fees given its refusal to cooperate and because Defendants have now been required to dedicate resources to responding to this motion instead of productively advancing this case.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court deny Marsh's motion and grant such further relief as the Court deems proper.

Dated: December 1, 2025

/s/ Kevin P. McCoy
Kevin P. McCoy (*pro hac vice* admitted)

CARLTON FIELDS, P.A.
Corporate Center Three at International Plaza
4221 W. Boy Scout Boulevard, Suite 1000
Tampa, FL 33607
(813) 229-4272 (Telephone)
(813) 229-4133 (Facsimile)
Email: kmccoy@carltonfields.com

Michael L. Yaeger
CARLTON FIELDS, P.A.
730 Third Avenue, 19th Floor
New York, NY 10017
(212) 380-9623 (Telephone)
(212) 785-5203 (Facsimile)
Email: myaeger@carltonfields.com

Steven J. Brodie (*pro hac vice* admitted)
CARLTON FIELDS, P.A.
2 Miami Central
700 NW 1st Ave., Ste 1200
Miami, FL 33136
(305) 539-7302 (Telephone)
(305) 530-0055 (Facsimile)
Email: sbrodie@carltonfields.com

*Attorneys for Defendants Michael Parrish,*
*Giselle Lugones, and Robert Lynn*

## <u>CERTIFICATE OF WORD COUNT</u>

As required by S.D.N.Y. Local Rule 7.1(c), I hereby certify that Defendants' Memorandum of Law in Opposition to Plaintiff's Proposed Order to Show Cause for Contempt of the Court's Preliminary Injunction contains 8,748 words, excluding the parts of the document that are exempted by rule.

Dated: New York, New York
      December 1, 2025

                                      */s/ Kevin P. McCoy*
                                      Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 1, 2025, I served the foregoing document by e-mail on all counsel of record.

/s/ Kevin P. McCoy
Attorney